**Cheryl KLINGER, Linda Lange, Gweniver Lay, Stacy Finn, Individually and on Behalf of Others Similarly Situated, Plaintiffs,**

v.

**NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES, Frank Gunter, former Director, Nebraska Department of Correctional Services, Harold Clarke, Director, Nebraska Department of Correctional Services, Larry Tewes, Assistant Director, Nebraska Depart-**

---

ment of Correctional Services and former Acting Superintendent of Nebraska Center for Women, Victor Lofgreen, former Superintendent of Nebraska Center for Women, Larry Wayne, Superintendent of Nebraska Center for Women, Judith Danielson, Psychologist, Nebraska Center for Women, Margaret Wehland, Medical Nurse, Nebraska Center for Women, Defendants.

No. CV88–L–399.

United States District Court,
D. Nebraska.

June 21, 1993.

Gail Perry, Bob Grimit, Baylor, Evnen, Curtiss, Grimit S. Witt, Lincoln, NE, for plaintiffs.

Elaine Chapman, Laurie Smith–Camp, Asst. Attys. Gen., Lincoln, NE, for defendants.

MEMORANDUM OPINION ON LIABILITY, INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW, AND RELATED ORDER

KOPF, District Judge.

After a month-long trial which produced countless exhibits, over 5,450 pages of transcript,[1] and more than 350 pages of posttrial briefs, the primary issue boils down to this: Regarding programs and services, have female prisoners been given a fair shake by the State of Nebraska when compared to male prisoners? By and large, the answer to that question is no.

Although women prisoners are generally well treated by a very competent and extremely dedicated superintendent and staff at the one Nebraska prison for women, I find and conclude that in important respects regarding programs and services, both presently and in the past, Nebraska has violated, and does now violate, the rights of women prisoners guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the Constitution. Accordingly, pursuant to Rule 52 of the Federal Rules of Civil Procedure, I now set forth the findings of fact and conclusions of law which have informed my decision.[2]

## I. Introduction

### A. Background

#### 1.

If you are a woman, if you break the law in Nebraska, and if you are required to serve a prison sentence, you will be sent to the Nebraska Center for Women (NCW). NCW is located in York, Nebraska, a small town in east central Nebraska located about 100 miles from Omaha, Nebraska, and about 50 miles from Lincoln, Nebraska. NCW is the only prison for women in Nebraska. Thus,

1. Because of plaintiffs' lack of funds, the court reporter agreed to produce an unedited, computer-generated transcript at a substantially reduced cost for use by the parties in preparation of their posttrial briefs. I have referred to this unedited transcript in this memorandum. If an edited transcript is prepared for purposes of appeal, that transcript may, of course, vary from the unedited transcript. The Clerk of the United States District Court for the District of Nebraska shall file the unedited transcript with the exhibits in this case.

2. It is my intention that any finding of fact which is more appropriately considered a conclusion of law shall be so construed, and it is likewise my intention that any conclusion of law which is more appropriately considered a finding of fact shall be so construed.

no matter what your crime, and regardless of whether you are classified as a minimum, medium or maximum custody inmate, you will do your time at NCW.

Although this case is not about ambience, in many respects NCW looks like a college campus. The chief administrator at NCW is called a "superintendent." There are no gun towers. However, the "campus" is surrounded by a tall, barbed-wire fence. During the times pertinent to this lawsuit, the population at NCW ranged from about 90 inmates to about 130 inmates and included inmates with minimum, medium, and maximum custody designations.

If you are a man and you break the law in Nebraska you could be sent to any one of a number of penal institutions to serve your sentence. Where you go generally depends on your custody classification.

You could be sent to the Hastings Correctional Center (HCC) in Hastings, Nebraska. You could be sent to the Omaha Correctional Center (OCC) in Omaha, Nebraska. You could be sent to the Lincoln Correctional Center (LCC) in Lincoln, Nebraska.

If you are a man, you could also be sent to the Nebraska State Penitentiary (NSP) which is located in Lincoln, Nebraska, near LCC. NSP normally houses medium and maximum custody inmates, but does not normally house minimum custody inmates.

NSP looks like a traditional prison. Thick block walls or very tall fences with barbed wire surround the prison. A number of gun towers overlook NSP. During the times pertinent to this lawsuit, the NSP inmate population ranged from about 650 inmates to something less than 800 inmates. The chief administrator at NSP is called a "warden."

All prisons in Nebraska are run by a state agency known as the Department of Correctional Services (DCS). DCS is located in Lincoln, Nebraska. The chief administrator of DCS is called a "director." The director of DCS has the power to set policy. The director assigns and reassigns superintendents and wardens.

2.

By January, 1988, some of the women inmates at NCW were upset. They perceived an inequality in the treatment they received compared to the treatment male inmates received. Specifically, the women were concerned about programs—such as education—and services—such as the law library. The NCW inmates corresponded with an inmate who served as a legal aide at NSP, and that correspondence evidently did not alleviate the concerns of the NCW inmates. Believing they were being treated unfairly, the women prepared a written grievance and circulated it among the other inmates at NCW. The superintendent of NCW became aware of the grievance while it was being circulated.

In late January, 1988, the superintendent had a meeting with certain DCS staff members and the heads—wardens and superintendents—of all the adult prisons in Nebraska. This was a regularly scheduled meeting. At the meeting, the NCW superintendent told those in attendance, among other things, that the inmates at NCW had corresponded with the legal aide at NSP, that the women were concerned about the perceived inequality of certain programs provided for the women when compared to what the men received, and that the superintendent expected a grievance to be filed. He also warned of the possibility of federal litigation.

The director of DCS was not present at the meeting in late January, 1988. But, as was the normal practice, the director received what were in essence minutes of the meeting. The announcement of the NCW superintendent about the inmate grievance was described in the minutes.

In early March, 1988, more than half the inmates at NCW signed a grievance and delivered it to the superintendent at NCW. The grievance was long and detailed, but essentially complained that the women were not receiving parity of treatment in programs and services as compared to male inmates.

The NCW superintendent acknowledged receipt of the grievance, but refused to deal with it because, according to the superintendent, it required certain comparisons which

the NCW staff could not make. The superintendent suggested to the NCW inmates that they submit the grievance to the director of DCS.

The NCW inmates submitted the grievance to the director of DCS in early March, 1988. Legal counsel for DCS looked into the grievance and prepared a draft letter in response to the grievance for signature by the director. In the latter part of March, 1988, the director of DCS had a meeting with the heads of all the adult prisons and certain DCS staff members. The grievance was discussed. It was agreed that the letter drafted by counsel should be sent in response to the grievance. Soon thereafter, in March, 1988, the letter was sent to the inmates at NCW.

The response of the director of DCS was long and detailed, like the grievance of the NCW inmates. In most important respects, the letter response denied any inequality. In three important respects—lack of equal pay, lack of visitation for orientation inmates, and lack of inmate training regarding legal research—the director promised some relief. Relief was granted in other minor respects, such as equalizing when the lights had to be turned off. The director also informed the inmates that a "task force" had been established to assure consistency.

By mid–July, 1988, the promised equal pay had not come about. By mid–July, 1988, no NCW inmate had completed training in legal research. There is a dispute as to whether the orientation visitation policy had changed by mid–July, 1988. The NCW inmates had heard nothing from the "task force."

## B. Procedural History

### 1.

The initial complaint in this case was filed pro se by certain NCW inmates on July 20, 1988.[3] (Filing 2.) The case was assigned to the Honorable Warren K. Urbom, who was then a United States District Judge in active service.

In October, 1988, counsel was appointed to represent the pro se plaintiffs. (Filing 5.)[4] In January, 1989, counsel filed an amended complaint, (Filing 12), and a motion for class-action certification. (Filing 13.)

Judge Urbom granted the class-action motion, and certified the class this way: "The class shall consist of all female prisoners at [NCW] as of the filing of this action and all women who will be confined at NCW up until the conclusion of this lawsuit." (Filing 19, ¶ 2 of the order.) The plaintiffs then moved to clarify the class certification because one of the plaintiffs had been released from NCW a few days prior to suit being filed. (Filing 21.)

The class was redefined on April 19, 1989, to "include all female prisoners confined at [NCW] in York, Nebraska (NCW) as of January 1, 1988, and all female prisoners who will be confined at NCW until the conclusion of this lawsuit." (Filing 26, ¶ 2, at 2.) The phrasing of the last order was that of United States Magistrate Judge Piester, based upon his understanding of what the parties had agreed to. (Id.) For practical purposes, the court certified the class as all women who were NCW inmates at any time on or after January 1, 1988, through the conclusion of this case.[5]

3. After various amended complaints were filed, it is clear that the court has jurisdiction over the persons of the defendants and it is equally clear that the court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). This action is brought pursuant to 42 U.S.C. §§ 1983 and 1985, and 20 U.S.C. § 1681(a).

4. The law firm of Baylor, Evnen, Curtiss, Grimit & Witt represented the named plaintiffs and later the class. Three lawyers from the Baylor firm appeared at trial for the plaintiffs: Ms. Perry, Mr. Grimit, and Mr. Dudley. Appointed counsels' service was of the very highest caliber, no doubt at great personal sacrifice to the lawyers, who, of course, were not being paid. The court

appreciates the willingness of counsel to accept the appointment in this case.

5. Defendants argue that the class does not consist of persons who were incarcerated at NCW after January 1, 1988, but released before the conclusion of this lawsuit. Stated differently, defendants contend that the class includes only those (1) who were incarcerated on January 1, 1988, or (2) who are incarcerated at NCW at the conclusion of the lawsuit. I do not think this is a common-sense interpretation of the orders granting class certification, and I shall not interpret the orders in the manner suggested by defendants. I note that to interpret the orders as suggested by defendants might be to permit the defendants to control who is a member of the

A second amended complaint (Filing 31) was filed June 15, 1989, and a third amended complaint (Filing 333) was filed September 6, 1990. The normal pleading practice followed. A very extensive pretrial conference order (Filing 409) was entered October 23, 1990.

In the pretrial conference order the parties agreed that the following may be accepted as established facts for purposes of this case only:

1. The plaintiff Cheryl Klinger was an inmate assigned to the Nebraska Center for Women from October 26, 1987, to July 11, 1988.

2. The plaintiff Linda Lange was an inmate assigned to the Nebraska Center for Women from October 21, 1987, until October 12, 1989.

3. The plaintiff Stacy Finn was an inmate assigned to the Nebraska Center for Women from December 28, 1987, to December 14, 1989.

4. The plaintiff Gweniver Lay was an inmate assigned to the Nebraska Center for Women from February 9, 1988, through November 28, 1988, and from June 16, 1989, through August 28, 1989.

5. The defendant, Nebraska Department of Correctional Services, is and was, at all times relevant to the third amended complaint, the state agency in charge of matters involving the control and operation of Nebraska's correctional facilities.

6. The defendant, Nebraska Department of Correctional Services, operates the Nebraska State Penitentiary in Lincoln, Nebraska, and the Nebraska Center for Women in York, Nebraska.

7. The Nebraska State Penitentiary houses only male inmates.

8. The Nebraska Center for Women houses only female inmates.

9. The defendant, Nebraska Department of Correctional Services, receives federal funds to operate some educational programs in the Nebraska correctional facilities.

10. The defendant, Frank Gunter, was the director of the Nebraska Department of Correctional Services until February 24, 1990, and was an employee of the State of Nebraska, in that capacity.

11. The defendant, Harold Clarke, has been the director of the Nebraska Department of Correctional Services since August 27, 1990, and is an employee of the State of Nebraska.

12. The defendant, Larry Tewes, was the acting superintendent of the Nebraska Center for Women from August 4, 1988, to January 5, 1989, and was an employee of the State of Nebraska, in that capacity.

13. The defendant, Victor Lofgreen, was the superintendent of the Nebraska Center for Women until August 3, 1988, and was an employee of the State of Nebraska, in that capacity.

14. The defendant, Larry Wayne, has been the superintendent of the Nebraska Center for Women since January 5, 1989, and is an employee of the State of Nebraska.

15. At all times relevant to the third amended complaint, the superintendent of the Nebraska Center for Women was and is responsible for the custody, control and correctional treatment of persons committed to that correctional facility and for the general administration of that correctional facility in accordance with the laws and the Constitution of the United States.

16. The defendant, Margrett Wehland, is and was at all times relevant to the third amended complaint, a medical nurse at the Nebraska Center for Women and an employee of the State of Nebraska.

17. The defendant, Judith Danielson, is and was at all times relevant to the third amended complaint, a psychologist at the

---

class since defendants may well have had the capacity to influence who would be paroled. Moreover, Judge Urbom denied a motion to decertify the class precisely because he believed some plaintiffs would come and go at NCW during the relevant time period and thus a class-action suit was particularly necessary: "Numerous inmates will have come and gone from NCW during the protracted time period required to complete the trial and appeal procedures of a case like this. Accordingly, I find that, **as to any given plaintiff**, this case is capable of repetition, yet evading review." (Filing 45, at 1 (emphasis added).) It is thus difficult to believe that Judge Urbom meant to certify the class in the limited manner suggested by defendants.

Nebraska Center for Women and an employee of the State of Nebraska.

18. The defendants, Frank Gunter and Victor Lofgreen, are sued solely in their individual capacities.

19. The defendant, Harold Clarke, is sued solely in his official capacity.

20. The defendants, Larry Wayne, Margrett Wehland, and Judith Danielson, are sued in both their official and individual capacities. (Filing 409, at 2–4.)

On November 6, 1990, Judge Urbom denied defendants' motion to decertify the class, holding that the class was properly certified under Fed.R.Civ.P. 23(a) and 23(b)(2). (Filing 435.)

On January 29, 1991, Judge Urbom granted in part and denied in part a motion for summary judgment filed by the defendants. (Filings 486 and 487.) In so doing, Judge Urbom noted that this suit essentially involved the claim that "defendants have illegally discriminated against [plaintiffs] on the basis of their gender by providing [programs and services] that are inferior to those offered to male inmates at [NSP]."[6] (Filing 486, at 1.)

Judge Urbom denied the motion for summary judgment in all but the following respects: (1) he granted summary judgment for all defendants in their official capacities as to claims against them for damages to the extent barred by the Eleventh Amendment; (2) he granted summary judgment for defendant Lofgreen, who had been an NCW superintendent, as to claims for injunctive relief because Lofgreen was no longer the superintendent at NCW; (3) he granted summary judgment as to all individual defendants for Eighth Amendment claims of deliberate indifference to serious mental health needs; (4) he granted summary judgment regarding Judith Danielson for any Eighth Amendment claims of deliberate indifference of any kind; and (5) he granted summary judgment as to the fifth cause of action dealing with institutional rules and regulations and the sixth cause of action dealing with conspiracy under 42 U.S.C. § 1985. (Filing 486, at 2–11; Filing 487.)

2.

Due to the extensive (and sometimes bitter)[7] discovery phase of this case, and the busy schedule of Judge Urbom,[8] the case was not finally set for trial until July 27, 1992. As trial time approached, Judge Urbom was required by the Speedy Trial Act to try a number of criminal cases at the same time this case had been set for trial. Thus, upon a request for reassignment by Judge Urbom, this case was assigned to me by Chief Judge Strom on June 19, 1992. (Filing 584.) With the parties agreeing that the liability phase of trial would be bifurcated from the remedy and damage phase of trial, trial of this case commenced on July 27, 1992.

The net impact of Judge Urbom's ruling granting the defendants' motion for summary judgment in part was that trial was limited to four liability issues. Broadly, and generally stated, those issues were:

(1) Were the female inmates at NCW discriminated against because of their sex in violation of the Equal Protection Clause of the Fourteenth Amendment by a quantitative or qualitative lack of "parity" in programs and services as compared to the male inmates at NSP;

(2) Were the female inmates at NCW discriminated against because of their sex in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688, by a quantitative or qualitative lack of "parity" in educational programs receiving federal finan-

6. It has been my understanding that the comparison institution in this case was alleged by plaintiffs to be NSP and not some other institution. Interestingly, although defendants now contend that the males at NSP are not "similarly situated" to the NCW females for comparison purposes, the defendants successfully objected to certain discovery regarding other institutions, contending that such discovery was irrelevant. (Filing 488, at 4.) In any event, the comparison institution has been understood by the court and counsel to be NSP and not HCC, LCC or OCC.

7. Unlike the protracted discovery proceedings in this case, the trial was characterized by civility and good humor on the part of all the lawyers.

8. During this time, Judge Urbom took senior status, but he maintained a full caseload while awaiting appointment of his successor.

cial assistance as compared to the male inmates at NSP;

(3) Were the female inmates at NCW denied their right of access to the courts under the Fourteenth Amendment because of the alleged inadequacy of the law library and the alleged lack of trained and independent inmate legal aides at NCW;

(4) Were the female inmates at NCW denied their right to be free from cruel and unusual punishment under the Eighth Amendment because of the alleged deliberate indifference to their serious medical and dental needs.

The liability phase ended after 19 trial days. A briefing and oral argument schedule was established. The matter was finally submitted to me in late October, 1992.

I turn now to the four liability issues.

## II. Equal Protection

The plaintiffs do not claim that the segregation of men and women in Nebraska prisons solely because of their gender is per se violative of the Equal Protection Clause of the Fourteenth Amendment.[9] In fact, plaintiffs describe a similar decision in Michigan as an "otherwise justifiable legislative decision to house the sexes separately." (Pls.' Post–Trial Br. at 17.) Rather, the plaintiffs claim that segregated women at NCW are not provided with substantially equivalent opportunities compared to the male inmates at NSP, and it is this failure to provide "parity" of treatment which is said to violate the Equal Protection Clause. The challenged programs deal with employment/economic concerns, educational/vocational training concerns, concerns about the law library, concerns about medical and dental services,

concerns about mental health services, recreation concerns, and concerns about visitation.

### A. The Proper Test

Modern equal protection doctrine is based upon three types of judicial scrutiny: the rational basis test, the heightened scrutiny test, and the strict scrutiny test. Note, *Women's Prisons*, 94 Yale L.J. at 1185–86. Both the plaintiffs and the defendants agree that the strict scrutiny test is not applicable here since it is employed in cases involving race, not sex. *Id.* at 1186–87 n. 22. Therefore, I must first determine whether to apply the rational basis test or the heightened scrutiny test.[10]

### 1. Rational Basis

■ If the governmental **purpose** of treating males and females at NSP and NCW differently is intended to address the "fact" that such persons are not "similarly situated" because attributes **not solely associated with gender** may legitimately permit (if not require) differences in treatment, then different treatment of men and women at NSP and NCW is justified under the Equal Protection Clause, as a general principle, so long as the fact of "dissimilarity" is true. *Parham v. Hughes*, 441 U.S. 347, 354, 99 S.Ct. 1742, 1747, 60 L.Ed.2d 269 (1979) ("In cases where men and women are not similarly situated, however, and a statutory classification is realistically based upon the differences in their situations, this Court has upheld its validity.").

In *Parham*, the Court upheld a statute that required unmarried men, but not unmarried women, to legitimate their children in order to sue for the wrongful death of the children. The Court found: "The fact is that mothers and fathers of illegitimate children are not similarly situated." *Id.* at 355, 99

---

9. Therefore, this court is not confronted with the question of whether prison segregation on the basis of sex alone violates the Equal Protection Clause. Thus, I have no occasion to consider whether such segregation is inherently unequal as it would be if the classification was based upon race. **See** Note, **Women's Prisons: An Equal Protection Evaluation**, 94 Yale L.J. 1182, 1189 (1985) (comparing **Plessy v. Ferguson**, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) with **Brown v. Board of Education**, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), **supplemented**, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed.

1083 (1955)) [hereinafter referred to as Note, **Women's Prisons**].

10. This, of course, assumes that there are, as a matter of fact, qualitative or quantitative differences between the programs at NSP and NCW such that it may be said that women suffer a substantial burden. If there is no such burden, then there is no factual basis for the equal protection claim, and there is no reason to apply any test. The question of "burden" was hotly contested.

S.Ct. at 1747. The Court believed this "fact" to be true because "[u]nlike the mother of an illegitimate child whose identity will rarely be in doubt, the identity of the father will frequently be unknown." *Id.* The Court found that the purpose behind the statute—avoiding false claims by men for the wrongful death of children—was not based upon an invidious premise. *Id.* at 355 & n. 7, 99 S.Ct. at 1748 & n. 7.

Assuming dissimilarity in fact, the only remaining inquiry would be whether the means used to further the purposes behind the differences in treatment are rationally related to the governmental objective. *Parham,* 441 U.S. at 357, 99 S.Ct. at 1748 ("Having concluded that the Georgia statute does not invidiously discriminate against any class, we still must determine whether the statutory classification is rationally related to a permissible state objective."). Having concluded that the purpose of the classification was not based upon factors exclusively related to gender, but rather was based upon the difficulty in proving paternity as opposed to the difficulty in proving maternity, the *Parham* Court then inquired whether the means used were rationally related to the purposes of the classification. Since the means used—requiring men to acknowledge paternity—were rationally related to the purposes behind the differences in treatment—avoiding false claims by men—the rational basis test was satisfied.

■ The "rational basis" test tolerates seemingly unwise decisions by the political branches of government because of the Constitutional preference for democratic solutions as opposed to judicial ones. So long as there is no overarching constitutional reason to interfere—such as discrimination based upon characteristics that the victim can do nothing about, like race or gender—democratic, rather than judicial, solutions are to be preferred. As the Court stated: " 'The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and the judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.' " *Parham,* 441 U.S. at 351, 99 S.Ct.

at 1746 (quoting *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 942–43, 59 L.Ed.2d 171 (1979)).

## 2. Heightened Scrutiny

■ The Supreme Court has also stated that if the classification is based upon gender alone, then an " 'exceedingly persuasive justification' [is] needed to sustain the gender-based classification." *Miss. Univ. for Women v. Hogan,* 458 U.S. 718, 731, 102 S.Ct. 3331, 3340, 73 L.Ed.2d 1090 (1982). Thus, if women at NCW are **treated differently** than men at NSP **because they are women,** a much more searching analysis is required.

In *Hogan,* the Court was confronted with the admissions policy of a nursing school that prohibited men from attending. The justification for the single-sex admission policy was the assertion that the state should be allowed to compensate for discrimination against women.

The Court first held that the party seeking to uphold the classification based upon gender must carry the burden of showing two things. *Id.* at 724–25, 102 S.Ct. at 3336–37. The classification must be shown to serve an important governmental objective. *Id.* at 724, 102 S.Ct. at 3336. If the classification is shown to serve an important governmental objective, the discriminatory means chosen must be substantially related to the achievement of the objective. *Id.* at 725, 102 S.Ct. at 3336.

The Court held that the state can evoke a compensatory purpose to justify an otherwise discriminatory classification only if members of the gender benefitted by the classification actually suffer a disadvantage related to the classification. *Id.* at 728, 102 S.Ct. at 3338. The Court then concluded that the nursing school failed to prove the first part of the test—the classification was not shown to be based upon an important governmental objective. The Court found this to be true because women had not in fact been disadvantaged by discrimination in the nursing field, and rather than compensating for discriminatory barriers faced by women, the policy of excluding males furthered the ster-

eotypical view of nursing as women's work. *Id.* at 729, 102 S.Ct. at 3338.

The Court also found that the nursing school failed to satisfy the second part of the test; that is, the nursing school failed to establish that the policy of excluding men was substantially and directly related to the proposed compensatory purpose. *Id.* at 730, 102 S.Ct. at 3339. The Court reached this conclusion because of the inconsistent policy of allowing men to audit nursing classes. *Id.* at 731, 102 S.Ct. at 3339–40. The Court was thus persuaded that the "record in this case is flatly inconsistent with the claim that excluding men ... is necessary to reach any of [the nursing school's] educational goals." *Id.* at 731, 102 S.Ct. at 3340.

### 3. Heightened Scrutiny is the Proper Test

#### (a)

■ Most of the cases involving women's prisons have used the "heightened scrutiny" test. *See, e.g., Pitts v. Thornburgh,* 866 F.2d 1450, 1455 (D.C.Cir.1989) (applying the heightened scrutiny test to prison policy of incarcerating female offenders outside of the District of Columbia, but finding that the test was satisfied, even though similarly situated males were incarcerated closer to the Dis-

trict of Columbia, because the difference in treatment was based upon the need to respond to severe overcrowding problems and was not based upon outmoded concepts of the role of women in contemporary society); *Canterino v. Wilson (Canterino I),* 546 F.Supp. 174, 209–12 (W.D.Ky.1982) (applying the heightened scrutiny test, and holding, among other things, that the state was required to show, but failed to show, that disparate treatment of female inmates, which resulted in inferior programs in areas of vocational education, training, and pay, was substantially related to important governmental objective); *Glover v. Johnson,* 478 F.Supp. 1075, 1079–83 (E.D.Mich.1979) (*Glover I*) (applying the heightened scrutiny test, and holding, among other things, that state prison authorities must provide women inmates with treatment and facilities that are substantially equivalent to those provided male inmates, but such authorities offered women inmates markedly poorer educational and vocational programs in violation of the Equal Protection Clause).[11]

The most thoughtful analysis of why heightened scrutiny is appropriate in cases such as this is found in Judge Starr's [12] opinion in *Pitts,* 866 F.2d at 1453–1456. In *Pitts,*

---

**11.** The history of the *Canterino* and *Glover* line of cases is complex. In this opinion, I have sometimes distinguished the cases by the use of Roman numerals. *Canterino v. Wilson (Canterino II),* 644 F.Supp. 738 (W.D.Ky.1986), dealt with the Equal Protection Clause in relation to law libraries. *Canterino v. Barber (Canterino III),* 564 F.Supp. 711 (W.D.Ky.1983), dealt with the liability of a prison administrator in relation to vocational courses. For additional rulings by the district court, see *Canterino v. Wilson,* 538 F.Supp. 62 (W.D.Ky.1982) (ruling on motion to intervene), and *Canterino v. Wilson,* 562 F.Supp. 106 (W.D.Ky.1983) (ruling on motion for supplemental relief). For rulings of the court of appeals, see *Canterino v. Wilson,* 875 F.2d 862 (6th Cir.) (affirming *Canterino II,* 644 F.Supp. 738), *cert. denied, Wilson v. Canterino,* 493 U.S. 991, 110 S.Ct. 539, 107 L.Ed.2d 536 (1989); *Canterino v. Wilson,* 869 F.2d 948 (6th Cir.1989) (vacating in part *Canterino I,* 546 F.Supp. 174, and holding that prisoners had no liberty interest in release programs and prisoners failed to prove denial of release programs was gender based). *Glover v. Johnson (Glover II),* 510 F.Supp. 1019 (E.D.Mich.1981), *aff'd sub nom. Cornish v. Johnson,* 774 F.2d 1161 (6th Cir.1985), *cert. denied, Johnson v. Manzie,* 478 U.S. 1020, 106 S.Ct.

3334, 92 L.Ed.2d 739 (1986), set forth remedies. *Glover v. Johnson (Glover III),* 855 F.2d 277 (6th Cir.1988), dealt with the propriety of injunctive and related relief and remanded for further findings. *See Glover v. Johnson (Glover IV),* 721 F.Supp. 808 (E.D.Mich.1989) (on remand from *Glover III*). For other rulings by the district court, see *Glover v. Johnson,* 85 F.R.D. 1 (E.D.Mich.1977) (dealing with class certification); *Glover v. Johnson,* 531 F.Supp. 1036 (E.D.Mich.1982) (dealing with attorney fees); *Glover v. Johnson,* 659 F.Supp. 621 (E.D.Mich. 1987) (dealing with contempt), *vacated by Glover III,* 855 F.2d 277; *Glover v. Johnson,* 662 F.Supp. 820 (E.D.Mich.1987) (dealing with remediation costs). For a related opinion of the court of appeals, see *Glover v. Johnson,* 934 F.2d 703 (6th Cir.1991) (affirming in part and reversing in part contempt rulings in *Glover IV* and noting that the finding of equal protection violations was the law of the case). Suffice it to say that the vitality of the *Canterino* and *Glover* line of cases for the propositions cited throughout this opinion remains unchallenged.

**12.** Judge Starr subsequently became Solicitor General of the United States.

# 1388

the court applied the heightened scrutiny test because: (a) women offenders, because they were women, were imprisoned considerably farther from the District of Columbia than similarly situated males, and were thus "substantially burdened";[13] (b) although courts should be loath to substitute their judgments for that of prison officials, see *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) ("[w]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."), any case touching upon prisons necessarily implicates *Turner*'s concerns; (c) *Turner* applies to cases involving prison security or the day-to-day operation of prisons and the challenged policy did not involve either security concerns or the day-to-day operation of prisons; (d) facial gender discrimination traditionally has summoned heightened scrutiny because such distinctions are often based upon inaccurate stereotypes which increase the danger that the state has chosen means which are not related to legitimate state interests; and (e) heightened scrutiny is properly employed where equal protection claims are at issue, as opposed to assertions of individual rights, because the right sought to be enforced is the right to be treated equally as opposed to challenges to limitations on personal rights which are often inherently limited by incarceration.

The court was careful to point out, however, that heightened scrutiny does not allow courts to disregard the special difficulties facing prison administrators. *Id.* at 1455. In this regard, the court emphasized that the heightened scrutiny test did not eliminate an appreciation of the difficulties that prison administrators face or the considerable limits of judicial competency. *Id.*

Applying *Pitts* to this case, I am satisfied that heightened scrutiny is appropriate in this case as there is no doubt that women are incarcerated at NCW because of their gender and not for some other reason. There is only one prison for women in the State of Nebraska. Whether a woman is convicted of writing bad checks or of murder, she will find herself at NCW when sentenced to prison. Men, on the other hand, could be sent to a variety of institutions depending upon a variety of penological goals—from security to programming. As a consequence, despite the fact that nongender-related reasons may exist to justify treating female prisoners differently from male prisoners, the fact remains that female prisoners, as a result of their gender alone, can receive only the programs available at NCW. Therefore, if the programming at NCW is comparatively inferior to programs at NSP, the female recipients may receive poor programming because of their gender and not for some nongender-related reason.

### (b)

■ At my request, the parties have devoted a great deal of effort to addressing the question of whether the female inmates at NCW are "similarly situated" to their male counterparts at NSP.[14] As noted in the foregoing discussion of *Parham*, the Supreme Court has stated that where factors other than gender alone distinguish one class from another, the proper test to employ is the so-called rational basis test. *Parham*, 441 U.S. at 354, 99 S.Ct. at 1747. I have concluded that the inmates at NCW are "similarly situated" with the inmates at NSP for equal protection purposes for the following reasons.

First, while inmates at NCW span the security continuum—from minimum to medium to maximum—and inmates at NSP tend

---

**13.** In *Pitts*, the court could easily find a disparity between male and female inmates which "substantially burdened" the females. 866 F.2d at 1453 & n. 4. The fact of "burden" in this case is in dispute.

**14.** The plaintiffs contend that NSP, as opposed to some other male institution, is the proper comparison against which to judge the programs at NCW. (Pls.' Post–Trial Br. at 28: "NCW/NSP Parity Analysis".) This case has proceeded on

that assumption. (Filing 486.) As Judge Urbom noted in January, 1991, "[t]he plaintiffs allege that the defendants have illegally discriminated against them on the basis of their gender by providing educational and vocational services that are inferior to those offered to male inmates at the Nebraska State Penitentiary (NSP) in Lincoln." (Filing 409, Mem. Order Defs.' Mots. Dismiss and Summ. J. at 1.)

to be at higher security levels—medium and maximum—inmates at both institutions are nevertheless inmates. At the most basic level, the inmates at both facilities are in similar situations—confined as a result of a criminal conviction.

Second, since NCW spans the security continuum and houses maximum custody inmates, and since NSP also houses maximum custody inmates, it is likely that the court will be comparing populations, aside from gender, which are classified as roughly comparable by the State of Nebraska. In this regard, since there is no segregation between minimum custody inmates and maximum custody inmates at NCW, minimum custody inmates receive the same type of treatment as maximum custody inmates. Thus, it is not inconsistent to treat both institutions as having roughly comparable populations. Stated another way, female minimum custody inmates are treated essentially the same as female maximum custody inmates. Therefore, if it is appropriate to compare institutions housing female maximum custody inmates with institutions housing male maximum custody inmates, then the existence of lower custody status inmates at NCW is irrelevant.

Third, as the court found in *Glover I*, "I find no evidence on this record that the [State] views its **general purpose** in administering the [challenged] programs differently at [the female prison] than at male institutions." *Glover I,* 478 F.Supp. at 1082 (emphasis in original) (footnote omitted). In other words, although the state may have segregated men from women, there is no evidence to suggest the state thought that as a general matter the **purposes** of incarceration were different for men than for women.

As a consequence, other things being roughly equal, it is not inappropriate to consider NSP inmates and NCW inmates as "similarly situated" for equal protection purposes because the Nebraska legislature has not defined different general purposes for the incarceration of offenders on the basis of gender.

Fourth, much of the defendants' argument—that female inmates at NCW are not similarly situated to their male counterparts at NSP [15]—is premised on a prior case from this court involving security and privacy issues. In point of fact, the United States Court of Appeals has upheld a finding by this court that men and women incarcerated at NSP and NCW are not "similarly situated" and, therefore, the Equal Protection Clause was not violated when the State of Nebraska afforded lesser privacy protections to men as opposed to women. *Timm v. Gunter,* 917 F.2d 1093, 1103 (8th Cir.1990) (holding that differences in privacy protections afforded male and female inmates in Nebraska prisons did not violate the Equal Protection Clause because male and female inmates were not "similarly situated" due to differences in security concerns having to do with the kinds of crimes committed, length of sentence, and frequency of violence, escapes and contraband), *cert. denied,* —— U.S. ——, 111 S.Ct. 2807, 115 L.Ed.2d 979 (1991).

While security issues are at the periphery of every prison case, the differences in treatment between men and women in this case cannot honestly be attributed to issues of security.[16] *Pitts,* 866 F.2d at 1454 (opining that the challenged policy did not "directly implicate either prison security or control of inmate behavior, nor does it go to the prison environment or prison regime.").[17] By and

---

**15.** It should be noted that the defendants concede that "[b]ecause treatment for serious medical needs and access to the courts are constitutionally required, the profile of inmates and security concerns of the institutions are irrelevant." (Defs.' Reply Pls.' Post–Trial Br. at 4 (discussing the "similarly-situated" issue).) This concession means that for Fourteenth Amendment claims regarding access to the courts and for Eighth Amendment claims regarding medical treatment—rights predicated upon substantive provisions of the Constitution—an inmate need not show that she is "similarly situated" compared to some other inmate.

**16.** The inmate-to-staff ratios for men at NSP and women at NCW are similar. (Ex. 1378.) In 1992, the inmate-to-staff ratio for security at NSP was 3.02, and for females the ratio was 3.03. (Ex. 1378.) One might have expected more security staff at an institution housing men if security concerns were greater for male institutions as compared to female institutions.

**17.** The same could be said of administrative concerns. Once again, almost any prison case will have some potential impact on day-to-day prison administration. The real question is whether the court's scrutiny broadly threatens to microman-

large, the policies under challenge here have nothing to do with security. On the contrary, if anything, the relative lack of security concerns at NCW, compared with NSP, makes at least some of the differences in programs inexplicable if based upon security concerns.[18]

Fifth, a good deal of the defendants' argument is nothing more or less than a restatement of the decision to segregate men from women in the first instance. I do not make light of this point. Indeed, the *Pitts* court recognized, as I must also, that the plaintiffs have not challenged the decision to segregate men from women.

Nevertheless, as the *Pitts* court stated, "the existence of the facial classification raises sufficient concerns to trigger heightened scrutiny." *Pitts*, 866 F.2d at 1459. If there really are **relevant** differences [19] between the men at NSP and the women at NCW, the place to take account of those relevant differences is in that part of the "heightened scrutiny" analysis which tries to determine whether there is a sufficiently strong relationship between an important governmental objective and the means chosen to further that objective such that it can be said that the challenged policies are not "the product

of traditional stereotyping or archaic notions of 'appropriate' gender roles." *Id.*[20] In so doing, the court will be forced to articulate, and therefore justify by the process of articulation, differences which are "constitutionally relevant":

> Rather than avoiding the issue of differences, courts should confront it directly; if they determine that sex differences have a role in the equal protection analysis, they must articulate a standard of what constitutes a relevant difference. In so doing, the courts should be cautious in their identification of constitutionally relevant differences. In particular, they should be wary of differences resulting from past discrimination. At a minimum, the "similarly situated" analysis should not encompass socially constructed differences or discrimination will be self-perpetuating.

Note, **Women's Prisons**, 94 Yale L.J. at 1186–87 n. 22.

## B. General Application of the Heightened Scrutiny Test

### 1.

■ It is wise to restate what the heightened scrutiny test requires me to do. It

age a prison. In this case, the challenged conduct, while certainly having some impact on the minutia of daily prison life, is programmatic in nature. Thus, the court's "interference" in such programs is properly focused on policy rather than administration. It is therefore unlikely that the court will involve itself in questions having to do with the "daily oversight of inmate behavior." *Id.* While the danger of such inappropriate micromanagement is ever present, the court, if it is sensitive to the potential, can properly apply heightened scrutiny without presuming to run a prison.

18. For example, the policy of paying women less than men for comparable work can hardly be justified by questions of security.

19. As one commentator has cautioned, "[b]eliefs about women's nature encourage prison officials—nearly all of whom are male—to deal with women in a protective, even infantilizing manner." Nicole Hahn Rafter, Address, 1987 A.B.A. Sec. Individual Rights and Responsibilities, 14 S.P.G. Hum.Rts. 2828 (LEXIS, JLR). This is not to say, however, that women may not have strikingly different needs from men, not based entirely upon gender, when they are imprisoned.

20. The proper point to recognize the historic separation of men from women in prison in the

heightened scrutiny analysis is where the court determines whether the means chosen to further the state's objective are substantially related. *Pitts*, 866 F.2d at 1458 ("Our inquiry into the relation between the classification under challenge and the government interest advanced to justify it begins by noting a pervasive characteristic of American prisons, namely, the separation of inmates on the basis of gender.... We therefore assume for purposes of our analysis that these general, widespread practices in American prison systems do not run afoul of constitutional demands."). The question becomes whether the means chosen to further the state's objective "directly responds to and entirely correlates with the more pervasive gender classification existing in both federal and state prison systems." *Id.* at 1459. Even if the challenged classification is consistent with gender segregation in general, the court must then also determine whether the challenged policy (not the general policy of gender segregation) reflects invidious discrimination. *Id.* ("Despite the classification's relation to more general differential treatment, we must also ensure that the classification does not otherwise reflect or stem from invidious discrimination.").

must first be determined whether, as a matter of fact, programs (in quantity or quality) are provided male inmates at NSP which are not provided to female inmates at NCW such that it can be found that the women suffer a "substantial burden." *Pitts*, 866 F.2d at 1453 & n. 4. If so, the test then requires that I determine what the defendants "specifically asserted [to be] the governmental interest that supports the contested policies." *Id.* at 1456. Once having established what the stated objective is, the court is required to ascertain whether the objective is "important," meaning that it is constitutionally legitimate. *Id.* Having determined the objective of the contested policy, and presuming that the governmental objective is "important," the next step is to decide whether the means chosen to further the objective are "directly and substantially related." *Id.*

In summary, the framework may be stated this way: (a) determine whether there are programs (means) afforded (in quantity or quality) to male inmates at NSP but not female inmates at NCW which place a "substantial burden" on female inmates (disparity); (b) if so, ascertain whether there is an important governmental objective (objective) which underlies the "means"; (c) if so, finally decide whether the "means" chosen to further the governmental "objective" are directly and substantially related to the "objective" (relationship of means to objective) such that the "disparity" may be overlooked.

### 2.

There are two questions which can and should be addressed as a threshold matter. The first question is whether the court should examine each program separately, or whether the court should examine the institutions as a whole, to determine whether in fact females suffer a substantial burden. In other words, a question is presented as to whether the court should compare NSP with NCW generally, or whether the court should compare NSP with NCW on a program-by-program basis. As part of the first inquiry, if the court is to examine the programs separately, it must also determine what standards should be employed to judge whether women suffer a substantial burden. Secondly, if the court believes a program-by-program analysis is required, the next question is whether the asserted important governmental objective is the same for each program. I turn to those threshold questions now.

### (a)

■ I think it appropriate to examine the contentions of the parties on a program-by-program basis. Although the parties have provided me with general overviews of NCW as compared to NSP,[21] each party ultimately relies upon a program-by-program comparative analysis for the contention that women either do or do not suffer a substantial burden. Indeed, one of the pretrial conference orders in this case appears to require a program-by-program analysis. (Filing 409, **compare** plaintiffs' controverted issues at page 63 and following **with** defendants' controverted issues at page 4 and following.)[22] The parties primarily rely on such a program-by-program analysis in their posttrial briefs. More basically, it would simply be impossible to judge the plaintiffs' equal protection claim and the defendants' response thereto in a coherent fashion by trying to evaluate NSP and NCW across the board.[23] I shall therefore examine the equal protection claim on a program-by-program basis by separately comparing each challenged pro-

---

21. For example, at the defendants' request I toured both NSP and NCW.

22. Despite enormous effort on Magistrate Judge Piester's part, the parties could not even agree what the controverted issues in this case were. The principal pretrial conference order sets forth both plaintiffs' and defendants' controverted issues, and to some extent the statements of the issues are different. The pretrial conference order thus runs well over 70 pages, approximately 64 of which are devoted to setting forth what the parties believed were the controverted issues. (Filing 409.)

23. It must be admitted that any comparison between sex-segregated prisons is difficult at best precisely because of the segregation based upon gender. Note, **Women's Prisons**, 94 Yale L.J. at 1196–97 & nn. 75–76. Yet by limiting the analysis to the program level, some of the differences which exist between prisons that house male and female inmates can be ignored since many of those differences simply have nothing to do with the programs under scrutiny.

gram at NCW with a similar program at NSP to determine whether female inmates suffer a substantial burden as to a particular program.

When making a program-by-program analysis to determine whether female inmates at NCW suffer a substantial burden, it is important to keep two things in mind.

First, the Equal Protection Clause does not require that NSP and NCW have identical programs, but rather programs which are "substantially equivalent."[24] *Glover I,* 478 F.Supp. at 1079 ("equivalent in substance if not in form"); *see also Canterino I,* 546 F.Supp. at 210 ("[T]he equal protection clause requires parity, not identity, of treatment."); *Bukhari v. Hutto,* 487 F.Supp. 1162, 1171–72 (E.D.Va.1980) (quoting unreported decision of *Barefield v. Leach,* No. 10282 (D.N.M.1974), " 'what the Equal Protection Clause requires in a prison setting is **parity of treatment, as contrasted with identity of treatment,** between male and female inmates ...' " and ordering further hearing on female inmates' claim of disparity of treatment between conditions of confinement in maximum security setting for women compared to men) (emphasis in original). On the other hand, programs are not "substantially equivalent" solely because each institution has similar programs if the "programs said to be available to the female prisoners are inferior in design, execution, or both." *Glover IV,* 721 F.Supp. at 837.

Second, expenditures of money, while of general relevance, do not substitute for reasoned analysis. *Glover III,* 855 F.2d at 288–89 (Engel, C.J., concurring and stating, "[t]he very difference between the sexes may mean in a given situation that the delivery of rehabilitative services may necessarily require the varied expenditure of monies be-

cause of natural differences in the sexes or in their conditions of confinement.").

Women's prisons tend to have much smaller populations than male prisons,[25] but size has little constitutional relevance. Indeed, the argument that women's prisons are small and therefore expensive to run "is, frankly, not a justification but an excuse for the kind of treatment afforded women prisoners." *Glover I,* 478 F.Supp. at 1078. Or, as stated in *Canterino I,* "[i]t is well established that economic considerations alone cannot serve as an excuse for failure to meet constitutional standards." 546 F.Supp. at 207.

Women are not more expensive to incarcerate than men just because they are women. Rather, since prisons for women are small, it is difficult to achieve economies of scale similar to those in the larger prisons housing men. In fact, Mr. Falconer, who prepared much of the defendants' cost data, said that due to "the economies of scale" he was not surprised by the difference in costs between institutions which house men and women. (5223:25.) He attributed the difference in costs primarily to the difference in number of inmates, not some attribute of womanhood:

Q. I was just looking for what factors that you're aware of that make the per capita cost [for a] female inmate at NCW higher than a per capita cost at NSP for example?

A. It's numbers. Numbers of inmates.

Q. That is primarily the difference is that right?

A. Yes.

(5226:1–7.)

Indeed, the lack of economies of scale can be seen in administrative salaries measured

---

**24.** Terms such as "substantially equivalent" or "parity" are vague and therefore invite inconsistent application. Note, **Women's Prisons,** 94 Yale L.J. at 1196 & n. 72. However, if a court accepts, as the plaintiffs do and as I think precedent requires, the principle that the "strict scrutiny" test, normally applied in cases involving race, should not be employed in equal protection cases involving gender-segregated prisons, there is probably no better concept than "substantially equivalent" or "parity." Id. at 1196–1198. The concept of "parity" is endorsed by the American

Correctional Association: "Correctional systems must be guided by the principle of parity. Female offenders must receive the equivalent range of services available to other offenders." (Ex. 292, at 28 (Public Correctional Policy on Female Offender Services).) It thus has a general meaning that is not foreign to prison administrators.

**25.** Note, **Women's Prisons,** 94 Yale L.J. at 1183 n. 6 (citations omitted). Depending upon the time period, NSP was approximately 5–7 times larger in terms of population than NCW.

by inmate-to-staff ratios. Mr. Falconer testified that "70 to 72 percent of our budget etc. in the Department of Correctional Services are staff related costs." (5226:12–13.) If this is true, and staff-to-inmate ratios mean anything, NCW is spending much more, relatively speaking, per inmate on its administrative staff than NSP, but NCW spent, relatively speaking, about the same per inmate as NSP on support staff, security staff, and total staff. (Ex. 1378.)

For example, in 1992 the inmate-to-staff ratio for administration at NCW was 16.00 to 1, whereas the same ratio for NSP was 49.44 to 1. (Ex. 1378.) The administration category included "the superintendent or warden's staff, the assistant warden, the business manager, business [sic], the accounting people." (5170:8–10.) In effect, NCW had more administrative staff per inmate than NSP and, therefore, administrative costs per inmate must have been higher at NCW. On the other hand, in 1992 support staff ratios were similar (NCW = 9.93 and NSP = 10.14), and total staff ratios were similar (NCW = 2.03 and NSP = 2.22).[26] (Ex. 1378.) This same trend was generally true for the preceding years as well.

At least in terms of staff salaries, the data would suggest that spending, as measured by inmate/staff ratios, was about the same for NCW and NSP except in the area of administration. Moreover, if it is true that it takes more money to obtain the same level of services for females as compared to males due to the smaller total size of the female population and the concomitant loss of economies of scale, this data may also suggest that Nebraska is not spending sufficient monies on the support staff and total staff who work in its female prison if women are to receive parity of treatment.

Thus, spending is not a very good measure of equivalency.[27] Accordingly, I have not concentrated on spending data.

**(b)**

■ Having determined that a program-by-program analysis is required, I pause to consider whether the defendants assert the same or different important governmental objectives for any differences that may exist between the programs at NCW and NSP. If the same governmental interest is asserted for each program, I can make a threshold determination of whether, assuming that female inmates are substantially burdened, the governmental interest underlying the burden is "important." If the governmental objectives change from program to program, then a separate determination of whether the objective is "important" would be required for each program.

Probably because they do not agree that this case warrants "heightened scrutiny," the defendants did not prior to trial, during trial, or after trial clearly articulate what they believed the important governmental interests were. Therefore, it is not clear what governmental objective may undergird the differences, if there be differences, in the various programs.[28]

---

**26.** As noted earlier, security staff ratios were also similar.

**27.** Per capita spending, standing alone, can also be very misleading. Education cost data used in this case provide a good example. The cost per inmate for Adult Basic Education or General Educational Development (ABE/GED) in fiscal year 91/92 was $1,050 for females and $320 for males, if one simply took the total dollar figure for those programs and divided by the average number of inmates at each institution. (Ex. 1378.) But if one looked at the cost per inmate graduating with a GED, it cost $7,640 for females and $9,832 for males for the same period of time. These figures are calculated by using relevant education costs for fiscal year 1992 for each institution. At NSP, these costs were $245,-800, (5266:25; 5267:1–2), and at NCW, these costs were $129,885 (5264:19–25). The number

of inmates receiving their diplomas during the same period of time as the cost data is then determined for each institution. At NCW, 17 inmates received their diplomas during the relevant time frame. (3090:5–9.) At NSP, 25 inmates received their diplomas during the same time. (3040:8–10.) The cost data for each institution are then divided by the number of inmates at the institution receiving diplomas.

**28.** It is worth noting that, "[o]nly when analysis rather than habit results in the implementation of ... programs will the State have met this burden as well." *Glover I,* 478 F.Supp. at 1082 n. 5. Because the defendants have not been willing to expressly articulate what they believe the important governmental objective is behind differing treatment of NCW inmates, judgment could be entered in favor of the plaintiffs—assuming the difference in treatment imposed a

However, I have been able to ascertain from the evidence one important governmental objective that is an ever-present theme of the defendants even though not articulated in relationship to the "heightened scrutiny" test of any particular program. Defendants argue that male and female inmates are initially segregated for security reasons, and thereafter female inmates are treated differently because they have different needs than males. (Defs.' Post–Trial Br. at 8 ("The testimony of all of the experts in this case confirmed that the profile and thus the needs of female inmates differ significantly from the needs of male inmates.").)

The defendants contend, and plaintiffs do not generally disagree,[29] that the evidence shows that most women come to prison with fewer resources than most men. (**Compare** Defs.' Post–Trial Br. at 8–11 **with** Pls.' Post–Trial Br. at 19: "Indeed the plaintiffs presented evidence of a female offender 'profile' which pointed out some of the different correctional needs of women as opposed to incarcerated men.") The following is a general description of the evidence as to the profile of female and male inmates.

Many female inmates are passive to the point of dysfunction as they enter prison. Many female inmates come to prison after living at a low income level prior to incarceration. Female inmates tend to lack job training and job-related education. Female inmates have severe confidence problems and suffer from low self-esteem. Most of the female offenders are single parents responsible for supporting themselves who do not have contact with the significant males in

their lives after incarceration; thus, the separation of mother and child is especially traumatic. Female inmates tend to have poor living skills and little exposure to employment opportunities, resulting in poor work skills and habits.

Men, on the other hand, come to prison with greater resources than women. Male inmates tend to have been employed "on the outside" in higher-paying jobs compared to women. The problem of low self-esteem tends to plague men less than women. Men tend to be less actively dependent. Most male inmates do not have responsibility for child rearing. Most males tend to be comparatively more employable than women.

Having noted these "differences," and realizing, as the parties evidently do, that the "differences" are largely the product of societal gender bias,[30] the question becomes whether these differences are relevant to a legitimate and important governmental objective regarding the treatment of women prisoners. I conclude that these differences are relevant and, in fact, provide a legitimate and important governmental objective. The differences establish that if the State of Nebraska had an important governmental objective in treating women differently, the important governmental objective was the remediation of effects of gender bias suffered by female inmates prior to their entry into prison in order that the Nebraska prison system might better address its statutory mission of preparing inmates for "lawful community living." Neb.Rev.Stat. § 83–901 (Reissue 1987).[31]

---

substantial burden on the plaintiffs. The defendants would have failed on the first part of the *Hogan* test. However, I shall not do so, for the reason that at least from an evidentiary point of view the defendants may have (perhaps inadvertently) proven a legitimate governmental objective.

29. There is strong disagreement about the legal relevance of this information.

30. For example, plaintiffs' expert Ms. Goins testified during cross-examination that males, as they come into correctional facilities, have been employed at higher-paying positions than females. The defendants cite this testimony with approval, suggesting that it "reflects a societal disparity." (Defs.' Post–Trial Br. at 9.) Ms. Goins stated:

"This is a society problem as well ... [O]ur prisons mirror ... the societ[y's] problems.... [I]n general, male inmates would have been employed in the community above the rate of pay that a female would have [been paid]." (684:12–18.)

31. Once again, the defendants have not attempted to expressly articulate an important governmental objective because the defendants do not think the *Hogan* "heightened scrutiny" test is applicable. By making the assumption in the text, I am being generous since the defendants have failed to prove that the legislature of the State of Nebraska had such a goal in mind for treating women differently than men. *Hogan,* 458 U.S. at 730 n. 16, 102 S.Ct. 3339 n. 16. *See*

This remedial need has been identified by others, including the American Correctional Association (ACA). In the ACA's publication entitled Public Correctional Policy on Female Offender Services the following is forcefully noted:

> Because of their comparatively small numbers, female offenders—both adults and juveniles, accused and adjudicated—have been virtually ignored in the justice system. While data suggest that female offenders are very receptive to rehabilitation programs and supportive services, they seldom have access to such programs, and certainly not to the range of services available to male offenders.
>
> Some female facilities and programs are excellent. Many, however, have never received the resources they need to offer parity of programs and services and to provide the necessary training to their staff. As a result, many institutions have had to simply "hold" their female inmates, providing few opportunities to them for constructive change.
>
> Justice professionals and the public should be made aware of the profound need for parity of resources and services for females.
>
> . . . .
>
> **More than half of the nation's workforce is now female. Most women who are convicted of crimes held jobs before their conviction, yet most also were earning incomes below the poverty level. The majority of these women were also the sole support for themselves as well as their children. Adequate academic education programs and occupational assessment and training for female offenders is therefore a critical need.**
>
> To successfully compete in a demanding job market, female offenders should receive the opportunity for suitable training, based on their interests and abilities, in both traditional and non-traditional vocations. Many female offenders also lack the relevant lifeskills necessary for successfully managing a household and being independent in a competitive and costly society. Whether in an institution or under community supervision, females should have an opportunity to acquire and practice these skills through instruction, counseling, and gradual release programs such as furloughs and pre-release. Work release programs should be available so that female offenders can apply their training in a structured and supportive setting.

(Ex. 292, at 29–30 (emphasis added).)[32]

Clearly, *Hogan* stands for the proposition that remediation of past discrimination against women[33] is an important and legitimate governmental objective (if remediation is the real goal). As the Court stated in *Hogan:* "In limited circumstances, a gender-based classification favoring one sex can be justified if it intentionally and directly assists members of the sex that is disproportionately burdened."[34] 458 U.S. at 728, 102 S.Ct. at 3338.

*Kirchberg v. Feenstra,* 450 U.S. 455, 461, 101 S.Ct. 1195, 1199, 67 L.Ed.2d 428 (1981).

---

**32.** NCW was familiar with and consulted ACA "standards" (e.g., Ex. 25, at 6). In fact, all Nebraska prisons are accredited by the ACA. Although the foregoing statement is not an ACA "standard" as such, it does apparently represent the policy of the ACA. But since the foregoing statement was not a "standard," the ACA evidently did not have occasion to determine whether NCW was operated in conformity with the statement. I note that there is a general ACA standard which requires institutions housing female inmates to "provide essential equality with male institutions." (Ex. 40, at 87, Standard 2–4332.) As the ACA did not specifically compare NSP with NCW for purposes of accreditation to determine the issue of "equality" pursuant to standard 2–4332, I am not persuaded that the ACA accreditation means very much for purposes of this case.

**33.** The Supreme Court has repeatedly recognized that women have suffered discrimination. *Hogan,* 458 U.S. at 728, 102 S.Ct. at 3338 (citing *Califano v. Webster,* 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977), and *Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975)). Thus, this point is not simply some popular belief about women, but a judicially recognized fact of constitutional significance.

**34.** But, if the defendants are required to justify their actions for equal protection purposes on remediation goals, they may "hang by their own rope." As *Hogan* demonstrates, the state cannot advance a remedial goal as a legitimate and important objective, and then act inconsistently with that objective. 458 U.S. at 731, 102 S.Ct. at 3340.

I therefore find and conclude that the State of Nebraska may justify differential treatment of females at NCW on a program-specific basis if the means chosen are directly and substantially related to the objective of providing women with remedial assistance so that they may be better able to engage in "lawful community living." [35] Neb.Rev.Stat. § 83–901. Although there may be other ostensibly important governmental objectives, I can find no other such objectives that span the entire range of programs at issue in this lawsuit. As I make the program-by-program analysis, if it is apparent to me that another governmental objective may exist as to a specific program, I shall endeavor to discuss the objective in relation to the specific program. I turn now to the challenged programs.[36]

### C. Employment/Economic

#### 1. Burden

The plaintiffs argue that they have been denied an equal opportunity to make money while incarcerated and to acquire vocational skills on the job. The plaintiffs challenge (a) the pay policy, (b) the hobbycraft policy, (c) the private venture policy, (d) the Cornhusker State Industries (CSI) policy, and (e) the state-paid work assignment policy. At this point in the analysis, the sole question is whether inmates at NCW are "substantially burdened" by any of the policies.

#### (a)

■ As to the hobbycraft policy, the private venture policy, and the state-paid work assignment policy, I find that the female inmates at NCW have not suffered a substantial burden by virtue of disparity of treatment, in policy or practice, when compared to inmates at NSP.

As to the hobbycraft policy, plaintiffs essentially contend that they have less of a market to sell their hobbycraft than the men at NSP. At NSP, inmates apparently can take orders to produce hobbycraft items, while at NCW, the crafts must be purchased from a display case. While the policies are different, as noted earlier, they need not be identical. At bottom, both male and female inmates may sell their hobbycraft, and the slight difference in policy does not warrant further analysis. Indeed, this is probably the type of day-to-day operational concern in which the court ought not to involve itself. *Pitts,* 866 F.2d at 1454.

As to the private venture policy, (**see generally** Exs. 232, 274, and 1346B, Interrog. 9), some elaboration is necessary. At various times, at both NSP and NCW, private companies have located their businesses at the institutions. The inmates at both institutions were then employed by the private ventures. For the inmates, the attractive thing about the private venture jobs was that they paid the inmates a higher wage compared to other jobs at the institutions.

Since June, 1990, when a telemarketing firm left, there has been no private venture at NCW, while there has been a private venture, a sewing factory, at NSP. The present superintendent of NCW testified that NCW was in the process of negotiating with a new private venture firm in the hopes of attracting such a firm to NCW.

There is simply no evidence to suggest that the defendants have adopted a policy or practice of pursuing or encouraging private venture employment for the men but not the women. The defendants are not responsible for a private business decision to cease business. Although the women are practically burdened, and perhaps substantially so, by

**35.** There are thus two components to the goal. The first component is "rehabilitation" and the second component is "remediation." "Rehabilitation" by itself probably would not be sufficient as there is no evidence that men need rehabilitation either less or more than women.

**36.** I pause here to comment on the expert witnesses. With few exceptions, I found the expert testimony from both sides to be generally uninformative. More often than not, the experts seemed to concentrate on generalities (sometimes providing homilies) rather than specifics.

Perhaps the experts simply did not have a good grasp of the facts. In any event, I do not mention this point to criticize capable counsel. Rather, I make this point as a fact finder who found it annoying to have to sort out and understand a complex fact pattern with little help from the experts on the specifics. I also make this point for such other judges as may review this opinion. I generally found the experts to be lacking in credibility; consequently, sparse mention is made of the experts in this opinion.

the lack of a private venture job opportunity, the burden has not been caused by the action or inaction of the defendants. Therefore, the plaintiffs have not been burdened for purposes of the Equal Protection Clause.

As to state-paid work assignments, (**see generally** Exs. 54, 220, 227, 228, 233, and 234, 412 and 1346A, Interrog. 9), the plaintiffs claim they are not given the same type and number of jobs. "State–paid work assignments" are jobs an inmate performs for the state and for which the state pays the inmate. I do not find that the female inmates are substantially burdened by any policy or practice regarding the state-paid work assignments.

While there may have been more categories of assignments at NSP than at NCW from time to time, the general policy was to provide the same types of assignments to both sets of inmates, and differences in the categories of work available were largely inconsequential. While the state-paid work assignments at NCW appear to be menial, boring, and not relevant to the real world (**see generally** the testimony of inmates Blank and Anthony), there is no reason to believe that the inmates at NSP are substantially better off regarding the quality of the state-paid work assignments they receive. The same is true for quantity. For example, there was testimony from one female inmate (Anthony) that when she asked for additional state-paid work, she received it.

The NCW inmates argue that some NSP [37] inmates (trustees) were permitted to leave the security perimeter of NSP to perform their state-paid work assignments, but the NCW inmates (who had similar minimum custody status) were not. The extent of this disparity is not clear from the record, but it does not appear to be significant qualitatively or quantitatively. At least some of the NCW inmates were permitted to leave the security perimeter, if only to take out trash as part of their jobs. As to this issue, I find that the

burden, if any, is so minimal on this record as to be inconsequential, and, in any event, this is an area where legitimate security and day-to-day operational concerns, clearly outside the competency of the court, are implicated. *Pitts*, 866 F.2d at 1454.

**(b)**

I believe discussion of the CSI policy should be deferred for consideration in the section of this memorandum on Education/Vocational Training.

**(c)**

■ As to the pay policy, I find that the female inmates have been substantially burdened by the pay policy. Before May, 1989, when the policy changed, inmates at NCW were paid on an hourly basis for their state-paid work assignments. If they worked an hour, they were paid for an hour's work. In contrast, male inmates at NSP were paid for a day's work even if they worked only 15 minutes. The net impact was that females received substantially [38] less pay than males for comparable work. For example, Ms. Klinger testified that she would have made $41.30 more in February, 1989, had she been paid like a man. It is clear that the defendants knew of the disparity no later than March, 1988, when a grievance was submitted, and perhaps as early as January, 1988, and yet 14 months elapsed before there was any change.

**2. Important State Objective**

Having determined that females suffered a substantial burden as a result of the pay policy which compensated women less than men for the same work, I must now determine whether there are important governmental objectives which are said to warrant the policy, beyond the legitimate and important remediation justification previously discussed.

Once again, the defendants are not clear about what legitimate state objective under-

---

**37.** The plaintiffs point to other opportunities available to male inmates at the Hastings Correctional Center (HCC). I do not think the state-paid work assignment opportunities available to the male inmates at HCC are directly relevant since the comparison institution is NSP.

**38.** "Substantially" is a relative term. To inmates with a limited opportunity to earn money, and then only at a nominal rate in most cases, a difference of a few dollars per month is meaningful.

girds the pay policy. The defendants claim that the policy of paying females on an hourly basis was consistent with a normal work environment and, therefore, it was appropriate to pay females less than males on an hourly basis. It also appears that the defendants claim the only reason men were paid on a daily basis was because it would have been too costly to maintain any other accounting system for men, whereas for women it was easier, apparently because of their smaller numbers, to account for their work on an hourly basis.

As to the justification that women, as opposed to men, should be paid on an hourly basis because such a schedule is more like a normal work environment, I find the justification a pretext. Even if it is not a pretext, the justification is not a legitimate governmental objective. NCW could then and can now pay women on an hourly basis and still pay the women an effective hourly rate that is equal to men. For example, if men at NSP working at a particular job were ostensibly paid $1.00 per hour, but worked only 4 hours and yet got paid $8.00 for their work, the effective hourly rate for the men would be $2.00 per hour. NCW could have compensated females at the same effective hourly rate as males without sacrificing the hourly rate concept.

As the Court stated in *Orr v. Orr*, 440 U.S. 268, 283, 99 S.Ct. 1102, 1113–14, 59 L.Ed.2d 306 (1979), if the goal can be accomplished without gender classification, the gender-based goal itself is not legitimate[39]:

> Where, as here, the State's compensatory and ameliorative purposes are as well served by a gender-neutral classification as one that gender classifies and therefore carries with it the baggage of sexual stereotypes, the State cannot be permitted to classify on the basis of sex. And this is doubly so where the choice made by the

State appears to redound—if only indirectly—to the benefit of those without need for special solicitude.

I do not accept the argument that it was too expensive (at least until the pay policy was changed) to account for the time actually spent by the men, but it was less costly to do so for the women, and therefore it was permissible to pay women less than men. Generally, cost, like other administrative excuses, *Califano v. Goldfarb*, 430 U.S. 199, 211 n. 9, 97 S.Ct. 1021, 1029 n. 9, 51 L.Ed.2d 270 (1977), is not a good enough reason to discriminate on the basis of gender. *Canterino I*, 546 F.Supp. at 211 ("A desire to preserve the state's limited resources cannot be used to justify an **allocation** of those limited resources which unfairly denies women equal access to programs routinely available to men.") (citation omitted) (emphasis in original); *Bukhari*, 487 F.Supp. at 1172.

### 3. Relationship Between Objective and Means

Having previously determined that the defendants would have an important governmental objective in providing remedial services to women at NCW for past gender discrimination, the question becomes whether the means chosen—the pay policy—to further that objective are directly and substantially related.

As the *Pitts* court recognized, where the challenged policy "directly responds to and entirely correlates with the more pervasive gender classification existing in both federal and state prison systems," the challenged policy may be upheld,[40] unless the record shows the challenged policy to be the product of traditional stereotyping or archaic notions of "appropriate" gender roles. 866 F.2d at 1459. The pay policy fails the *Pitts* test on both counts.

First, paying women less than men does not "directly respond" and "correlate" to the

---

**39.** For the same reason one could also conclude that the means adopted to further the goal were not directly and substantially related to the goal because the goal—payment on a hourly basis—could be accomplished without gender classification.

**40.** This point stands for the unremarkable proposition that if the challenged policy is a direct

product of otherwise validly segregated prisons, one has less reason to be skeptical about the relationship between the means chosen to implement the legitimate governmental objective. Location was the issue in *Pitts*, and by definition, prisons for females will always be located at different places than prisons for males.

"pervasive" policy of segregation of women from men in prison.[41] It is as easy to segregate men from women in prison and pay them equally as it is to segregate men from women in prison and pay them unequally.

Second, paying women less than men for equivalent work is perhaps the hallmark of traditional stereotyping and archaic notions of "appropriate" gender roles. Such a policy proclaims that women, because they are women, are worth less in the marketplace than men. In fact, such a policy only serves to perpetuate such unfortunate notions, and conflicts with the goal of providing remediation for the effects of gender bias suffered by female inmates prior to their entry into prison in order that the Nebraska prison system might better address its statutory mission of preparing inmates for "lawful community living." Neb.Rev.Stat. § 83–901 (Reissue 1987).

I therefore conclude that there is no relationship between the important governmental objective—remediation—and the means chosen—the pay policy. In fact, the objective and the means are contradictory. Thus, plaintiffs have established a violation of the Equal Protection Clause regarding the pay policy.[42]

## D. Educational/Vocational Training

### 1. Burden

The plaintiffs challenge for lack of equality some of the educational and vocational training policies at NCW as compared to NSP.[43] The challenges pertain to: (a) the postsecondary academic policy, (b) the vocational training (including preemployment) policy, and (c) the prerelease education policy. I conclude that plaintiffs suffer, and have suffered, a substantial burden in all three areas, although I do not think the burden is quite as extensive as plaintiffs contend. Since all three areas are fairly complex factually, I shall discuss them separately in some detail.

### (a) Academic

The challenge to the postsecondary academic policy involves both the lack of on-site postsecondary academic programs and the relative lack of quality of such on-site programs as were offered. The challenge also implicates restrictions regarding correspondence courses.

### (1)

I turn first to the challenge to the on-site programs or lack thereof. The postsecondary on-site academic policy issue requires review of two separate time frames—before October, 1990, and after October, 1990.

Before October, 1990, a male inmate at NSP could receive an accredited on-site postsecondary education offered through South East Community College (SECC). (See generally Ex. 34, at 51–53.) Between 14 and 17 separate courses were offered. This course of study could lead the male inmate to a certificate, associate degree, or diploma in business administration.

During the same time frame, a female inmate could only receive college instruction by correspondence courses, (Ex. 34, at 52), which correspondence courses were also available to men. This led Dr. Ryan, then a consultant to the State of Nebraska, and later an expert witness for the defendants, to warn in May, 1989, that "[t]he lack of opportunity for college courses for women is a matter which has been the subject of litigation in other states." (Ex. 34, at 38.) Ryan concluded that Standard 020 of the Correctional Education Association which "required institutions housing female inmates to pro-

---

41. The policy of segregating women from men in prison is thought to be founded upon four objectives: avoidance of the cost of co-correctional facilities, provision for the special needs of women in prison (for example, maternity), protection of the privacy rights of incarcerated women, and preservation of prison security. Note, **Women's Prisons,** 94 Yale L.J. at 1198–1204. As noted earlier, cost is not a justification for unequal treatment.

42. All members of the class who were employed at NCW during the time frame covered by the disputed pay policy would have been damaged by the policy. For the testimony of one or more inmates who testified that they were specifically harmed, examine the testimony of Linda Lange.

43. Both institutions offer and offered so-called basic education programs such as Adult Basic Education (ABE) and General Educational Development (GED), and plaintiffs do not challenge these programs.

vide educational programs" had been violated. (Ex. 34, at 65.)

In this connection, defendants endeavored to prove that the lack of postsecondary educational offerings was the fault of the inmates, and, at least implicitly, no practice or policy of the defendants burdened the inmates. Essentially, the defendants presented proof that NCW inmates were offered the opportunity to sign up for college courses to be taught by instructors from Peru State College, but not enough students showed an interest in the program.

I have carefully considered this evidence, but do not find it persuasive. First, the inmates were led to believe that they had to pay $33.00 per credit hour in advance without financial assistance, with six hours required. (Ex. 5000G.) Second, the proposed teachers were either high school teachers or a disliked NCW staff member. I note that staff members at NCW were initially interested in the proposed program, but later refused to sign up in sufficient numbers as well. Third, the offerings by Peru State College were not as extensive as those offered at NSP, and the administrators of DCS were not involved in initiating or arranging the proposed program.

There is simply no question that there were inmates at NCW who wanted to take college courses for credit. There is also no question that there were women at NCW who were fully capable of doing college-level work. For example, Ms. Lange had studied at the University of Nebraska and Northeast Community College before being imprisoned. Before arriving at NCW, Ms. Brown–Cortes had attended two colleges, and after leaving NCW, she completed the environmental laboratory program at SECC. In my opinion, the fact that NCW subsequently offered on-site college courses rebuts any claim that the failure to provide college courses was somehow based upon a lack of interested and able students.

Defendants raise two related arguments in an effort to establish either that the females were less capable of doing college work than the males, or that the females would not stay at the institution long enough to do college work. I am not convinced by either argument. Each argument disregards the fact that NCW later elected to offer college courses taught by SECC, and this fact effectively rebuts the argument that the women were not capable or that they would not stay long enough. Moreover, for the reasons indicated below, I am not persuaded that the facts support the defendants' arguments.

Defendants argue in their brief that since "60 percent of the NSP population had either 12 years of education or a GED" but the females at NCW on "average tested [at a] grade level of approximately the seventh grade ... a rational basis exists for the emphasis on basic education at NCW." (Defs.' Reply Pls.' Post–Trial Br. at 20–21.)

It appears that the defendants are not factually correct in absolute or relative terms. For example, while there is evidence that the average tested grade level for female inmates at one point was 7.37, (Ex. 783), the trial testimony of Ms. Axdahl, the person responsible for academic testing at NCW, was that the inmates at NCW tested near the ninth grade in school (8.9), and, accordingly, scored well above the sixth-grade level which was the adult national average for reading. In fact, in answer to one of my questions, Ms. Axdahl stated that as a "community of inmates [8.9 is] pretty good." (3227:21–25.) Significantly, she thought that 25 percent is "probably [a] real close estimate" for the number of inmates who could do college work at NCW. (3213:10–14.)

Also, defendants place a great deal of stock in the fact that apparently 60 percent of the male inmates at NSP had a GED or had been in school for 12 years. (Ex. 448, Education at Admission.) [44] However, it is incor-

---

44. It is interesting to note that this statistic is based upon "missing" data. For example, this statistic is based upon missing data for "149" maximum custody inmates. (Ex. 448, Education at Admission, under "Frequency.") The total **potential** sample size for this statistic was 538 inmates in current custody at the maximum se-

curity unit. (Ex. 448, **compare** total number under "frequency" (538) in Table "current custody" (maximum security) **with** total number under "frequency" (538) in Table "education at admission" (maximum security).) This means that out of a potential sample size of 538 inmates, NSP lacked educational data for 28 per-

rect to compare years of school attended with test scores—the former simply measures the number of years in school and the latter achievement. Unless one knows the tested grade level of the male inmates, no realistic comparison of abilities can or should be made. The evidence does not reveal the tested grade level for male inmates.

Still further, the evidence relied upon by defendants, (Ex. 783), also reveals that on average the females attained the 11th grade prior to commitment. Accordingly, the difference in grade levels attended (12th grade vs. 11th grade) between the two inmate populations is insignificant (assuming the doubtful utility of that comparison in the first place).[45]

Defendants next argue that because the average length of stay of the female inmates was less than 13 months, (Ex. 783 (12¾ months)), whereas the average length of stay for the males was 54 months, most of the women would not benefit from college course work. Thus it is argued that defendants had a reason for not providing on-site college course work to the females. I conclude that the "average length of stay" figures are also of doubtful utility.

At the outset, it is difficult to understand the argument of the defendants since male inmates, regardless of length of stay, could enroll in college work. Thus, it is difficult to understand the rationale for denying females the opportunity to do college work based upon a factor that was not employed for males. In this regard, the defendants have shown me no comparative data from which I could conclude either that NSP provided course work only to "long-time" inmates or, conversely, that NSP's experience with

"short-time" inmates in college classes was not satisfactory. Therefore, the "length-of-stay" argument is speculative.

Further, the difference in "length of stay" between NCW inmates and "medium" custody NSP inmates was small. The "medium" custody male group at NSP was probably "most like" the females at NCW. For example, in June, 1990, (Ex. 1385), the data showed: (a) inmates staying 24 months or less: NSP (medium) 70.7% vs. NCW 82.4%; (b) inmates staying 18 months or less: NSP (medium) 61.5% vs. NCW 74.3%; (c) inmates staying 12 months or less: NSP (medium) 50.6% vs. NCW 66.9%. Even if one looks at the maximum custody inmates at NSP, one out of five inmates stayed 12 months or less. *Id.* Indeed, nearly 40% of the NSP maximum custody inmates stayed 24 months or less. Since college course work was offered to these male inmates regardless of "length of stay," it seems fair to conclude that "length of stay" was not a factor in offering college work at NSP.

Also, Dr. Ryan, who found that NCW violated an educational standard regarding "equity," (Ex. 34, at 65), observed that in 1989 female inmates at NCW had sentences ranging from one year to life, (Ex. 34, at 49), and that the female inmates had no on-site college courses. (Ex. 34, at 53.) In contrast, she also observed that at one male institution with lower custody status inmates, (all minimum), and where the inmates had an average length of stay of about 18 months, (Ex. 34, at 48), 93 males were enrolled in 18 college courses. If 93 inmates at OCC enrolled in 18 college courses, then it is apparent that the "short length of stay" for the males (18 months) was not an inhibiting factor.[46] This

---

45. It should also be emphasized that Dr. Ryan found in 1989 that at OCC 18 on-site college courses, (Ex. 34, at 52), were offered to male inmates whose level of educational attainment was similar to the women. (Ex. 34, at 52.)

46. As I observed earlier, the same is true for levels of educational attainment where the OCC inmates and NCW inmates were found by Ryan to be similar, (Ex. 34, at 52), but OCC offered a substantial number of college courses to males.

cent of the maximum security inmates. A similar problem exists for medium security inmates where the total inmates in "custody" were 185, but NSP was "missing" data for 63 inmates for purposes of calculation of "education at admission." (Ex. 448, **compare** total number under "frequency" (185) in Table "admission type" (medium security) **with** total number under "frequency" (185) in Table "education at admission" (medium security).) NSP was missing educational data for about 34 percent of its medium custody inmates. With NSP missing educational data for well over 25 percent of the male inmates, it is difficult to give the "60%" figure relied upon by the defendants much credence.

being true for OCC, with lower custody status inmates than NCW, there is no reason to believe that it would not also have been true for NCW, given the average length of stay of about 13 months. Indeed, the data shows that slightly more than 25% of the females stayed longer than 18 months, and nearly 1 out of 5 female inmates stayed longer than 24 months. (Ex. 1385.) Thus, a significant number (25%) of the female population at NCW stayed longer than the average inmate at OCC, yet OCC, like NSP, and unlike NCW, offered on-site college work to its males with little evident difficulty.[47]

The failure to offer on-site postsecondary education at NCW substantially burdened inmates at NCW.

### (2)

After October, 1990, the women at NCW were offered on-site courses taught by SECC toward a certificate in secretarial technology, but not a degree or diploma. It is noteworthy that this offering took place about the same time this case was first set for trial. The software to run the computers necessary to teach at least an important portion of the secretarial technology courses for college credit was not available at the time trial started in July, 1992. Indeed, when Mr. Bomberger testified on August 4, 1992, he stated: "We are in that process now." (1982:5–10.) In fact, Bomberger indicated that the reason the business administration courses could not be offered at NCW as at NSP was because of the lack of sufficient computers:

Q. Is there a reason why you did not [offer] the business administration program that you had at NSP at NCW?

A. At the time, the business administration program had two computer classes in the first two quarters that we were offering and with only two computers, it would have been difficult to offer a business program.

(1973:2–8.)

During this same time frame (after October, 1990), NSP was offering the same business administration program to males that it had offered prior to October, 1990. As noted earlier, that program offered not only certificates, but also degrees.

After college courses were offered at NCW, the women were still substantially burdened as compared to male inmates at NSP regarding postsecondary education. First, the courses which were offered at NCW could not lead to a degree, while the men could obtain a degree at NSP. Second, without adequate computer resources, the courses which were offered were not adequate when compared to the evident availability of operational computers at NSP.

As to the first point, defendants argue that there is no burden on the females regarding the lack of a degree program because few inmates (perhaps no more than 17) stay more than 3 years at NCW. Defendants also argue that since no one has yet completed the certificate program at NCW it is advisable to wait to offer a degree program.

I am not persuaded. Given the small number of inmates at NCW, 17 inmates constitute a fairly large percentage of the total population. In fact, it appears that one out of five inmates stay longer than 24 months. (Ex. 1385.) In this regard, there is no showing that more than 3 years is required to complete a program leading to a degree (like most community colleges, SECC does not offer a bachelors degree). Finally, the testimony of defendants Director Clark and Assistant Director Tewes that they will consider a degree program after an NCW inmate completes the certificate program disregards (and tends to perpetuate) the historical disparity which existed at NCW.

The defendants have no convincing response as to the question of burden and the lack of computers.

Plaintiffs also argue that they are burdened because the secretarial course is a "traditionally female" course of study. Implicitly, plaintiffs argue that they are burdened because they lack the same program in business administration as the males at

---

47. Here it is appropriate to look at data from OCC, not because OCC was necessarily similar to NCW or NSP, but because it provides an opportunity to examine whether the "length-of-stay" data impacts male institutions where the length of stay is relatively short.

NSP. However, I do not find that the offering of secretarial technology but not business administration was a substantial burden, even though that course of study may properly be classified as traditionally female. As noted earlier, NCW was not obligated to offer identical programs.

In this case, a crude needs assessment was conducted, and that needs assessment establishes, to my satisfaction, that the secretarial technology course was responsive to many of the felt needs of the inmates. (Ex. 766.) Although it can be persuasively argued that the study was not the reason the secretarial course was in fact offered, the secretarial course is nonetheless responsive, particularly given the good participation rate of the female inmates. I also note that the SECC representative frequently surveys the NCW students to determine their needs with the result that some business administration courses are now being offered. Finally, I note that many of the secretarial technology classes are transferable as part of a basic curriculum in a variety of other SECC programs (including business).

### (3)

I turn next to the issue of burden regarding correspondence courses. Inmates at NSP could take correspondence courses for college credit, with some limited screening to insure the student had a chance at success, but there were no special prerequisites. On the other hand, inmates at NCW (at least up until SECC came on campus) were required to take and complete extensive prerequisites consisting of independent study course work in one of four areas, which was graded by the ABE/GED teachers, in addition to writing a paper based upon library materials the staff had compiled. The NCW prerequisites were required even if the inmate had done prior college work.

For example, Ms. Vrtatko testified that she attempted to take a correspondence course. She was informed that she had to take and complete certain high school courses. At first she took what courses she thought were required. She was then informed that she would have to take biology. She took and passed the biology course. She was then required to write a research paper.

At that point, Vrtatko became frustrated, did not do the research paper, and thus could not take the correspondence course. No more than four or five women were able to take correspondence courses from 1986 through 1990.

The prerequisites to the college correspondence courses, particularly during the time there were no on-site college courses taught at NCW, substantially burdened the female inmates given the fact that there were no similar prerequisites for males at NSP. There has been no convincing explanation as to why the inmates at NCW were required to take and pass the prerequisites when the males at NSP were not.

### (4)

In summary, in the academic area I find and conclude that:

1. Prior to October, 1990, the failure to offer on-site postsecondary education at NCW substantially burdened inmates at NCW, given the fact that such offerings were available to males at NSP;

2. After October, 1990, the failure to offer on-site postsecondary education to females at NCW which would lead to a degree and the failure to have a sufficient number of operational computers substantially burdened the female inmates, given the fact that male inmates at NSP could pursue on-site degree programs with operational computers;

3. Although traditionally female in nature, the secretarial technology course at NCW did not substantially burden females at NCW because it was generally responsive to surveyed inmate needs, the SECC representative frequently surveys inmate needs, some business courses are now being offered, and some of the courses which are offered constitute core courses for other areas of study (including business);

4. The prerequisites to the college correspondence courses, particularly during the time there were no on-site college courses taught at NCW, substantially burdened the female inmates, given the fact that there were no similar prerequisites for males at NSP.

### (b) Vocational

 I turn next to the challenged vocational training (including preemployment) policy. Once again, the vocational training policy is made up of components, some of which changed over time. The components challenged by the plaintiffs are the so-called clerical arts vocational education program, and the CSI employment policy, including preemployment training.

### (1)

Turning first to the clerical arts program, there are two time frames which must be reviewed—before and after July 1, 1991. I turn first to the period before July 1, 1991.

Before July 1, 1991, NCW offered vocational education to its inmates through an unaccredited program entitled "clerical arts" and later "business education." The "clerical arts" program was the only vocational education program offered at NCW, with the exception of a horticulture program that was offered for about one year during 1990 and 1991. The clerical arts program offered training to NCW females so they might work in an office. The clerical arts program could not be taken for college credit. In contrast, males at NSP during this period of time could receive vocational training in either culinary arts or welding. Those courses were taught by instructors from SECC. Unlike the NCW clerical arts program, the culinary arts and welding programs at NSP could be taken for college credit. The female inmates complain that they were substantially burdened during this time frame because the "clerical arts" program was qualitatively poor, not taught by an accredited institution from which college credit could be received, stereotypical as compared with the programs at NSP, and limited as to available options as compared to NSP.

As a general matter, I do not believe the inmates at NCW were burdened because the clerical arts program was qualitatively poor when compared with the vocational programs at NSP. By and large, the evidence reveals that the clerical arts program was based upon a solid curriculum, was taught or supervised by good teachers (particularly Ms. Axdahl), and was generally responsive to the needs of inmates who desired clerical arts vocational training. To the extent that the "experts" can be believed, they generally thought the vocational educational program at NCW, particularly in the later stages of its development, was adequate.

However, there is evidence to suggest that the clerical arts program, at least until about July, 1990, lacked sophisticated computer equipment, particularly software. And, unlike "secretarial technology," which obviously sought to develop significant proficiency beyond that necessary for an entry-level position, Ms. Axdahl testified that the goal of the clerical arts program was more modest. She believed that the goal was to train the inmates for entry-level positions. Drawing from a conference with employers, Ms. Axdahl believed that from a vocational education perspective, learning "very basic" computer skills—"knowing how to turn off and on a computer, what a disc drive is, what a disc is, what a monitor is"—was the appropriate type of program. (3076:18–21.) Thus, it does not appear that the lack of computer equipment rendered the clerical arts program unable to satisfy its modest goals. This being true, one should remember that the inquiry here for equal protection purposes is on comparative quality. I am unwilling to conclude that because its goal was modest the clerical arts program was qualitatively poor as a result of lack of computer equipment when compared with the culinary arts or welding programs, both of which also sought to provide entry-level training (when not taken for a college degree).

I do believe, on the other hand, that the women at NCW were substantially burdened in two areas compared to the men at NSP. The men had the opportunity to pursue a varied vocational education program—culinary arts or welding. The women were limited to clerical arts, an admittedly traditional field for females. The men were taught through SECC and could receive college credit for their vocational training. In fact, they could receive degrees from the programs. (Exs. 167 and 168.) The women were not taught by SECC and could not receive college credit or degrees for their vocational training. With perhaps the excep-

tion of a typing course, none of the "clerical arts" courses could be used for SECC credit when SECC started teaching "secretarial technology."

In sum, during this time frame the women were burdened because they lacked the range of options that were made available to the men in vocational education. They had only one course to choose from and they could not receive college credit (or a degree) for their vocational efforts.[48]

Dr. Ryan, who was, as noted above, a consultant to the State of Nebraska and later one of its expert witnesses in this case, opined in May, 1989, that the "vocational program for female offenders was inadequate," (Ex. 34, at 69), inasmuch as "there was only one vocational program for women and this was the traditional clerical arts or office occupations." (Ex. 34, at 65–66.) Dr. Ryan warned that the limited opportunity for women "has been addressed in court cases in other states in which inequity for female inmates has been charged." (Ex. 34, at 38.)

The defendants do not address the significance of the inability of the females to pursue college credit for their vocational training. However, they do make a number of arguments suggesting that women were not burdened by the limited opportunities for vocational training at NCW compared to what was available to the men at NSP. Those arguments are: NCW previously offered vocational programs (truck-driving and apprentice programs) but the women were not interested; the women receive prevocational programs which are not offered to men; a greater percentage of women participate in vocational programs than men, and men are idle and women are not; and per capita spending is greater for vocational programs for women than it is for men. I turn to those arguments now.

Defendants argue that NCW had offered truck-driver training (1978–1980) and apprentice programs (the last inmate left the

program in 1987) in the past. Defendants point out that not enough female inmates successfully completed these programs for the programs to remain in place. From this fact, the defendants argue that the limited option (clerical arts) available to the inmates at NCW was caused by lack of inmate interest in other types of training. I am not persuaded by the truck-driving and apprentice evidence.

The truck-driving evidence was sketchy at best. While there was evidence that few inmates completed the program, there was also evidence that a fairly large number of individuals took the courses. Moreover, it is not surprising that few people would complete the truck-driving program given the fact, as one expert noted, that it would be difficult to get a job driving a truck with a felony criminal conviction.

As to the apprentice program, I think the evidence strongly suggests two things. First, the apprentice program was probably too difficult (for males or females). Two, Dr. Ryan suggested in 1989 that the apprentice program for females be reactivated, (Ex. 34, at 40), which further confirms the relative need at NCW for more vocational options. NCW did not see fit to do so.

Most importantly, the evidence shows that when NCW adopted the horticulture program as an alternative to clerical arts, the program was very successful. Thus, when NCW had a properly designed course as an alternative for clerical arts the inmates were very interested. As a consequence, the "lack of interest" argument is not persuasive.

Defendants also argue that the women received "prevocational" training that was not offered to the men. By implication, the defendants seem to argue that this prevocational training should substitute for the lack of options at the vocational level. I am not persuaded by this argument either.

The prevocational training—one course in living skills and one course in parenting—

48. Horticulture was offered at NCW for about a year in 1990 and 1991, but was terminated when budget cuts were implemented, as will be discussed in a moment. In any event, when horticulture was offered, thereby providing the female inmates with a nonstereotypical additional vocational training option, the program was very well received. During the time horticulture was offered, the inmates did have two options for vocational education, but still would have been burdened by the inability to receive college credit or a degree in either vocational program.

was excellent.[49] In fact, the parenting course—called by the acronym of MOLD for Mother Offspring Living Development—was a truly outstanding program by all accounts. But these courses were not vocational by definition. These programs addressed needs, but not, at least directly, vocational needs. For comparative purposes, the relevant question focuses on the vocational opportunities for women compared to men, and not some other opportunity no matter how otherwise significant.[50]

To the extent the defendants argue that the prevocational training precluded offering options for vocational training to women, I find there is no credible evidence to support such a contention. Indeed, the success of the horticulture program disproves such an argument.

Finally, defendants rely upon statistics for their argument that the women are not burdened. They argue that a greater percentage of women as compared to men received vocational training, and that the State of Nebraska spent more on a per capita basis for vocational training for females than for men. I am not persuaded by these statistics.

As to the fact that a larger percentage of women have taken advantage of the vocational training than men, such a statistic is not helpful because the order of magnitude is quite small. The statistic also fails to account for the differences between the programs at NSP and NCW. The statistic further fails to account for the large proportion of men who simply would rather be idle. At most, the statistic may show that the women at NCW were more motivated than the men at NSP to achieve vocational education.

The evidence reveals that about 14% of the women at NCW and 7% of the men at NSP took advantage of vocational programs. (Ex. 34, at 50.) The order of magnitude between the two percentage numbers tells me very little. When the numbers are scrutinized

more closely, they may in fact tend to confirm the disparity.

For example, 7% of 560 NSP inmates, (Ex. 34, at 47), is about 40 inmates, whereas 14% of 112 NCW inmates, (Ex. 34, at 48), is about 16 inmates. Thus, about 2.5 times as many inmates participated in the two programs at NSP which offered college credit than participated in the one program at NCW which offered no college credit. If the statistic shows anything, it tends to show that the women were quite motivated to pursue fewer options.

Moreover, the programs at NSP take more time to complete than the clerical arts program at NCW. The clerical arts program involved attending class 2 hours a day and was essentially a self-study course. (Ex. 34, at 49.) The welding course was full time and lasted about 9 months. (Ex. 34, at 47.) The culinary arts program was a full-time course and took about a year to complete. (Ex. 34, at 47.) Thus, an NSP inmate would have to forego all other activities in order to pursue vocational education, whereas an NCW inmate would not. It is not surprising, therefore, that relatively greater numbers of inmates at NCW could take advantage of a course of vocational education in clerical arts which was much less demanding from a time standpoint than the vocational courses at NSP.

Still further, any comparison of inmate activity must take into account the fact that large numbers of inmates at NSP simply did not want to be active. The warden at NSP testified. He told me:

[T]here's 25 to 30% of the population that aren't interested in working anywhere close to a six or eight hour day and will work in some cases only because we have assigned them to work. They are not given a choice, and that many of those simply want to do the minimum they have to do in a given job so that they have

---

49. There is no dispute about the fact that these programs were "prevocational"; in fact, that was the nomenclature used by the defendants. (Defs.' Post–Trial Br. at 31 ("The pre-vocational programs, MOLD and Living Skills, help inmates develop parenting skills and home economics skills.").)

50. For example, no one would could reasonably contend that providing males with a course on anger control would amount to providing them with vocational training, although anger control might otherwise be needed by males to pursue a vocation.

satisfied the minimum expected of them and be onto things they might otherwise be interested in.

(5157:7–15.)

If 25% to 30% of the NSP inmates did not want to work anything close to a 6- or 8-hour day, they clearly would have no interest in vocational education which required a full-time commitment. Thus, the statistic offered by the defendants is misleading.

The warden's testimony also reveals the tenuous nature of the raw data offered by the defendants. If one excludes 30% of the inmates from the calculation on inmate utilization of vocational programs at NSP, the percentage of male inmates using vocational programs increases by over 45%—from about 7% of the population to about 10% of the population.[51]

Of additional interest is the fact that the 30% of the male inmate population at NSP who do not want to work anything close to a 6- or 8-hour day exceeds in number the **total** inmate population at NCW during the time the statistic was derived (168 vs. 112). Thus, on a given day, there are more inmates at NSP who do not wish to be busy than there are total inmates at NCW. Therefore, the fact that a relatively large percentage of female inmates wanted vocational education attests to the strong motivation of the females as compared to the males. It is this motivation, not some perceived equality of programming, that probably accounts for the larger percentage of women than men pursuing vocational education.

For similar reasons, I discounted almost entirely the data on "idleness." The defendants provided statistical evidence that nearly 100% of the female inmates were busy during the day, while something approaching 60% of the male inmates at NSP were "idle" during the day. This survey, which appeared to be hurriedly prepared (conducted the day before the witness testified at trial), was offered in an evident attempt to show that the females received more of all kinds of programming than the males, including vocational education, jobs, schooling and the like.

The person who prepared the report stated that males who went to school half time and worked half time were counted in the statistic as "idle." For purposes of the study, a male inmate would be "active" only if he went to school or a job full time (at least 6 hours), but he would not be "active" if he went to a job half time and school half time. It is difficult to determine whether the witness followed the same methodology at NCW.

I have two serious reservations about the validity of the "idleness" study. First, the study does not account for male inmates who do not want to be active (as much as 30% of the population at NSP). Second, the study uses an artificial definition of "idle," counting as idle inmates who went to school half time or worked half time, or performed some combination of work and schooling. As to this second point, the number of inmates who worked or went to school on less than a full-time basis is not revealed by the study, but it may be as much as the majority of inmates. ("Most people in the adult male institutions are in school one, two, three hours the majority, so they would not be included in those that worked six hours.") (4230:25–4231:3.)

I also note that this "idleness" data could be contradicted by Dr. Ryan's 1989 study. Dr. Ryan found that at NCW no more than 16 inmates were working, and the number involved in full-time schooling was 12. (Ex. 34, at 49.) Thus, at NCW, during 1989, if one employed the same methodology used by the defendants, 75% of the females were "idle" (28 divided by 112). Using Dr. Ryan's data again for NSP, one finds that NSP apparently provided full-time jobs or full-time schooling for 247 inmates, or more than 8 times more opportunities for full-time jobs or schooling than provided by NCW. (Ex. 34, at 47 (112 working at private venture, 100 working at CSI, 15 full time at school, 20

---

51. Thirty percent of 560 inmates is 168 inmates. (560 − 168 7c 392.) Forty inmates in vocational programs divided by 392 potentially interested inmates yields a figure of about 10.2 percent.

Thus, the exclusion causes the percentage of male inmates using vocational programs to rise from about 7 percent to 10.2 percent, or an increase of 45.7 percent.

inmates full time at welding or culinary arts).) [52]

More fundamentally, the defendants' "idleness" data tells me almost nothing about whether "idleness" was a factor in programming decisions at NSP, NCW, or both. If the data tells me anything, it tells me that the women are motivated to take advantage of the programming made available to them.

I briefly turn next to the question of per capita spending. Defendants argue that the expenditure per inmate for vocational education greatly favored females. (Ex. 1378.) But, as noted previously, per capita spending is not a good measure of "parity" because of the relatively small numbers of female inmates compared to male inmates.

As to the specifics regarding the cost of vocational education, these costs include expenses for "Living Skills" and "MOLD" which I have previously found are not vocational in nature. As a consequence, even setting aside the inherent difficulty of comparing costs given the difference in size of the two institutions, the data includes costs for nonvocational programs. Therefore, the defendants' cost data wrongly inflates the per capita costs to an unknown degree.

(2)

I next address the period of time from and after July 1, 1991. Due to a cut in budgets after July 1, 1991, all "vocational" programs at NSP were eliminated. The horticulture program at NCW was terminated, but NCW was allowed to keep its clerical arts/business education program. Apparently, NCW was allowed to keep its clerical arts/business education program because this program also served to provide "preemployment" training for workers who were employed to provide data-entry services for CSI.

Although plaintiffs fear that vocational education will be provided to male inmates through "pilot" projects at various CSI ventures, thereby denying the females equal opportunity for vocational education, there is no convincing evidence of such activity at present. Accordingly, since NCW maintained at least one vocational education program, and NSP none, I find that the females were not substantially burdened for vocational education purposes after July 1, 1991.

(3)

The NCW inmates challenge the way they are dealt with by the prison industries program known as CSI when compared to how the NSP men are dealt with by CSI. CSI is operated by DCS. CSI is not a corporation but is treated "as any other program within the department." (5196:18–19.) In essence, CSI provides goods and services, produced through inmate labor, to other state agencies and subdivisions of state government. The female inmates complain that they are treated inequitably because they have fewer quality options [53] for employment, and because they either were not provided with preemployment training or the training was relatively poor compared with that provided the men.

It is true that the men have a greater number of employment options through CSI than the women. At NSP, men could work at CSI shops dealing with furniture, welding, license plates (seasonal), braille, paint, soap and printing. At NCW, women could work at either a sewing shop or a data-entry shop.

I am not persuaded that the women are substantially burdened simply because men have a greater number of CSI shops to choose from. Unlike the situation in vocational education prior to July, 1991, where the women had no alternatives to clerical arts but the men could choose between welding and culinary arts, in terms of CSI employment the women have options (data entry and sewing), although the options are comparatively more limited than for the men.

Remembering that the Equal Protection Clause does not require identical programs, since women have options regarding CSI, the

---

**52.** Dr. Ryan did not count state-paid work assignments.

**53.** I do not understand the plaintiffs to argue that, as compared to the men, fewer jobs relatively speaking are provided to the females by CSI. Indeed, about 35 NCW inmates have CSI jobs and about 108 NSP inmates have CSI jobs. Given the fact that NSP is anywhere from 5 to 7 times larger than NCW in terms of inmate population, there is rough parity in the sheer numbers of jobs provided by CSI.

question is not so much numbers but the quality of the options. *Glover IV*, 721 F.Supp. at 837 (refusing to judge parity regarding vocational programming on "a 'body count' of programs," but finding the quality was inferior). The evidence was sketchy at best as to whether the CSI jobs at NSP were better in terms of quality compared to the CSI jobs at NCW.[54] In fact, plaintiffs spend virtually no time in their posttrial briefs telling me why, aside from counting jobs, the female inmates are substantially burdened in this area. Accordingly, I find and conclude that the women were not substantially burdened by the number of CSI employment options or the quality of CSI jobs at NCW as compared with NSP.

I turn next to the preemployment aspect of CSI's presence at both prisons. It is clear that all inmates who work for CSI at either NSP or NCW receive some preemployment training. The plaintiffs argue that the preemployment aspect of the CSI operation, in essence, provides vocational education and that, comparatively, the females are substantially burdened by the differences in treatment.

The preemployment training at NSP is provided through SECC, and it is extensive and comparatively sophisticated. (Exs. 264–274; 927–933.) The training is made up of five core courses (orientation, mathematics, measurements, the "worker," and safety) followed by specific vocational courses (blueprint reading/drawing; wood furniture (power equipment); metal furniture (including welding) and sewing). It takes about two weeks to complete this training.

SECC described what it did for preemployment training this way:

SOUTHEAST COMMUNITY COLLEGE

CORRECTIONS DIVISION

CORRECTIONAL INDUSTRIES PRE–EMPLOYMENT TRAINING

MAY 22, 1990

Upon assignment as a STUDENT, individuals are registered on a registration form that specifies that they are enrolling in a non-credit course of training. There are nine courses or booklets offered to the enrollee:

1. ORIENTATION

2. MATHEMATICS

3. MEASUREMENTS

4. THE WORKER

5. SAFETY

6. BLUE PRINT READING/DRAWING

7. WOOD FURNITURE (Power equipment)

8. METAL FURNITURE (including Welding)

9. SEWING (Jade/Lapen)

The first five basic core booklets are manditory [*sic*] for all students. One must take these courses, in order to receive *a certificate of completion.* Enrollees are interviewed as to their desire and purpose for joining the program ... what their expectations are, what goal they want to achieve.

The new student is then given a brief oral history of Correctional Industries, summerizing [*sic*] highlightes [*sic*] and events that have taken place over the years. The changes that have taken place in manufacturing, management, warehousing, and marketing. Class and shop routines are discussed ... times of arrival and departure; the signing in and out proceedure [*sic*]; location of class room toolroom [*sic*]; toilet faculity [*sic*]; smoking area; drinking water; fire exits; along with areas off limits.

Students are assigned a SERIES # 1 Note Book containing: ORIENTATION, MATHEMATICS, MEASUREMENTS, and THE WORKING MAN plus SAFETY. The course is presented as an open entry open exit plan of study enabling each

---

54. For example, there was a fair amount of testimony that the data-entry job involved only "inputting" such things as names into a computer, and, therefore, the inmates did not learn much. On the other hand, there was very little evidence about whether the jobs for the males were much better.

person to proceed at his own pace. The introduction portion of the Orientation is in fact a reading test which can be taken either immediately after reading the introduction only or after reading the complete booklet.

After a student has taken SERIES # 1 and is interested in further study he is given SERIES # 2 which covers the balanced [*sic*] of core booklets i.e.,

BLUE PRINT READING

WOOD FURNITURE

METAL FURNITURE

SEWING

In conjunction with the core booklets the student is provided with various film strips and viedo's [*sic*] covering various aspects of proper tool use and safety. Plus, the program provides the student with the exposure and access to various books for further reading and research if the student so desires.

(Ex. 264.)

For NCW, there are two time periods that must be considered regarding preemployment training and the sewing factory—before and after July, 1991. Prior to July, 1991, there was no preemployment training of any formal nature. While there was a suggestion that the women who worked at the sewing factory received some sort of "on-the-job" training, it is clear that until the program was formalized, the women received substantially less training, particularly in the five "core" areas, than the men at NSP received.

After the summer of 1991, an administrative assistant for NCW was assigned to conduct the training, and NCW formally adopted a preemployment training program for the sewing factory which utilized most of the same manuals as were used for the men at NSP. The training program at NCW is individualized with the NCW inmate working through the training manuals obtained from NSP. A practical test on sewing is given after the manuals are completed. It is noteworthy that NSP has adopted the practical test on sewing for use in its preemployment course of study for sewing.

I conclude that prior to July, 1991, the inmates at NCW who took jobs in the CSI sewing factory were substantially burdened since they did not receive preemployment training of the quality the men received at NSP. I conclude that after July, 1991, the women were not substantially burdened since they received preemployment training similar in quality to that received by the men.

Insofar as preemployment training regarding the CSI data-entry program is concerned, it is limited to typing instruction given by the business education department. As recounted by Ms. Axdahl, the program is for those who cannot type, and the purpose of the program is to establish basic typing skills:

Q. And would you describe for us how that training for data entry occurs through the business education department?

A. Yes. When students, when inmates go [sic] are interested in data entry, they speak with Mrs. Mary Mast and Mrs. Mast if she is interested in having that person and the person doesn't possess adequate typing skills, can recommend that they go and participate in a month long program and sometimes the program is extended, but it's generally just a month to develop some basic typing skills in the business education department.

(3085:19–3086:3.)

Regarding preemployment training for the data-entry program, I conclude that the females at NCW are substantially burdened in that they receive no formalized preemployment training of any kind unless they need to know how to type. In any event, the females receive no training in the five "core" areas stressed in the preemployment training at NSP. The value of the "core" training for the females can be seen by the adoption of such training for the females at the sewing factory.

The defendants argue that preemployment training is job-specific and therefore cannot be compared between institutions, let alone between jobs. While defendants may be correct to a degree, the factor common to all preemployment training through CSI is a series of five "core" courses that serve a distinct educational function which is not job

specific. Indeed, at NSP, CSI treats preemployment training in a "generic" way, regardless of the job sought, until the five core areas of study are completed. In this regard, I agree with the NCW inmates that the preemployment training given by CSI at NSP may properly be considered educational in nature. Note, for example, that CSI describes the prospective employee not as an inmate or employee but as a "student." The "student" receives instruction in five core areas that are clearly educational in nature, and the "core" instruction culminates in a reading test.

(4)

In summary, in the vocational area I find and conclude as follows:

1. Before July 1, 1991, the females at NCW who were enrolled in the clerical arts program were not substantially burdened because the program lacked sufficient computer capacity since the goal of the program was modest (to provide entry-level skills) and, in this regard, the vocational programs at NSP were of comparable quality (if not taken for a degree).

2. Before July 1, 1991, the females at NCW were substantially burdened because they lacked the range of options that were made available to the men in vocational education in that the women had only one course to choose from (clerical arts), and they could not receive college credit or a degree for pursuing such a program. Whereas, the men had two courses to choose from (culinary arts and welding) which could be taken for college credit, and a degree could be received for pursuing such a course of study.

3. After July 1, 1991, since NCW maintained at least one vocational education program, and NSP none, the females were not substantially burdened for vocational education purposes.

4. The women at NCW were not substantially burdened by the number of CSI employment options or the quality of CSI jobs at NCW as compared with NSP inasmuch as the women had options, albeit fewer in number than the men, and the jobs appeared to be of comparable quality.

5. Prior to July, 1991, the inmates at NCW who took jobs in the CSI sewing factory were substantially burdened since they did not receive preemployment training of the quality the men received at NSP, but after July, 1991, the women were not substantially burdened since they received preemployment training similar in quality to that received by the men.

6. Regarding preemployment training for the data-entry program, the females at NCW are substantially burdened in that they receive no formalized preemployment training of any kind unless they need to know how to type, and, in any event, the preemployment training is not of similar quality to that received by the men.

(c) **Prerelease**

The female inmates challenge the so-called prerelease policy at NCW, claiming that as compared to the program at NSP the program was either not offered at NCW, or if offered, was deficient. Prerelease programs are programs designed to prepare an inmate for reentry into society, and are considered by DCS to be academic and vocational in nature. (Exs. 183 and 1299.)[55]

I turn first to the NSP prerelease program. Since Mike Smith, an SECC instructor, began directing the program in September, 1988, the prerelease program at NSP has involved 32 or 33 different study units. The study units consist of broad areas regarding general health and nutrition, mental health, transition to community, community resources, employment, and family transition. The prerelease program is not mandatory, but it is given to inmates who wish to take the course. It is taught in a classroom by an instructor 4 days a week for 2½ hours, with Friday used as a make-up day. The class is 5 weeks long, and is offered every 45

---

55. Defendants complain that prerelease as such was not a matter controverted in the pretrial conference order and, accordingly, argue that I should not consider plaintiffs' claim. In my view, prerelease is a part of the academic and vocational policies challenged by the plaintiffs and is thus fairly raised by the order. Even if it were not, I would grant leave to amend under Fed.R.Civ.P. 16 as it is clear that the defendants were not surprised by the issue.

days or so. An inmate becomes eligible when he has received a parole eligibility or tentative release date which is six months to a year in the future. Mr. Smith believes the program reduces recidivism rates. For example, in one year the recidivism rate for those who completed the program was 10%, while the general rate was 23%.

When it is offered, the prerelease program at NCW consists of a six-week course of study which includes units on life on the street, job-seeking skills, the parole and pardon process, planned parenthood (if not done by the medical department), community corrections (work release), money management (if the inmate has not taken the programs through MOLD), and self-esteem. The program was offered five times in 1988, twice in 1989, and then not again for more than a year. The program was offered once more in June, 1990, January, 1991, and October, 1991. As of the date of trial in July, 1992, the program had not been offered since October, 1991. Although the superintendent of NCW thought the program was important, Ms. Axdahl, the person who was responsible for the program, had so many other duties— education coordinator, recreation director (at times), law librarian (at times) and resource person for orientation—that she simply did not have time to offer the program on a regularly scheduled basis.

I do not believe the inmates at NCW have been substantially burdened by any qualitative differences in the prerelease programs as between NCW and NSP. While the programs are different at the two institutions, from a qualitative standpoint I believe the program at NCW is sufficiently designed such that it is comparable to the NSP program. Indeed, Mike Smith testified that some of the course work for the NSP program had been derived from the NCW program.

On the other hand, I think it clear that the NCW program has not been offered on a regularly scheduled basis since 1988. Accordingly, the NCW women have not known when the course would be offered, and for fairly large blocks of time—in some cases for more than a year—the prerelease program was simply not made available to the inmates at NCW. Thus, I find and conclude that the women at NCW have been substantially burdened since January 1, 1989, by the failure of NCW to provide regularly scheduled prerelease programs to its inmates given the fact that NSP inmates were provided with regularly scheduled prerelease programs.

The defendants argue that the prerelease program at NCW must be viewed in light of the other programs at NCW such as the MOLD program. In other words, the defendants, in essence, argue that because of other programs at NCW the failure to provide regularly scheduled prerelease programming did not harm the NCW inmates. I am not persuaded.

The Department of Corrections, and indeed the staff at NCW, viewed prerelease programs, as such, as important for male and female inmates. The truth of the matter, according to the NCW superintendent, is that the prerelease program, as a separate program, "**was very important.**" (3786:9– 14) (emphasis added).)

### 2. Important State Objective

Having determined that females suffered a substantial burden as a result of the defendants' educational and vocational policies, I must now determine whether there are important governmental objectives which are said to warrant the challenged policies. Once again, the defendants do not clearly articulate the important state objectives which justify the policies at issue. Accordingly, I conclude that the important state objective upon which the educational and vocational policies are founded is the objective of remediation and there exists no other asserted objective.[56]

### 3. Relationship Between Objective and Means

Having previously determined that an important governmental objective exists in providing remedial services to women at NCW, the question becomes whether the means

---

**56.** There are repeated references in the briefs to various administrative excuses for the comparative inequality, such as cost. But, as noted previ-ously, these excuses do not constitute an important governmental objective.

chosen to further that objective are directly and substantially related. In this instance, the "means" chosen are the academic and vocational policies found to have substantially burdened the female inmates at NCW.

As noted earlier, the *Pitts* court recognized that where the challenged policy "directly responds to and entirely correlates with the more pervasive gender classification existing in both federal and state prison systems," the challenged policy may be upheld, unless the record shows the challenged policy to be the product of traditional stereotyping or archaic notions of "appropriate" gender roles. 866 F.2d at 1459. Once again, the challenged academic and vocational policies previously found to have substantially burdened the female inmates fail the *Pitts* test on both counts.

First, and by way of example, denying women the opportunity to take on-site college classes when their male counterparts have such opportunities cannot be said to "directly respond" and "correlate" to the "pervasive" policy of segregation of women from men in prison. There is nothing about the need to segregate men from women in prison that requires the state to provide unequal educational or vocational opportunities to women.

Second, to the extent the unequal academic and vocational policies are postulated upon the notion that the "special needs" of women require the difference in treatment, I am satisfied that such a notion is an afterthought, predicated, in any event, upon a stereotypical assumption about women. The defendants largely argue that the differences in treatment between the male and female inmates are products of the exercise of discretion of prison administrators. In essence, the defendants argue that so long as female inmates were provided some type of programming, the court should not interfere with the prison administrators' exercise of discretion as to which programs should be offered inasmuch as women have special needs.

For example, in regard to vocational services the defendants argue: "As long as prison administrators provide vocational programming across the board, courts should not interfere with prison administrators' discretion in determining the types of vocational program[s] to be offered at each institution." (Defs.' Post–Trial Br. at 35.) The defendants seem to argue, albeit implicitly, that the programming decisions for the women as compared to the men were based upon "different needs ... within the two institutions." (*Id.* at 24.)

There are two difficulties with this argument. To begin with, there is virtually no evidence to suggest that the programming offered the women was the product of the exercise of discretion. What struck me over and over again was that female inmates were treated differently simply because it was **assumed** that the females required different treatment. Very little, if any, thought was given by the defendants as to whether women truly required different academic or vocational policies compared to the men. While the defendants now point to the differences in the inmate "profiles," there is scarce evidence that these profiles ever motivated the defendants when making programming decisions.

Still further, the fact that women may have "special needs" does not warrant the conclusion that women have lesser academic or vocational needs. The defendants make much of the fact that the women are provided with programs designed to assist them in raising their children—the so-called "MOLD" and "Living Skills" programs—and seem to suggest that as a result of such programs the relative inequality of the academic and vocational policies should be overlooked. The short answer to this argument is that the needs of the women in the academic and vocational areas are simply not addressed by programs such as "MOLD" or "Living Skills."

As noted earlier, it could scarcely be contended, for example, that programs designed to assist men in dealing with aggression are academic or vocational in nature, although surely control of aggression may be a necessary ingredient for academic or vocational success. The same is true of the "MOLD" or "Living Skills" programs offered to the women. Therefore, one cannot substitute one

program, such as MOLD, for another program, such as postsecondary education, on the theory that the former addresses the need for the latter.

Moreover, to the extent the defendants argue that NCW was required to stress basic education due to the special needs of women compared to men, such an argument, as previously indicated, is not factually supported in absolute or relative terms. For example, any comparison between the males at NSP and the females at NCW is premised upon a significant amount of "missing data" for the men; female inmates at NCW tended on average to score better than the adult national average for reading; and about 25% of the women could do college work. Indeed, at OCC, where in 1989 levels of educational achievement were admittedly similar to those at NCW, the State of Nebraska offered on-site college courses, thereby suggesting that it is feasible to do for NCW inmates what was being done for inmates at NSP.

Thus, much of the defendants' argument is based upon views of the nature of women which are irrelevant (just because women need programs such as MOLD does not mean they do not need equal academic or vocational programs) or inaccurate (women compared to men in either absolute or relative terms are as capable academically). Because the challenged policies are built upon notions about women that are irrelevant and inaccurate, it is fair to infer that there is no direct and substantial relationship between the means chosen and the objective sought.

In summary, I find and conclude that the challenged academic [57] and vocational [58] policies previously determined to have substantially burdened the female inmates are not directly and substantially related to an important governmental objective. As to these policies, the NCW inmates have therefore proven a violation of the Equal Protection Clause.

### E. Law Library

#### 1. Burden

■■■■ The NCW inmates claim they are substantially burdened as compared to the men at NSP by the following policies concerning the law library: [59] (a) law library restrictions on segregation inmates; (b) law library restrictions on orientation inmates; (c) the hours the law library is available to general population inmates; and (d) the contents of the law library. I shall address each complaint in turn.

#### (a) Segregation

The evidence establishes that prior to and until November, 1989, the women inmates at NCW who were segregated [60] from the general population had no physical access to the law library, and they had to submit requests for materials to Ms. Axdahl, who in turn would have other inmates, who were generally untrained, gather the materials. It is not clear what type of access males at NSP were provided during this period of time, but it appears to have been similar to that provided

---

**57.** For the testimony of one or more inmates who have been harmed by the challenged policies, see generally the testimony of Lange, Nancy Brown (Cortes), Vrtatko, Anthony, Rebecca Brown, Neely, Griffin, and Danekas.

**58.** For the testimony of one or more inmates who have been harmed by the challenged policies see generally the testimony of Klinger, Nancy Brown (Cortes), Vrtatko, Younger, Anderson, Danekas, Williamson, Anderson, Rebecca Brown, Batiste, Neely, Griffin, Danekas, and Smith.

**59.** The inmates also have a separate claim that, notwithstanding the claimed equal protection violation, they have been denied their constitutional right of access to the courts under the Fourteenth Amendment. See *Bounds v. Smith*, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977). Thus, the women argue that even if

there was no equal protection violation, they have proven a constitutional violation in that they did not have meaningful access to the courts. See, e.g., *Glover I*, 478 F.Supp. at 1096–97 (the fact that the law library at the men's institution was larger than the law library for the women did not establish an equal protection violation so long as the library for the women was adequate, but the women were nevertheless denied their right of access to the courts because an adequate library cannot provide meaningful access to the courts to a prisoner untrained in basic legal research techniques). For the sake of clarity, I shall review these claims—equal protection and access to the courts—separately.

**60.** This segregation was normally for disciplinary reasons.

the females. *See Reutcke v. Dahm,* 707 F.Supp. 1121, 1127–32 (D.Neb.1988) (finding similar restrictions on males). While the female inmates may have proven a violation of their right of access to the courts, they have not proven that they were substantially burdened by the difference in treatment for equal protection purposes.

### (b) Orientation

The orientation [61] inmates appear to have been restricted in the same manner as the segregation inmates until November, 1989; that is, they had no physical access to the law library and they had to submit requests for materials to Ms. Axdahl, who in turn would have other inmates, who were generally untrained, gather the materials. But the evidence is vague about precisely how the NSP inmates in orientation were treated during this time frame. Accordingly, I conclude that the NCW female inmates have not proven they were substantially burdened for equal protection purposes, although they may have established a violation of their right of access to the courts.

### (c) Library Hours and Contents

 Since the challenges to the library hours and the contents of the library by the general population inmates are similar, I shall consider the challenges together.

I reiterate that simply because the law libraries at the male and female institutions are different in size or are operated differently does not mean that the women are substantially burdened for equal protection purposes. *Glover I,* 478 F.Supp. at 1096 ("I do not believe that because [the male prison] has a much larger library that Plaintiffs can fairly claim that the State discriminates against them."). On the other hand, simply because the state provides an otherwise constitutionally acceptable law library under *Bounds* for use by women does not mean

that women are treated appropriately for equal protection purposes. *Canterino II,* 644 F.Supp. at 739–740. The relevant question, of course, is whether the differences are significant enough that it may be said that women are substantially burdened for equal protection purposes.

I have concluded that throughout the relevant time frame the women inmates have been substantially burdened with reference to issues concerning the law library.

### (1)

Prior to November, 1989, the NCW law library was housed in a very small room. For example, in order to do legal research one apparently had to "stand in the aisle," (2717:6), because the only table was a small typewriter stand. The legal materials were not organized but "just were kind of piled all over." (2717:8–10.) After November, 1989, the law library was moved to better quarters. The male inmates at NSP always had adequate quarters for a law library.

For a substantial period of time, the law library at NCW did not contain the important tools for basic legal research. Until "either late in 1989 or early 1990," (1872:21), the NCW law library did not contain a "Shepard's" citator [62] for Nebraska cases. It appears that the library did not contain a "Shepard's" citator for federal cases until October, 1990. (Ex. 830.) During this period of time, the only way to check the history of a case was to send a request through the mails to have it "Shepardized" by an inmate legal aide at NSP.[63] The request first had to go through a staff person at NCW and then to a staff person at NSP, who finally routed the request to an inmate aide at NSP.

During this period of time, as a practical matter, the female inmates had no timely method to do basic research. Without a

---

61. As discussed in more detail later, NCW inmates in orientation were under a "quarantine."

62. In 1977, the Supreme Court observed that Shepard's Citations is part of a minimum collection list for prisons approved by the American Correctional Association, American Bar Association, and the American Association of Law Libraries, although the Court did not find that the failure to include Shepard's Citations amounted

to a constitutional deprivation. *Bounds,* 430 U.S. at 819–20 n. 4, 97 S.Ct. at 1493–94 n. 4.

63. In this connection, the NSP men had at least four trained inmate legal aides, but the NCW women had only one inmate legal aide. In fact, the women had no legal aides until about January, 1989. The NSP law library also had a full-time law librarian, whereas the NCW law library did not.

method like Shepard's Citations for checking the history of a case, legal research of any quality·was very difficult. Indeed, as of November 5, 1991, the DCS library coordinator required that each Nebraska penal institution subscribe to Shepard's Federal Citations, U.S. Citations, and Nebraska Citations. (Ex. 1115.) The inmates at NSP, in contrast, always had adequate research materials.

Finally, throughout the relevant time frame, and at present, the women at NCW have had significantly less time to use the law library than the men at NSP. In fact, the women had only about a third of the time which was available to the men. The general population women have been limited to using the law library as follows: one hour per day between 4:00 p.m. and 5:00 p.m., Sunday through Saturday, and every other day from 6:00 p.m. to 7:00 p.m. Thus, the women have no more than 2 hours of scheduled law library time available to them each day, and about half the time the females have only one hour per day of scheduled law library time.

On the other hand, the general population men at NSP have the opportunity to study at the law library as follows: more than 5 hours per day between 11:45 a.m. and 1:00 p.m., 1:00 p.m. to 3:00 p.m., and 5:30 p.m. to 7:30 p.m., Monday through Friday, and 6 hours per day Saturday and Sunday from 10:00 a.m. to noon, 1:00 p.m. to 3:00 p.m., and 5:30 p.m. to 7:30 p.m. Thus, the men have a much greater opportunity to study during scheduled time at the law library when compared to the women.

Are these differences in scheduled hours significant? I believe they are. The NSP schedule provides a great deal more flexibility during each day for an inmate to pursue his legal research. He can do legal research in the morning, afternoon, and early evening, seven days a week. He can also count on at least two hours of uninterrupted time per day, seven days a week, and perhaps as

much as six hours per day. These factors make it much easier for the men to do legal research compared to the women.

### (2)

The defendants' response to these points is not clear, but basically it seems to be that the law library at NCW now meets the due process requirements of *Bounds*.[64] Even if true, such an assertion is simply not responsive to the equal protection challenge of the NCW inmates.

The defendants argue that the lack of Shepard's Citations did not burden the women because the women could get the material from the law library at NSP. I am not persuaded by this argument.

As I observed earlier, the mailing procedure required an inmate to disclose her research needs to NCW and NSP staff members—people she might ultimately sue. More importantly, it is obvious to anyone who has done legal research that the process of having to submit mail requests for case history makes legal research cumbersome.

Legal precedent develops in an incremental fashion. When one case is cited by a second decision, appropriate methodology requires that the second decision be read and its history searched. This may in turn require the process to be repeated over and over again.[65] There is virtually no efficient way to write a mail request for all the needed case histories at one time.

That NSP men were spared the difficulty of mailing requests for case histories, but NCW women were not, compels me to conclude that the women were substantially burdened during the time the NCW library lacked the appropriate citation systems.

The defendants further argue that the differences between NSP and NCW regarding the time when the law library is open for scheduled research are insignificant because

---

**64.** The defendants also seem to argue mootness as a result of the fact that the NCW library now has Shepard's Citations. Their argument in this regard is cursory. In any event, it seems to me that the present availability of a citation system may effect the appropriate remedy, but it certainly does not mean that the past equal protection violation may be disregarded. *Canterino III*, 564 F.Supp. at 713 (denying mootness defense). This

is particularly true where, as in this class-action suit, the liability phase of trial has been bifurcated from the remedial stage of trial.

**65.** For example, the complex history of the *Canterino* and *Glover* cases would have been difficult to research by mail.

the women can ask for and receive extra time to study in the law library. I am not persuaded by this argument.

The "extra time" policy is not written. In fact, it appears to be quite new and perhaps even an accident.[66] Therefore, it is difficult for an inmate to know of its existence or see to its enforcement. Of course, such an unwritten policy is ripe for arbitrary enforcement. To the extent the policy does exist, the inmate is required to disclose, at least in a general way, why she needs the extra time. Still further, the policy is subject to the availability of NCW staff to supervise the extra time, and staff availability generally has been a significant problem.

Finally, the defendants seem to argue that the women do not need the same type of scheduled hours because, unlike the men, few women use the law library. I am not persuaded by the defendants' statistics. The evidence is clear that the NSP men use the law library extensively; the evidence is also clear that since 1988, even when the NCW law library was located in very cramped quarters with few tools for rudimentary research, the NCW inmates have doubled their usage from an average of 35 visits a month to an average of 80 visits a month. Given the differences in size of the inmate populations, it is not surprising that there are more visits per month in absolute terms at NSP than at NCW. Nevertheless, in absolute numbers, 80 visits per month represents more than half the inmate population at NCW. As a consequence, I do not believe defendants' assertion that the women are not burdened by the comparative lack of time in the law library.

### (d)

In summary, I find that neither the segregation inmates nor the orientation inmates have been substantially burdened for equal protection purposes as result of the law library policies because the men were treated in a similar fashion, or the record is unclear as to how the men were treated. On the other hand, I conclude that the general population inmates at NCW have been substantially burdened by the law library policies in the following particulars: (a) prior to November, 1989, the law library was housed in such a small room that it precluded meaningful use of the library, in contrast to the adequate facilities enjoyed by the men at NSP; (b) prior to October, 1990, the law library did not have rudimentary research tools (Shepard's Citations), in contrast to the adequate materials enjoyed by the men at NSP; and (c) during all relevant times, and continuing to the present, the scheduled hours for the NCW law library were less than ⅓ of the scheduled hours available to the men at NSP.

### 2. Objective and Relationship Between Objective and Means

The defendants offer no insight into what important governmental objective undergirds the NCW law library policy aside from the remediation objective previously identified. Furthermore, the historic preference for segregating women from men in prison certainly does not compel, or support, a law library policy that burdens women. Finally, the implication that women do not need law library facilities similar to those provided the men at NSP certainly smacks of archaic notions of gender roles. The plaintiffs have proven an equal protection violation.[67]

### F. Medical and Dental

#### 1. Burden

■■■ The women at NCW challenge the medical/dental care they are provided on equal protection grounds.[68] They argue that (a) the medical facilities at NCW are comparatively inadequate; (b) the delivery of medical care through a physician is comparatively inadequate; (c) the delivery of appropriate emergency medical care is comparatively inadequate; and (d) the dental care provided

---

66. The extra-time policy appears to have resulted because "[a]s of this present time there is no activities coordinator and Miss [Axdahl] has been working activities." (2104:25–2105:2.) Since Ms. Axdahl was in the area for activities, which is also near the law library, she was able in her administrative capacity to authorize a request for additional time.

67. For the testimony of one or more inmates who have been harmed by these policies, see generally the testimony of Klinger, Younger, Lange, Anderson, Wilson, and Neely.

68. The women also raise an Eighth Amendment challenge which will be considered separately.

the female inmates is comparatively inadequate. I shall consider each challenge in turn.[69]

### (a) Facilities

Men at NSP are fortunate to have a licensed hospital on grounds with 10 hospital rooms with regular hospital beds. The hospital can, and does, hold specialty clinics in neurology, orthopedics, ophthalmology, and general surgery. The hospital is equipped with X-ray equipment. In contrast, the women at NCW have no similar on-grounds hospital facilities, although they have a small "clinic" suite.

However, I do not think the lack of hospital facilities imposes a substantial burden upon the women because NCW is located very near a general hospital in York, Nebraska. The hospital is within 2 to 3 miles of NCW. York is a small town, and the hospital is within a very few minutes of NCW by ambulance. There is no evidence that the York hospital is inferior to the NSP hospital. And, there is very little evidence that NCW's reliance upon the public hospital results in unequal medical care for women inmates at NCW as compared to the men at NSP.

### (b) Physicians

The NCW inmates complain that the medical care they receive is burdensome when compared to the men at NSP because, unlike the NSP men, the women have no full-time doctor. Specifically, the women complain that they have difficulty seeing the doctor because the nurses stand in their way and the doctor is not present often enough. However, I do not believe the women are substantially burdened by any difference in the availability of a doctor.

Since 1988, a full-time doctor has been engaged to provide medical care at NSP, together with another doctor who spends part of his time there. During this period of time, NSP also employed at least one—and sometimes as many as two—physician's assistants.[70] NSP inmates are served by nurses 24 hours a day.

The evidence reveals that since 1988 a doctor has provided medical care at NCW one day per week for 4 hours, and on an as-needed basis thereafter. There is no coverage by a physician's assistant. Currently at NCW, five registered nurses or licensed practical nurses provide coverage between 6:45 a.m. to 9:00 p.m. or 10:00 p.m., Monday through Friday, and from 9:00 a.m. to 5:00 p.m. on weekends and holidays. Prior to September, 1990, the nursing coverage ended at 5:15 p.m. during the week, and there was no weekend coverage.

At NCW, "sick call" is held each day. If an inmate wishes to be placed on sick call, she gives notice of that request before 9:30 a.m. and is seen that day. A nurse holds the "sick call" and screens the inmate's problem. If the problem warrants the attention of the doctor, the inmate is seen by the doctor. The claimed inability to see a doctor is not peculiar to NCW; it also exists at NSP due to the much greater number of inmates. A very similar routine is followed at NSP, except that sick call is held only 5 days a week, and it takes between 3 and 4 days to be placed on sick call, except in an emergency.

Both institutions use the same type of procedure for referral to a doctor. Furthermore, there is no convincing evidence that the lack of a full-time staff doctor at NCW, with its much smaller population, results in poor care at NCW compared to the care received by the inmates at NSP. In this

---

69. The female inmates also complain about the medication procedures used by NCW upon intake into the facility. Specifically, they complain that the nurses fail to check with the doctor who issued the prescription as to the need for the medication. Suffice it to say that for equal protection purposes the nurses' conduct at NCW—examining the prescription and then consulting, if necessary, with the NCW doctor—is not subject to attack for the reason that the evidence fails to reveal a substantial difference in treatment at NSP. This is not to condone, however, a nurse making a medical decision without consul-

tation with a doctor. Such a practice could implicate the Eighth Amendment.

70. Under Nebraska law, a physician's assistant is a specially trained person who, although not a doctor, is authorized to "perform medical services when he or she renders such services under the supervision of a licensed physician." Neb. Rev.Stat. § 71–1,107.17 (Reissue 1990). The doctor need not be personally present at all times to supervise the assistant. Id.

connection, I was impressed by the fact that each female inmate receives a full medical examination upon entry into the institution, and an annual examination is offered to each inmate. Also, each female inmate is seen by the doctor every three months if she is taking prescription medication. I thus conclude that the inmates at NCW are not substantially burdened by the lack of a full-time, on-site doctor or the screening methods used by the doctor at NCW.

I recognize that the inmates at NCW gave me specific examples of what they consider to be the poor care they received from the physician at NCW, ranging from the failure of the doctor to treat inmate Danekas' spinal condition to the failure to treat another inmate's venereal disease. The plaintiffs argue that because these women received treatment once they went to their work-release assignments outside NCW, it must be inferred that the quality of treatment was, and is, significantly better at NSP since some NSP medical personnel also serve certain work-release centers. However, I do not think such an argument is persuasive because the pertinent question is not what medical treatment men or women receive while on work release, but rather the comparative quality of the medical treatment when both males and females are actually in prison. I am not willing to infer that because some women received good treatment from NSP doctors while on work release the quality of care at NSP is substantially better than the care at NCW.

### (c) Emergency Medical Care

■ As to the issue of emergency medical procedures and the lack of around-the-clock medical services, the evidence reveals that if a medical emergency occurs at NCW in the evening there are no on-site medical personnel to assess and deal with the emergency. Rather, one of the nurses is contacted by telephone.

At NSP, there is a full-time medical staff person, such as a nurse, available at all times, day or night. The evening nurse is located at the NSP hospital, and while the nurse's primary responsibility is at the hospital, in the event of a medical emergency the nurse is available either to examine the patient at the hospital or to go to the location of the injured or ill inmate.

While the defendants argue that NCW does not need such coverage because of its small inmate population, I am persuaded that the women are substantially burdened by the lack of coverage. DCS has admitted as much. In 1989, DCS noted this deficiency at NCW (as well as at OCC and HCC) in a budget request to the legislature, stating: "There are no medical personnel on duty during the evening or night shifts. **This creates serious liability issues for these institutions, and jeopardizes adequate response to medical emergencies.**" (Ex. 1305, at 9 (emphasis added).)

Notwithstanding this point made to the Nebraska legislature, it was decided by the administrators at NCW and DCS after the money was appropriated that additional nurses would be hired to staff nursing positions during peak demand times, but not during the evening. OCC is apparently trying to hire nursing staff for an evening shift but has not been able to recruit a nurse. HCC evidently decided to elect the same nursing coverage as NCW.

The defendants point out that a similar situation existed at OCC and HCC—two other male institutions. While this may be true, it does not make the women any less burdened as compared to the treatment the men receive at the comparable institution, NSP. Moreover, at NSP, LCC, and OCC, where most male inmates are incarcerated, DCS has provided, or is attempting to provide, 24–hour–a–day nursing coverage. Still further, there was no testimony about the capability of OCC or HCC to respond quickly in the event of a medical emergency even without nursing coverage, while there was quite a bit of testimony about the comparative situations at NSP and NCW.

Some examples will serve to illustrate my concern.

The head nurse at NCW, Ms. Wehland, lives about 21 miles from NCW and another nurse, Ms. Thomas, lives about 17 miles from NCW. In June, 1991, during a time when a nurse was not on site at NCW, Kim Younger was stung by a bee. Because she was quite

allergic to bees, "Kim started to have bad reactions," according to a guard. (Ex. 754.) One of the guards "tried to take her vitals but she was having trouble breathing and ended up on the floor." *Id.*

A lieutenant was called to attend to inmate Younger. He realized the situation was serious and called nurse Thomas on the telephone. Nurse Thomas instructed the lieutenant to give Younger a 50–milligram tablet of Benadryl, which he did. Younger had difficulty taking the pill as her breathing was rapid. In fact, in a report later authored by the lieutenant, Younger was described as having "great difficulty breathing." (Ex. 751.) The lieutenant became concerned about the telephone advice he had received from nurse Thomas: "The concern was that I guess I was not satisfied with what she had asked me to do with her which was administer the 50 milligrams of Benadryl." (1109:18–21.) [71] As a result, he called nurse Wehland. Wehland advised that Younger should be taken to the hospital, and, accordingly, Younger was transported to the hospital. Younger was described as being in "bad shape" by the guard who took her to the hospital. (Ex. 754.) Younger was kept overnight for observation after being treated.

I also recall the testimony of inmate Griffin. Although less dramatic than the Younger matter, she testified about an incident that reveals the potential significance of the lack of 24–hour–a–day medical staff to respond to serious medical problems.

Griffin testified that she had a hernia operation after her child was born. The incision bled from time to time, requiring that it be examined and the dressing changed. Yet, without a nurse in the evenings, Griffin was left unattended by trained medical personnel, and her bleeding was apparently fairly severe:

Q. And specifically what kinds of problems did you have?

A. The staff members, the medical department would give me bandages to take back to the hall with me so that the staff could change it if it needed to be changed.

Q. And did that happen during that week after you got back from the hospital?

A. Yes.

Q. After the surgery. And so it would be a staff person that change[d] [your bandage]?

A. Yes.

. . . . .

Q. Ms. Griffin, did … did any of the correctional staff at the Nebraska Center for Women provide you any medical treatment after you got back from the hospital?

. . . . .

A. Yes. [The staff] would come in when I first started having the drainage real bad they would come in and checked [*sic*] it then they went back out and made phone calls and they would come back in and told me to make sure I went to sick call next morning then they would change the bandage and look at the incision … to make sure it wasn't ripping open or something.

Q. During the time you were in your room after you got back from surgery, did this happen more than once?

A. Yes.

Q. Do you know how many times it happened?

A. [Two] maybe three [times].

. . . . .

Q. Did you continue—do you continue to still have some problems with that area?

A. Yes, I am.

(1008:1–1009:18.)

Griffin's medical records establish that while she may have been a chronic complainer, she also had real problems with her incision which occurred in the absence of medical personnel. For example, on April 30, 1990, a nurse noted in pertinent part: "States she had quite a bit of oozing from incision last pm. Cleansed and dressed by [staff member] Moorehead last pm. Dime sized area

---

71. The lieutenant had reason for concern. Page 1745 of the Physicians' Desk Reference (1993 ed.) states that Benadryl may be used for "anaphylactic reactions **adjunctive** to epinephrine and other standard measures after the acute manifestations have been controlled." (Emphasis in original.)

open base of incision. Intact now." (Ex. 5141, Entry of 4/30/90.) On May 2, 1990, the nurse noted that Griffin brought in a washcloth that appeared to be "soaked" in "serosanguineous fluid." (*Id.*, Entry of 5/2/90.) Serosanguineous fluid is a discharge of blood and serum. W. Nornette, *Steadman's Medical Dictionary* at 1275 (4th Lawyers ed.). This evidently caused the nurse to send "extra dressings ... to the hall." (*Id.*) Two weeks later, a doctor was required to drain the incision. (*Id.*, Entry of 5/15/90.) On May 16, 1990, the dressing was changed by the nurse and additional "dressings sent to the hall." (*Id.*, Entry of 5/16/90.) On May 17, 1990, the nurse noted: "Appears to have had a stitch work out of incision ⅛ of distance from top." (*Id.*, Entry of 5/17/90.)

It appears that whether the problem is potentially life threatening, as in the case of inmate Younger, or merely potentially serious, as in the case of inmate Griffin, due to the lack of trained on-site medical personnel, there are occasions during the evening when the NCW inmates are at greater risk than their fellow male inmates at NSP. Clearly, as the Younger incident reveals, phone consultation with a nurse who resides a significant distance from the institution is no substitute for on-site medical personnel when an emergency occurs. The State of Nebraska recognized this problem when DCS told the legislature in 1990 that the lack of such personnel at NCW "jeopardizes adequate response to medical emergencies." (Ex. 1305, at 9.) Accordingly, the female inmates are substantially burdened by the lack of trained medical personnel during the evenings as compared to their fellow inmates at NSP.

### (d) Dental Care

The inmates at NCW complain that while dental care is provided at NCW, it has been very difficult to obtain in a timely fashion. The inmates at NCW are most concerned with the time frame between December, 1988, to August, 1990.

From 1988 through August, 1990, a contract dentist provided dental care at NCW about 4 hours per week. No dental hygienist provided dental services during this period of time, so the dentist was responsible for any cleaning. In the summer of 1990, the contract dentist's hours were increased to 8 per week. It also appears that during the summer of 1990 DCS dispatched additional dentists and hygienists to deal with a backlog at NCW. Although the precise time is uncertain, sometime in 1992 a dental hygienist was also engaged to provide additional services at NCW.

During the relevant time frames, a dentist was engaged full time at NSP, and a dental hygienist was also engaged full time. NSP also has a dental laboratory which manufactures dental prostheses for all DCS institutions.

Without question, there was a backlog of dental work at NCW during the time frame between December, 1988, to August, 1990. This backlog was admitted, to one degree or another, by the head nurse, the superintendent at NCW, and the DCS administrator who dealt with dental services.

A crude statistical analysis would suggest that such a backlog was the inevitable result of the lack of sufficient dental health personnel at NCW when compared with NSP. In 1988, the average monthly inmate population at NCW was about 90 inmates and the average monthly inmate population at NSP was roughly 650 inmates. The NCW dentist spent only about 4 hours per week at the institution and he/she had no help from a dental assistant, whereas at NSP, a full-time dentist and a full-time dental assistant were available each week. Thus, even before the increase in the inmate population at NCW, which peaked in 1990, the ratio of inmates to available hours of dental services was much more favorable at NSP than at NCW.

For example, if one compares only the hours per week that a dentist was available to the inmates (and excludes the assistant at NSP), and assumes a 40-hour week for the NSP dentist, on a weekly basis for each hour the dentist was available at NSP roughly 16.25 inmates would compete for an hour of that dentist's time if all inmates needed dental care (650 inmates divided by 40 hours).[72]

72. The evidence revealed that prison inmates as

a class have poor dental health. Indeed, in a

During the same time frame, and assuming 4 hours were expended per week by the NCW dentist, on a weekly basis for each hour the dentist was available roughly 22.5 inmates at NCW would compete for an hour of that dentist's time if all inmates needed dental care (90 divided by 4 hours). Thus, the NCW dentist's services were spread much more thinly among the inmate population at NCW compared with the services at NSP. The figure would be even more disproportionate if one factored in the availability of a dental assistant at NSP and the lack of a dental assistant at NCW.[73]

Some of the backlog dealt with relatively serious dental problems. For example, the medical records and testimony indicate that inmate Williamson had to wait over a year to address a significant dental problem. She was first examined in June, 1989. (Ex. 5139(a).) The dentist observed "alot of decay." (*Id.*, Entry of 6/22/89.) Later that month, the dentist told the inmate "we needed to start working on her ASAP." (*Id.*, Entry of 7/27/89.) The dentist began work on the problem in August, 1989, but could not complete the work. (*Id.*, Entry of 8/10/89.) The dentist noted at that time that the patient "will be rescheduled . . . she has a lot of decay present." (*Id.*) The dental records indicate that Williamson was not seen by the dentist again until July, 1990, almost a year later. (*Id.*, Entry of 7/12/90.)

The defendants do not deny that there was a backlog. Rather, they argue that there has been no violation of the Eighth Amendment. This argument is not responsive for purposes of equal protection analysis. I find that compared to the men at NSP the NCW inmates were burdened by a lack of timely dental care between December, 1988, to August, 1990.

#### (e)

In summary, I find that the NCW inmates have not been substantially burdened by either the lack of medical facilities or lack of

access to a doctor when compared to the male inmates at NSP. I also find that compared to their fellow inmates at NSP the NCW inmates were substantially burdened throughout the entire relevant time frame by the lack of trained medical personnel during evenings and weekends. I further find that from December, 1988, to August, 1990, the NCW inmates were substantially burdened by the relative lack of timely dental care at NCW as compared to NSP.

### 2. Objective and Relationship Between Objective and Means

The defendants offer no insight into what important governmental objective substantiates the NCW medical and dental policies found to have burdened the NCW inmates, aside from the remediation objective previously identified. Clearly the remediation objective is not furthered by such burdensome policies. Furthermore, the historic preference for segregating women from men in prison certainly does not compel, or support, medical and dental policies that burden women.

The defendants suggest that the choice of whether or not to have on-site evening medical emergency coverage was the product of an exercise of discretion and imply that the court should not second-guess the administrators' discretionary decision. While I am sensitive to this point, I am not persuaded by the argument.

Initially, it should be remembered that DCS publicly stated in a budget request to the legislature that: "This [lack of coverage] creates serious liability issues for these institutions, and jeopardizes adequate response to medical emergencies." (Ex. 1305, at 9.) I fail to see how reliance upon the stated opinion of DCS could fairly be characterized as "second-guessing." More importantly, this exercise of discretion, if it was one, suggests that the defendants were willing to take risks with the NSP women that they were not

---

budget request DCS noted: "Inmates coming into Corrections generally have dental problems that far exceed those of the general population." (Ex. 1305, at 12.)

**73.** This crude statistical review does not prove the existence of a backlog or comparatively infe-

rior dental care. As noted previously, ratios of this kind can be quite misleading. However, in this instance, where a backlog was admitted, this type of analysis is helpful in understanding why the backlog existed.

willing to take with the NSP men (as well as the large majority of men in custody under DCS control). I conclude, therefore, that the exercise-of-discretion argument must be disregarded because it essentially devalues women inmates—a historic characteristic of gender discrimination.

The defendants further argue that the dental backlog was inadvertent and the result of a rapid increase in female inmates at NCW. From this point, the defendants assert that the disparity was not a product of gender discrimination but an unanticipated function of growth. I am not persuaded by this argument because, as previously noted, prior to the increase in NCW's population, the inmate-to-available-dental-hour ratios greatly favored the NSP men. I do not believe, therefore, that the difference in treatment regarding dental services can be so easily explained away.

In summary, defendants' explanations fail to establish that the means chosen to implement the important governmental objective are directly and substantially related. Accordingly, the plaintiffs have proven that the policies found to have substantially burdened the women violate the Equal Protection Clause.[74]

## G. Mental Health

### 1. Burden

The female inmates at NCW complain that their equal protection[75] rights were violated because: (a) compared to the inmates at NSP, there is, and was, a lack of effective substance abuse programming at NCW; (b) compared to the inmates at NSP, there is, and was, a lack of effective "straight" treatment programming at NCW; and (c) compared to the inmates at NSP, there is, and was, a lack of inpatient[76] programming for NCW inmates.

### (a) Substance Abuse Treatment

I shall leave the question of the unavailability of inpatient substance abuse treatment for consideration in the portion of this memorandum which deals with inpatient treatment in general. I thus concentrate here on the substance abuse treatment which does not require or warrant inpatient treatment.

While Judith Danielson, the administrator of the mental health programs at NCW, was not a credible witness,[77] I have concluded that the NCW women were not substantially burdened by the substance abuse programs (not requiring inpatient treatment) at NCW as compared to NSP. With the exception of a few months, both before August, 1988 (when the inmates were under a case management system), and after August, 1988 (when the inmates were under a unit management system),[78] the inmates at NCW have always had available to them specific education and counseling regarding substance abuse problems from a certified drug and alcohol counselor,[79] either through a staff person or through a contractor (NOVA). Whether given by an employee or through NOVA, the programs involved education and group therapy regarding substance abuse. In May, 1989, Alcoholics Anonymous and Narcotics Anonymous meetings were started

---

74. For the testimony of one or more inmates who have been harmed by these policies, see generally the testimony of Griffin and Williamson.

75. Judge Urbom granted the defendants' motion for summary judgment on the Eighth Amendment claim regarding mental health services. (Filing 487.) Moreover, I believe that Judith Danielson, a psychologist at NCW, is no longer a defendant in this case by virtue of Judge Urbom's granting of the motion for summary judgment since she appears to have been named as a defendant regarding only the Eighth Amendment claims. I therefore find and conclude that Judith Danielson is no longer a defendant.

76. In this context, "inpatient" refers to a mental health or counseling program that provides treat-

ment at the prison in a closed environment and is somewhat similar to "inpatient" treatment at a hospital.

77. Danielson appeared to be uninformed and quite uninterested when she gave her testimony.

78. As I understand the differences in management style, under a case management system the inmate is primarily supervised by a case manager, whereas under a unit management system the inmate is supervised by staff assigned to the living unit where the inmate resides.

79. Danielson was not involved in providing this counseling.

at NCW. In October, 1991, Adult Children of Alcoholics meetings were started. In April, 1992, relapse prevention groups were started.

In contrast, no treatment groups are held specifically to address substance abuse problems at NSP. However, NSP offers group therapy, and individual therapy as needed, to deal with these and other problems.

The inmates at NCW point to various problems with the NCW drug abuse counseling such as the NOVA group voting to determine who could be in the group and the NOVA group being too full to accept all interested inmates. However, these problems, significant as they might otherwise be, do not establish a burden when compared to the relative unavailability of specific substance abuse programming at NSP.

### (b) "Straight" Treatment

■ So-called "straight" treatment is the rendering of mental health services through testing and counseling (in group or individual sessions) in other than an "inpatient" setting, but it does not involve substance abuse treatment. I am persuaded that until August, 1990, when Deb Fitzgerald was hired, the NCW inmates were substantially burdened when compared to the men at NSP by the comparative lack of "straight" treatment.[80] After August, 1990, I am satisfied that the inmates at NCW were not substantially burdened by a relative lack of "straight" treat-

ment as compared to NSP, and plaintiffs do not seriously contend otherwise.[81]

Judith Danielson, an unlicensed psychologist,[82] was virtually the only person who provided "straight" treatment to NCW inmates with mental health problems until August, 1990, with the exception of a contract psychiatrist one morning every other week:

Q. Between January of 1988 and August of 1990, were you the only person providing mental health services to inmates at the Nebraska Center for Women?

A. Yes.

(2183:22–25.)

Not only was Danielson in charge of mental health, but she was also in charge of inmate *orientation and classification as they came* into the institution. Theoretically, Danielson was also to provide group counseling and individual counseling sessions.

In contrast, at NSP it appears that the males could and did receive mental health counseling from a psychologist and four mental health counselors, as well as from at least one contract psychiatrist. This counseling was provided through group therapy sessions, with individual counseling provided when necessary.

While both NSP and NCW offered group counseling and individual counseling, it is clear that from January, 1988, until August, 1990, the women were comparatively and substantially disadvantaged because Danielson was apparently too busy to perform her

80. It is important to realize that 60% to 80% of the women inmates at NCW reported having been the victims of sexual or physical abuse, or both. Moreover, the evidence makes clear that female inmates especially need mental health services because of the psychological profiles of inmates at NCW.

81. Individual and group therapy is generally available without waiting lists at the present time. In addition to the programs for substance abuse discussed previously, specific group therapy sessions now available include "basic group" (an introduction to the concept of criminal thinking), "personality group" (for those who have completed the basic group), "assertiveness training," and "domestic violence."

82. Danielson was apparently "supervised" by a contract psychiatrist until Dr. Bohn, a DCS employee, assumed clinical supervisory responsibility over her in July, 1990. Danielson testified

that she never submitted any periodic reports to the psychiatrist, and prior to clinical supervision by Dr. Bohn, Danielson reported to the assistant superintendent of NCW, who was also not licensed or certified. The supervising psychiatrist came to NCW once every other week for a morning. It is interesting to note that the July 1, 1987, Operational Memorandum for NCW, describing the mental health programs at NCW, states that services "are provided by qualified mental health professionals **who are fully licensed in their respective disciplines.**" (Ex. 124, at 1 (emphasis added).) Danielson, together with Superintendent Lofgreen, appears to have authored the memorandum. (Id. at 9.) Danielson was not required by Nebraska law to be licensed as a psychologist because she worked for the state, Neb.Rev.Stat. § 71–1,207(2) (Reissue 1990), but she clearly was not "fully licensed in [her] respective discipline" either.

counseling duties. A number of inmates testified that they asked for, but did not receive, mental health counseling from Danielson. Inasmuch as Danielson's record-keeping practices were terrible (she essentially admitted as much on the witness stand), it is virtually impossible to clarify the quantity or quality of the counseling that Danielson may have provided to the NCW inmates.

Although Dr. Bohn later essentially denied that she meant it, after she took over the clinical supervision of Danielson and after the additional counselor had been hired at NCW, Bohn advised DCS that:

> Having recently received a mental health counselor position to augment the services of the only other mental health position at NCW, the staff Psychologist there, new treatment services are in the **initial stages of development**. Since the Psychologist has the responsibility for the orientation and initial classification of all female inmates admitted to NCW, **little on-going treatment previously occured** [*sic* ].

(Ex. 1321, at 5 (emphasis added).)

Indeed, Deb Fitzgerald testified that when she came to NCW Danielson complained of being "overwhelmed by the job duties." (3417:14–17.) And even the defendants' expert testified that NCW "probably needed another person." (Ex. 5156, 103:10–11.)

The defendants argue that some counseling was provided at NCW by inmate case managers prior to the switch to unit management. However, this evidence is so unclear and undocumented that I am not persuaded by it.

Defendants also argue that during this period of time the average cost per inmate for mental health was greater at NCW than at NSP. I have previously expressed my view that such statistics are largely meaningless, and I shall not restate these views again.

However, if these statistics show anything, they show that in 1989 and 1990 per capita spending on males at NSP and females at NCW was roughly similar,[83] and given the lack of an economy of scale at NCW, the fact that Danielson was the sole provider of "straight" treatment in addition to her orientation and classification duties, and that she was "overwhelmed," these statistics confirm what Dr. Bohn observed: Before the additional counselor was hired, "little on-going treatment previously occurred."

### (c) Inpatient Treatment

The females at NCW argue that they cannot practically receive inpatient treatment for serious mental health and substance abuse problems while the men at NSP can receive such treatment. The facts establish this point and cause me to conclude that the females are thus substantially burdened.

During all relevant times, and up to the present, males at NSP (and males at other institutions) could receive specialized and intensive inpatient treatment in four areas: substance abuse, sexual offenses, serious mental illness, and social or developmental impairment. (Ex. 1321, at 1–3.) These programs are housed at the Lincoln Correctional Center (LCC), but NSP inmates can and do receive this special treatment. After treatment has been completed, they return to NSP.[84] Each program is housed in what amounts to an "inpatient" setting like a hospital.

These programs are apparently quite successful. For example, relative to the mental health program and the socially and developmentally impaired program, Dr. Bohn observed that "[b]ecause of the intensity of treatment delivered to these inmates, many are able to make a near satisfactory adjustment to prison who otherwise would require interinstitutional transfer to the Lincoln Regional Center (LRC) [a state run mental institution]." (*Id.* at 2.)

At NCW, in contrast, persons with serious substance abuse, mental health, sexual, or

---

83. In 1989, per capita costs were about $286 at NSP and $345 at NCW, and in 1990, about $287 at NSP and $322 at NCW.

84. Although Dr. Bohn testified that no NSP inmates had received inpatient substance abuse treatment, she acknowledged that inmates at NSP were eligible for such treatment. In any event, it appears that Dr. Bohn was wrong. For example, in a memo she wrote in April, 1991, Dr. Bohn noted that two inmates were discharged to NSP after receiving substance abuse treatment. (Ex. 1321, at 3.)

social/developmental problems requiring inpatient care have no similar opportunity for such intensive treatment. The females are either not treated on an inpatient basis or they are transferred out of DCS custody to a state mental institution quite distant from NCW.[85] This, and perhaps other problems, apparently caused Dr. Bohn to observe in 1991 that there were serious questions of "parity" involved:

> **At the NCW as women inmates seek parity and equality with the mental health services offered to male inmates,** additional resources will need to be developed to address the growing needs of these women. There also is a need for increased ability to treat women with major mental and behavioral disturbances as evidenced by the necessity to transfer women to the Department of Public Institutions over the past year.

(Ex. 1321, at 7 (emphasis added).)

The defendants seem to argue that similar inpatient programs at NCW are not needed because inmates with "special needs" can be specially treated at NCW, given its much smaller inmate population, and thus the women are not burdened. I do not accept this argument.

The obvious reason that the inpatient programs are needed and work is due to "the intensity of treatment delivered to these inmates." (Ex. 1321, at 2.) Or, as Dr. Bohn stated in reference to the substance abuse program, the benefit of an inpatient program is "just more complete treatment." (2636:20.) There is no reason to suspect that women need less "intensity of treatment" or less "complete treatment" than do men. In fact, the evidence is to the contrary. For example, Deb Fitzgerald, the NCW counselor, testified that various NCW women have severe substance abuse problems and could benefit from inpatient treatment.

Neither do I think the availability of a transfer from DCS to HRC is a comparable solution, at least on the record presented to me.[86] It is clear that the inpatient programs for the men are specially designed to deal with the unique personalities of criminals. There is no evidence, or reason to believe, that a state mental hospital can provide an NCW inmate with specialized care of the kind provided to NSP males through the inpatient programs at LCC. This is undoubtedly why Bohn recognized the need at NCW "for increased ability to treat women with major mental and behavioral disturbances." (Ex. 1321, at 7.)

Examples will illustrate the point. The inpatient program for male prisoners with respect to substance abuse is specifically designed to deal with the "larger problem, that being a criminal personality in which responsibility is shunned and the rights of others not regarded." (*Id.* at 3.) The sex offender program deals with "victims who later become perpetrators." (*Id.* at 3.) The mental health and social/developmental programs endeavor to assist the inmate "to make a near satisfactory adjustment to prison." (*Id.* at 2.)

In conclusion, the NCW inmates are substantially burdened by the failure to provide them with inpatient treatment comparable to programs available to NSP men.

#### (d) Summary

In summary, I conclude that the NCW women were not substantially burdened by the substance abuse treatment available to them at NCW (excluding inpatient treatment). I also conclude that the NCW women were not burdened by the "straight" treatment afforded them after August, 1990. I further find that the NCW women were substantially burdened by the comparative lack of "straight" treatment prior to August, 1990, and the comparative lack of inpatient treatment throughout all relevant time periods.

### 2. Objective and Relationship Between Objective and Means

Once again, the defendants offer no insight into what important governmental objective

---

85. The women are generally transferred to the Hastings Regional Center (HRC), a state mental hospital approximately 60 miles west of NCW. The Hastings Regional Center is not operated by DCS.

86. In fact, NCW women are not transferred to HRC for substance abuse problems. NCW women simply have no opportunity for inpatient treatment of severe drug abuse problems.

substantiates the NCW "straight" treatment and inpatient treatment policies found to have burdened the NCW inmates aside from the remediation objective previously identified. Clearly the remediation objective is not furthered by such burdensome policies. Furthermore, the historic preference for segregating women from men in prison certainly does not compel, or support, mental health policies that burden women. Moreover, the suggestion, as implicitly made regarding inpatient treatment, that women do not need the same "intensity" of treatment as males devalues women and is characteristic of gender bias.

The NCW inmates have therefore proven a violation of the Equal Protection Clause with respect to "straight" treatment, prior to August, 1990, and inpatient treatment, at all relevant times.[87]

## H. Recreation

### 1. Burden

▮▮ The NCW inmates claim a violation of the Equal Protection Clause for the following reasons: (a) compared to the NSP general population, the NCW general population is disadvantaged from the perspective of the general recreational opportunities afforded them; (b) compared to the NSP general population, the NCW general population is disadvantaged in the art and hobbycraft area; (c) compared to the men at NSP, the NCW orientation inmates are disadvantaged because they must take their recreation at the same time they are permitted to go to the law library and because they must take their recreation indoors, and (d) compared to the men at NSP, the NCW segregation inmates are disadvantaged because of their limited recreation facilities. I turn to those issues now.

### (a) General Recreational and Art and Hobbycraft Opportunities

I think it best to discuss the issues of general recreational opportunities and art and hobbycraft opportunities together.

I conclude that the NCW women have been and are now substantially burdened compared with their fellow NSP inmates in both the general recreational area and the art and hobbycraft area in the following ways: (1) in the number of hours of recreational, art and hobbycraft opportunities available to them, particularly when no activities coordinator was employed,[88] and (2) in the number and sophistication of recreational, art and hobbycraft activities available to them, particularly when no activities coordinator was employed. I do not believe that the women are burdened because of the size of the respective gyms or because of any other differences in the plant or equipment for recreational, art and hobbycraft opportunities.

### (1)

At NCW, women have two hours on the weekends and between 1 and 2 hours during weekdays in which to use the gym and related recreation room. The men have much greater access to their gym. The NSP gym is open Monday through Friday from 8:00 a.m. to 10:15 a.m., 12:00 noon to 3:15 p.m., and 4:30 p.m. to 7:45 p.m., for a total of 8 hours and 45 minutes. On weekends, the men can gain access to the gym from noon until 3:15 p.m. and from 4:30 p.m. until 7:45 p.m., for a total of 6 hours and 30 minutes.

A similar situation exists with regard to the "yard" at each institution. The "yard" includes those areas where miscellaneous recreation facilities are located (e.g., ball diamonds). The yard is open to the women during the time they can obtain access to the gym. The men can gain access to the yard from 7:00 a.m. to 8:00 p.m. (except for "count" and meal times) during daylight savings time, and from 7:30 a.m. to 7:45 p.m. during standard time.

The situation is similar in terms of the number of hours available to pursue art and

---

**87.** For the testimony of one or more inmates who have been harmed by these policies, see generally the testimony of Klinger, Vrtatko, Smith, Blank, Rebecca Brown, and Anderson.

**88.** It is clear that much of the disparity at NCW results from the failure to consistently employ a

recreation coordinator. Indeed, from January, 1988, until the time of trial in 1992, NCW was without an activities coordinator for about 12 months. During this same period of time, NCW has had 4 different activities coordinators.

hobbycraft leisure-time activities. The art and hobbycraft area is only open to women during the time they can obtain access to the gym. On the other hand, the men at NSP can gain access to their art and hobbycraft area Tuesday through Saturday from about 11:00 a.m. to 3:15 p.m. and from 5:00 p.m. to 7:45 p.m.

As to the number of recreational, art and hobbycraft activities, defendants "readily admit that more recreational activities are scheduled at NSP than NCW," although the defendants do not concede the relevance of the point. (Defs.' Reply Pls.' Post–Trial Br. at 35.) As a matter of fact, the disparity between the two groups is clear.

For example, the women have no outside team competition, no hobbycraft association, and little or no structured intramural activities. The men have a "varsity" sports program which has competitions with outside institutions in softball, baseball, basketball, volleyball, and flag football. The men have a sophisticated hobbycraft association which promotes an equally sophisticated artistic, woodworking, and leathercraft program. The men have structured intramural activities in volleyball and basketball.

The defendants assert, in essence, that the women at NCW are not burdened because they are much less idle than the male inmates, and because NCW has always been responsive to the recreation needs of the women.

I have previously discussed why I am not persuaded by the "idleness" data and shall not reiterate my position. Suffice it to say that the methodology employed appeared to be flawed (e.g., men who worked part time and were part-time students were treated as "idle"), and the data fails to account for the large number of men who wish to be idle (perhaps as many as 30%). Thus, the argument that the women are not burdened because they are less "idle" than the men is built upon faulty data.

Equally important is the fact that even if many of the men at NSP are idle, many others are not.[89] For a man who is not idle, NSP provides a much better recreational program in terms of the number of hours of access and range of activities compared to a woman at NCW, be she busy or idle. Perhaps this is only a different way of stating that the recreational policies at NSP appear to take into account the large number of male inmates who are busy, and, this being true, the NCW policy which fails to similarly respond to the busy female inmate is burdensome by comparison. Thus, the "idleness" argument, even assuming the validity of the underlying data, does not support the defendants' position.

I am also not persuaded by the argument that NCW has been responsive to the recreation needs of the inmates. It is suggested that whenever the female inmates requested recreational activities such requests have generally been met. Initially, I do not believe that this assertion is factually accurate because for a substantial period of time NCW did not have a recreation coordinator; thus, the institution was simply not capable of knowing what the inmates wanted or needed. Moreover, even if one accepts the assertion that the women have not been demanding about their recreation needs, it is fallacious to assume that the female inmates at NCW do not want or need a program comparable to the NSP men, particularly when the women have never had the opportunity to take advantage of comparable programs.

(2)

As to plant and equipment, I do not believe the women are substantially burdened. Although the facilities are different at each institution, there is little reason to believe the differences cause any serious limitation in activities. For example, NCW has a gym, a ball diamond, a tennis court, a sand volleyball court, a "music" or recreational room adjacent to the gym, and an art room.[90] Recre-

---

89. For example, as noted earlier, even the "idleness" data presented by the defendants showed that about 40% of the NSP men were not idle. At any time during this litigation, 40% of the men at NSP would amount to more people in absolute numbers than were imprisoned at NCW at any similar time.

90. For a time, NCW had no art room, but this was at a time when there was no activities coordinator. Any disparity in activities regarding art

ational equipment includes weight-lifting equipment, a pool table, an exercise bike, a rowing machine, air hockey machine, "foosball" table, bats, balls, and the like. The art room includes wood materials, a router, a band saw, an engraver gun, and other tools such as "X-acto" knives.

### (b) Orientation

The NCW inmates complain that inmates who are in orientation have access to the activities area between 10:00 a.m. and 11:00 a.m. and that this is the time they must also use the law library. Furthermore, they complain that orientation inmates do not have access to outdoor recreation. They complain that male inmates who go through orientation do not have to choose between exercise or the law library, and the male inmates also have outdoor exercise opportunities.

It appears to me that orientation inmates at NCW may now use the law library both during their one hour of recreation and/or for additional periods of time as needed. It also appears to me that orientation inmates may use the indoor recreation facilities, but that outdoor recreation facilities are closed to the orientation inmates to avoid unnecessary contact with other prisoners during orientation. Since the orientation period is fairly short (normally no more than 30 days), and the NCW orientation inmates are offered some recreational opportunities, I do not believe that the NCW inmates are substantially burdened when compared to their male counterparts, even if I assume that the male orientation inmates have somewhat more liberal recreation privileges while in orientation.[91]

### (c) Segregation

The NCW inmates complain that the inmates in segregation have limited recreational facilities.[92] From my tour of NSP, the short answer to these allegations is that the segregation recreation facilities at NCW are similar to those at NSP. Both are small, fenced outdoor "yards." To the extent that during a short period of time (January through April, 1990) NCW segregation inmates were confined to exercise indoors (in a hallway), but the males at NSP were granted outdoor exercise privileges, I do not believe such a burden was substantial.

### 2. Objective and Relationship Between Objective and Means

Once again, the defendants offer no insight into what important governmental objective substantiates the NCW recreation programs found to have burdened the NCW inmates, aside from the remediation objective previously identified. Clearly the remediation objective is not furthered by such burdensome policies. Furthermore, the historic preference for segregating women from men in prison certainly does not compel, or support, recreation policies that burden women. Moreover, the suggestion, as implicitly made regarding the "idleness" data, that a "woman's work is never done" and therefore she does not need or want similar recreation opportunities is characteristic of gender discrimination.

The NCW inmates have therefore proven a violation of the Equal Protection Clause at all relevant times with respect to the number of hours the recreational, art and hobbycraft facilities are open to them, and as to the range of recreational, art and hobbycraft activities afforded them.[93] *Canterino I*, 546 F.Supp. at 215.

### I. Visitation

The NCW inmates contend that the institution's visitation policies violate their equal protection rights for the following reasons: (a) the NCW general population inmates have less visiting time than the NSP

---

came about as a result of the failure to have an activities coordinator as opposed to the lack of plant and equipment.

**91.** It is not at all clear what recreation privileges the males actually have during orientation.

**92.** In their brief, the NCW inmates suggest a violation of the Eighth Amendment, although they acknowledge that no such violation was alleged in the complaint. Since no such viola-

tion was alleged in the complaint, and since no such violation was set forth in the pretrial conference orders, and since I think the defendants would be unfairly surprised, I decline to consider such allegations.

**93.** For the testimony of one or more inmates who have been harmed by these policies, see generally the testimony of Lange, Batistc, and Danekas.

inmates, and (b) at one time the NCW orientation inmates effectively had no visitation privileges while their male counterparts at NSP did have visitation privileges.

### 1. Burden

#### (a)

With regard to the claim of the general population inmates at NCW, I am not persuaded that they are substantially burdened by the visitation policies at NCW, although the visitation privileges at NSP are different. (**Compare** Ex. 403 (NCW OM) **with** Ex. 441 (NSP OM).)

At NCW, women can have general visitors between 12:30 p.m. to 4:30 p.m., Thursday, Friday, Saturday, and holidays. For a time, these visits could not exceed 20 hours per month. NSP inmates may have up to eight hours of visitation on the weekdays, or 4 hours on weekends. In order to reduce weekend waiting lines, the NSP visitations must occur either on the weekdays or on the weekends, but not on both the weekdays and weekends. There was no monthly limitation on NSP visits. At both institutions special visits can be arranged (e.g., for those visitors who have to travel long distances), although the procedure was less formal at NCW than at NSP.

The women inmates at NCW also have so-called MOLD visits where an inmate can visit overnight with her minor child[94] on the grounds of NCW for a period of up to five 24-hour blocks of time each month.[95] In other words, an inmate mother can visit with her child for 5 days each month, including having the child stay overnight. The NSP men have no similar visitation privileges.

The fact that the males at NSP can have more hours of general visitation than the females at NCW if they visit on the weekdays does burden the females who do not have a similar benefit, but the burden is not substantial. Moreover, the slight difference between the two general visiting schedules is the type of day-to-day operational detail in which the court ought not involve itself. *Pitts*, 866 F.2d at 1464.

#### (b)

As to the visitation schedule for NCW orientation inmates, the policy has changed over time. Sometime in the late spring or early summer of 1988,[96] the orientation inmates at NCW had privileges similar to the general population inmates at NCW. Since I have found that the general population inmates at NCW are not substantially burdened by the differences between the general visitation schedules at NCW and NSP, the orientation inmates at NCW are not substantially burdened either. I turn then to the point in time in 1988 when the orientation inmates at NCW were subjected to a different visitation schedule.

Until the policy changed in the late spring or early summer of 1988, new NCW inmates were considered to be in a "quarantine unit." (Defs.' Post–Trial Br. at 57.) This meant that the inmates were not allowed to have visitors or use the telephone while they were in orientation.[97] Orientation normally took 30 days to complete. NSP inmates who were undergoing orientation were not similarly restricted.

The inability to have visitation, coupled with the restriction on use of the telephone, constituted a substantial burden to the female orientation inmates. For example, inmate Klinger testified that the lack of outside contact during her orientation was particularly troublesome because she did not have the ability to make arrangements for her son in California or her property in California prior to incarceration. Even though the time in orientation was relatively limited (in most cases 30 days or less), the burden was com-

---

**94.** While not all inmates at NCW are mothers of minor children, a significant (although unquantified) percentage of the inmates are mothers of minor children.

**95.** This policy and the related MOLD program have been recognized nationally. The NCW administration is justly proud of this recognition.

**96.** Although there is a dispute about when the policy actually changed, I was persuaded by the testimony of Ms. Lohmeir, the supervisor who was responsible for staffing, that the change occurred during this time frame.

**97.** The inmates did, however, have mail privileges.

paratively substantial because, except for the mail, the women were effectively shut off from family and friends, while the men were able to maintain contact with their families and friends.

### 2. Important State Objective

Although it is not characterized as such, the defendants essentially assert an additional objective beyond the goal of remediation which is said to support the orientation policy. The defendants suggest that there is a legitimate penological purpose for keeping inmates, regardless of gender, quarantined during orientation so as to ease the transition from citizen to inmate. As defendants put it, "orientation is a quiet time when inmates are allowed to get acquainted with the institution and the institution gets acquainted with them." (Defs.' Post–Trial Br. at 57.) In essence, it is suggested that prison life can be such a traumatic shock that unless an inmate is free from outside distractions during orientation, successful transition from a free-will citizen to an inmate is not possible. There was evidence to support the validity of this penological theory. I find and conclude that the objective of easing transition to prison life is an important and valid objective of the state.

### 3. Relationship Between Means and Objectives

The "means"—a quarantine—is directly and substantially related to the objective— easing transition to prison life. In fact, if one accepts the theory that prison life can be extremely traumatic, a "quarantine" may be virtually the only way such a trauma can be avoided.[98] The more difficult question is whether the quarantine policy is a cover [99] for discrimination against women inasmuch as the men did not suffer under a similar policy.

---

98. The "quarantine" policy is roughly like excluding visitors from seeing a hospital patient soon after surgery.

99. Even if not overtly intended as a cover, the policy could be based upon the archaic notion that women, due to their nature, are required to be treated in a paternalistic fashion and "eased" into prison, while men do not require such treatment. Whether overtly intended as a pretext or

Although the question is not free from doubt, I conclude that the quarantine policy was not a pretext for discrimination and that the policy was not based upon archaic notions about women. Unlike the unequal pay issue, very soon after DCS and NCW learned that the policies were different at NCW as compared to the institutions which housed men, the policy was changed and women were treated in a fashion comparable to men. Thus, since the "quarantine" policy is supported by a nongender-driven penological theory, a "quarantine" may be the only way to implement the objective, and the policy was quickly changed so that men and women would be treated in a comparable fashion once notice of the disparity was given, the plaintiffs have failed to establish a violation of the Equal Protection Clause resulting from the disparity in visiting privileges for orientation inmates.

### III. Title IX

Title IX of the so-called Education Amendments of 1972, 20 U.S.C. §§ 1681–1688, prohibits sex discrimination in educational programs receiving federal assistance:

No person in the United States shall on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

In *Canterino I,* 546 F.Supp. at 209–10, the court found that Title IX applied to prisons, stating that the court "cannot judicially impose a special exception to these statutes for correctional institutions." See also *Beehler v. Jeffes,* 664 F.Supp. 931, 940 (M.D.Pa.1986) (allegation of intentional discrimination by female inmates stated a claim under Title IX). The defendants do not contend in their posttrial briefs that Title IX is inapplicable; [100] rather, defendants argue that

---

"merely" based upon archaic notions of gender, the policy would fail.

100. Title IX is enforceable by persons impacted by the discrimination even though the statute may not explicitly authorize such a suit. *Cannon v. Univ. of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

no violation, particularly no intentional violation, has been established. In any event, I conclude that Title IX applies to prison educational programs receiving federal financial assistance.

■■■ The parties have stipulated that DCS "receives federal funds to operate some educational programs in the [DCS] facilities." (Filing 409, Pretrial Conference Order, ¶ C at 3.) In particular, the evidence reveals that DCS received federal financial assistance for its prerelease programs under the so-called Carl D. Perkins Vocational and Applied Technology Education Act, previously known as the Carl D. Perkins Vocational Education Act, 20 U.S.C. § 2301, et seq. (hereinafter sometimes referred to as the "Perkins Act").

For example, exhibits 81 and 81A establish that DCS applied for and received $60,000 in federal [101] monies under the Perkins Act in 1989.[102] In that application, (Ex. 81A), which was signed by Director Gunter, it was stated that it was DCS's "intention to continue the development and implementation of a uniform Pre-Release Program for **all adult facilities."** (Id. (emphasis added).) The application further represented that it was the intention of DCS that "all participants receive the same information and skills **regard-**

**less of the facility in which they reside."** (Id. (emphasis added).) One of DCS's objectives was to maintain "uniformity of the Pre-Release program activities throughout the Department's adult facilities." (Id. (emphasis added).)

Gunter and DCS gave certain "assurances." The application submitted for the Perkins Act funds represented, in pertinent part, that the "applicant ... assures ... that" the programs would be "open to both males and females" and that the applicant would "comply with all applicable federal ... laws and regulations that prohibit discrimination." (Ex. 81A, at 24.)

A violation of Title IX has been established by virtue of my earlier prerelease equal protection finding.[103] As previously stated, plaintiffs have established a denial of equal protection of the laws from January 1, 1989, to the present by virtue of the failure of NCW to offer regularly scheduled prerelease programs to its inmates [104] when NSP inmates were provided with such regularly scheduled prerelease programs. Accordingly, I find and conclude that plaintiffs have proven a violation of Title IX, by virtue of my previous finding relative to the prerelease program, from at least January 1, 1989, to at least July 1, 1991.[105]

**101.** Perkins Act money was administered by the Nebraska Department of Education (NDE), but as the grant approval letter of April 17, 1989, states, it was federal, not state, money that was being distributed: "Your participation in the distribution process for federal Vocational Education funds is appreciated." (Ex. 81A, Letter of 4/17/89.) Indeed, the application was on Perkins Act forms and explicitly requested "federal funds" under the Perkins Act. (Ex. 81A.)

**102.** It is not entirely clear how long Perkins Act monies were received and used for prerelease programs. In August, 1992, one witness, an assistant director at DCS, testified that Perkins Act money was first used for prerelease programs "[a]pproximately four or five years ago." (1563:8.) The fiscal year ending in July, 1992, was the "first complete year" that Perkins Act money was not used for prerelease programs, but was entirely used for juvenile programs. (1569:13–1570:4.) It thus appears that from at least 1988 through at least July, 1991, Perkins Act monies were used in the prerelease programs.

**103.** Plaintiffs briefly argue that they have also proven that other federal funds were received in

relation to other programs for which an equal protection violation has been proved. While I think that may be true as a general matter, the briefing is too sketchy for me to understand the ramifications of such a finding. Accordingly, I decline, at this point, to pass on these other arguments.

**104.** For example, inmate Danekas testified that she was paroled in May, 1991, without benefit of prerelease counseling. She testified that her adjustment was difficult because "all of a sudden you're on the other side" and "there is a whole lot of changes that you go through." (1178:12–16.) She ultimately returned to NCW.

**105.** July 1, 1991, appears to have been the last day Perkins Act monies were used for prerelease programs at any institution under DCS control. To the extent that DCS received Perkins Act monies thereafter (such as for use in the juvenile programs), defendants may be liable for the continuing discrimination in the prerelease programs (and perhaps others) despite the fact that the federal money was used for other purposes by DCS. See 20 U.S.C. § 1687 (definition of "program or activity"). I need not reach that issue now.

Defendants primarily argue that they should have no liability because the plaintiffs have failed to prove intentional discrimination.[106] I am not persuaded by this argument.

Setting aside for a moment the question of whether intentional discrimination is required in order to recover damages under Title IX, it is important to understand that there is a difference between a cause of action and remedies for that cause of action. As the Supreme Court recently stated in *Franklin v. Gwinnett County Public Schools,* — U.S. —, —, 112 S.Ct. 1028, 1034, 117 L.Ed.2d 208 (1992), " 'the question whether a litigant has a 'cause of action' is analytically distinct and prior to the question of what relief, if any, a litigant may be entitled to receive.' " (quoting *Davis v. Passman,* 442 U.S. 228, 239, 99 S.Ct. 2264, 2274, 60 L.Ed.2d 846 (1979)). Defendants cite no convincing authority for the proposition that intentional discrimination is an element of a cause of action under Title IX where the classification at issue is explicitly based upon gender.

In *Canterino III,* 564 F.Supp. at 714–15, the court rejected the argument that intentional discrimination was required before a violation of Title IX was established when the challenged classification is explicitly based upon gender. The court's reasoning in *Canterino III* was that because the policy of classification in Kentucky was explicitly based upon gender (as it is in Nebraska)—that is, women were assigned to a particular prison because they were women—intentional discrimination need not be shown to prove a cause of action under Title IX (or under the Equal Protection Clause). The court contrasted the situation in *Canterino III* with

situations where the classification was facially neutral, but applied in a discriminatory fashion. The court, citing *Hogan,* 458 U.S. at 718, 102 S.Ct. at 3333, stated that: "The Supreme Court does not require such an inquiry in the context of sex discrimination in cases attacking explicit gender-based classifications." *Canterino III,* 564 F.Supp. at 714.-[107] I believe the reasoning of the *Canterino III* court is sound.[108]

Plaintiffs and defendants agree it is likely that intentional discrimination must be shown under Title IX in order to recover damages. *Franklin v. Gwinnett County Public Schools,* — U.S. at —, 112 S.Ct. at 1035 (interpreting *Guardians Ass'n v. Civil Serv. Comm'n of New York City,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) and stating that "a clear majority expressed the view that damages were available under Title VI[109] in an action seeking remedies for an intentional violation"). If intentional discrimination is required in order to recover damages under Title IX, I find and conclude that plaintiffs have shown intentional discrimination.[110]

Intentional discrimination can be shown in a number of ways. See, e.g., *Village of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265–68, 97 S.Ct. 555, 563–65, 50 L.Ed.2d 450 (1977). "Disproportionate impact is not irrelevant, but it is not the sole touchstone of invidious ... discrimination." Id. at 265, 97 S.Ct. at 563. Discriminatory purpose is central to the inquiry, but the challenged action need not be motivated solely or even primarily by a discriminatory purpose. Id.

In this case, as demonstrated earlier, there has clearly been proven a disproportionate

---

**106.** Defendants raise other arguments which warrant no discussion as they have essentially been dealt with in Part II of this opinion. To the extent the defendants believe that the § 1983 claims are "subsumed" in the Title IX claim, that argument is premature and should be considered, if at all, during the remedy phase of this litigation.

**107.** The *Canterino III* court emphasized that the proof, as against one defendant, showed the defendant had given explicit assurances of compliance with Title IX. *Id.* at 715. Such is also the case here with Gunter.

**108.** As I later find that plaintiffs have proven intentional discrimination, the significance of this finding may not be great.

**109.** As the Court noted, the "analysis of Title IX and Title VI ... has developed along similar lines." *Id.* — U.S. at —, 112 S.Ct. at 1032.

**110.** Because of this finding, I need not, and do not, decide whether intentional discrimination must be shown where it is claimed that the Title IX regulations (see, e.g., 34 C.F.R. 106.1–106.71 (1989)) have been violated.

impact[111] upon the NCW females resulting from the gender classification regarding the prerelease program specifically, and NCW programs generally. Moreover, it was established earlier, applying *Hogan* and *Pitts*, that the means causing the substantial burdens are premised upon stereotypical or archaic notions of women and are not directly and substantially related to legitimate governmental objectives. Finally, as demonstrated later in this memorandum, I have concluded that defendants Gunter and Clarke, directors of DCS, displayed deliberate indifference to, or tacit authorization of, the practices which violated the Equal Protection Clause and Title IX. I am thus firmly convinced that intentional discrimination has been shown.

In sum, plaintiffs have proven a violation of Title IX, by virtue of my previous finding relative to the prerelease program, from at least January 1, 1989, to at least July 1, 1991.[112]

## IV. Access to the Courts and Medical Claims

In addition to the equal protection and related Title IX claims, plaintiffs assert claims regarding denial of access to the courts under the Fourteenth Amendment and deliberate indifference to serious medical needs under the Eighth Amendment. I address those separate claims now.

**111.** This is the equivalent of finding that the women were "substantially burdened" by the disparity in the programs.

**112.** The Eleventh Amendment immunity of the State of Nebraska was abrogated regarding the Title IX violation by the Civil Rights Remedies Equalization Amendment of 1986, 42 U.S.C. § 2000d–7. *Franklin v. Gwinnett County Pub. Schs.,* —— U.S. at ——, 112 S.Ct. at 1036 (quoting 42 U.S.C. § 2000d–7(a)(2)). This amendment was, by its terms, effective with "respect to violations that occur in whole or in part after October 21, 1986." 42 U.S.C. § 2000d–7(b). Thus, I find and conclude that defendant DCS is liable for paying any judgment regarding the violation of Title IX.

**113.** The NCW inmates do not claim that the number of hours the library is open violates their Fourteenth Amendment right of access to the courts. They do, however, contend that the fact that the scheduled law library hours at NCW are less than 1/3 of the scheduled hours available to the men at NSP violates the Equal Protection Clause of the Fourteenth Amendment. As noted

## A. Access to the Courts

The plaintiffs assert the following claims regarding access to the courts under the Fourteenth Amendment: (1) lack of physical access to the law library for inmates in segregation and orientation denied those inmates access to the courts, and (2) the inadequate law library denied inmates access to the courts.[113]

It is helpful to restate certain facts with regard to both of the foregoing arguments: (1) until November, 1989, inmates in segregation or orientation were denied physical access to the law library; (2) during the time segregation and orientation inmates were denied physical access to the law library, but before there was an inmate legal aide, they were required to submit their research requests to Ms. Axdahl, who would in turn have other inmates, who were generally untrained, gather the materials and deliver them to the requesting inmate; (3) no inmate received training as a legal aide until August, 1988; (4) no inmate was designated as a legal aide until January, 1989; (5) prior to November, 1989, the law library was housed in very small quarters which required that an inmate who desired to do legal research had to "stand in the aisle" as there was only a typewriter stand for a desk and the legal

earlier, I agree. Moreover, these positions are not inconsistent. For purposes of the access-to-the-courts claim, the question is whether the female inmates have meaningful access to the courts, taking into consideration a variety of factors including, but not limited to, library facilities. For equal protection purposes, the question is whether women, because they are women, should labor with less than 1/3 of the scheduled law library hours made available to men. In *Canterino II,* 644 F.Supp. at 738, Chief Judge Johnstone was confronted with the State of Kentucky's motion to alter his previous orders. He had previously ordered Kentucky to provide female inmates with law library facilities equivalent to the men, to expand the time the library was open, and to provide legal assistance to the inmates in areas of demonstrated need. Kentucky argued that it had complied with *Bounds* and such compliance was all that was required. Judge Johnstone denied the motion, reminding Kentucky that: "this court relied, not only on *Bounds,* but on the Fourteenth Amendment equal protection guarantee." *Id.* at 740–41. The decision was affirmed by the Sixth Circuit Court of Appeals. *Canterino v. Wilson,* 875 F.2d 862.

materials were not organized but "just were kind of piled all over"; [114] (6) until late 1989 or early 1990, the NCW law library collection lacked a "Shepard's citator" for Nebraska cases; (7) until October, 1990, the NCW law library lacked a "Shepard's citator" for federal cases; and (8) during the time the NCW law library lacked "Shepard's," an inmate who desired access to the citation system was required to submit a request to an NCW staff person, who in turn mailed the request to an NSP staff person, who in turn delivered the request to an NSP legal aide, who responded to the request by copying the appropriate volume of Shepard's which was delivered to NCW for the NCW inmate.

A brief overview of the law is also helpful. In 1977, the Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds*, 430 U.S. at 828, 97 S.Ct. at 1498 (footnote omitted).

In a Report and Recommendation dated January 13, 1988, United States Magistrate Judge David L. Piester held that "the simple fact is that if the state denies a prisoner direct physical access to a law library, the state must provide that prisoner, no matter what his status, with assistance by trained, skilled, and independent legal personnel." *Reutcke v. Dahm*, 707 F.Supp. 1121, 1132 (D.Neb.1988). [115] In his report and recom-

mendation, Judge Piester determined that a male inmate who was held in segregated custody was denied his right of access to the courts because the inmate had neither direct physical access to the law library nor the assistance of a trained inmate legal aide. Judge Piester determined that the *Bounds* doctrine was not satisfied by allowing a prisoner to use requested legal materials in his or her cell because it was unrealistic to think a prisoner could know in advance what materials he or she might need to consult. Judge Urbom adopted Judge Piester's recommendation on June 15, 1988. Id. at 1121-22.

I now turn to the arguments of the NCW inmates.

**1. Segregation and Orientation Inmates**

█ Insofar as the segregation and orientation inmates are concerned, the NCW inmates have clearly established a violation of their right of access to the courts until January, 1989: "The simple fact is that if the state denies a prisoner direct physical access to a law library, the state must provide that prisoner, no matter what his status, with assistance by trained, skilled, and independent legal personnel." *Reutcke v. Dahm*, 707 F.Supp. at 1132. It was not until sometime in January, 1989, that a trained inmate legal aide was appointed to assist NCW inmates. [116] Thus, without direct access to the law library, and without the assistance of a legal aide who was trained, skilled, and independent, the segregation and orientation inmates were denied their right of access to the courts. [117]

**114.** Soon after inmate Lange was appointed a legal aide in January, 1989, she began to organize the contents of the library.

**115.** As Judges Urbom and Piester observed, no showing of actual prejudice is required where the inmate establishes that the system of providing access to the courts is not in compliance with *Bounds*. *Reutcke*, 707 F.Supp. at 1129.

**116.** The testimony indicated that Linda Lange took her training sometime in August, 1988, but it was not until sometime in January, 1989, that she was appointed a legal aide. Lange apparently sometimes acted informally as a legal aide from August, 1988, until January, 1989, if an NCW staff person transmitted a request for assistance to her. Lange did not begin to give orientation programs to the inmates on the law library until the "first month" of her appointment.

(2731:6–9.) Without her formal designation as a legal aide, it is doubtful that other inmates knew they could ask Lange for assistance. Moreover, in early August, 1988, Lange tried to give legal assistance to an inmate in the "hole," but was denied permission. (Ex. 80.) Still further, since Lange was not paid as an aide and would have had to conduct her legal aide work in addition to her normal job responsibilities, her informal service was no substitute.

**117.** For the testimony of one or more inmates who have been harmed by these policies, see generally the testimony of Klinger, Younger, and Lange. The defendants object to the testimony of Younger to the extent that it relates to incidents which took place prior to January 1, 1988, the date established by the court as the beginning date for class certification. In my view, January

The defendants argue that since Ms. Axdahl had received some legal research training she served to provide the inmates with access to the courts because orientation and segregation inmates could request assistance from her. I am not persuaded by this argument.

Ms. Axdahl was an NCW staff member whose duties were many. For example, she was involved in education, orientation and recreation at NCW at various times. As such, she would likely be a frequent target of inmate suits. Moreover, she would likely be viewed by the inmates as an illicit source of information for other NCW administrators regarding confidential inmate legal matters involving those same staff members. As Judges Urbom and Piester observed in *Reutcke v. Dahm*, 707 F.Supp. at 1132, in order to comply with *Bounds*, the legal aide should be not only trained, but "independent." Ms. Axdahl was simply not independent; therefore, her availability did not satisfy the requirements of *Bounds*.

After January, 1989, since the NCW inmates did have the services of a trained inmate legal aide, NCW seemingly provided all that *Bounds* required. As Judges Urbom and Piester have observed: "There is no requirement ... that the state provide both trained legal assistance and adequate access to law libraries ... at least so long as either method alone is found adequate to satisfy the meaningful assistance requirement of *Bounds*." *Reutcke v. Dahm*, 707 F.Supp. at 1131 n. 21 (citations omitted).

An inmate legal aide was available when the law library was open to conduct interviews with other inmates. There was no testimony that an NCW inmate requested the assistance of the inmate legal aide but failed to obtain such assistance. The present inmate legal aide complained that she sometimes had to conduct interviews over a number of days due to the limited hours of the law library. But, being cognizant of the fact that NCW inmates concede that the law library hours comport with the requirements of *Bounds*, there was no convincing evidence that this limited interview time substantially interfered with the ability of the legal aide to do her work. I also note that inmate Lange testified that when she was an inmate legal aide she was given extra time in the law library.

Furthermore, DCS provides a 40–hour classroom course in legal research for all inmate legal aides. The course is taught by the DCS librarian.[118] A video tape by DCS attorneys on basic legal research is also available. The inmate legal aide works under the supervision of Ms. Axdahl who, as noted earlier, has received training in legal research as well.[119]

I am satisfied that the availability of and training for the inmate legal aides was sufficient to allow me to conclude that the provision of a trained legal aide constituted "meaningful assistance" under *Bounds*. Therefore, after January, 1989, and until November, 1989, the inability of the orientation or segregation inmates to gain physical access to the law library did not violate *Bounds* because the inmates had the services of a trained legal aide.

In summary, for the time period prior to January, 1989, plaintiffs have proven a violation of the right of access to the courts because segregation and orientation inmates were accorded neither access to the law library nor the assistance of a trained and independent legal aide. For the time period after January, 1989, the right of access to the courts was provided to NCW segregation and orientation inmates because they were afforded the assistance of a trained and independent legal aide.

---

1, 1988, established the beginning date for class certification, but it did not limit the presentation of relevant evidence regarding incidents which took place within the applicable statute of limitations period. Whether damages may be awarded to class members for incidents which took place earlier than January 1, 1988, is a matter I shall defer until the remedy stage of this trial.

**118.** This training is also available to any inmate who wants to take the course even though she might not want to be an inmate legal aide.

**119.** Inmate Lange and Ms. Axdahl "attended a quarter class at the penitentiary from [SECC] in legal research." (3114:4–8.)

### 2. Adequate Law Library

■ The NCW general population inmates attack the law library, contending that it is inadequate for a variety of reasons.[120] Once again, I must examine two time periods.

Prior to January, 1989, I believe the NCW general population inmates have unquestionably established that *Bounds* was violated. During this time frame, as noted earlier regarding the segregation and orientation inmates, the general population inmates did not have the assistance of trained and independent legal aides. Moreover, the law library was also not adequate. In order to do legal research, one had to "stand in the aisle," (2717:6), because the only table was a small typewriter stand. The legal materials were not organized but "just were kind of piled all over." (2717:8–10.)

After Lange was appointed in January, 1989, she organized the library, and later that year (sometime prior to November, 1989) she moved the collection into a larger room. After Lange organized it, the library was usable.

Starting in January, 1989, I believe NCW complied with *Bounds* because a trained inmate legal aide was made available to the general population inmates. As noted earlier, the inmate legal aides were made available to the inmates when the law library was open. Indeed Lange, the first legal aide, testified that she received extra time in the law library "when I was a legal aide." (2773:1.) The inmate legal aides receive a fairly extensive training course in legal re-

search from the DCS librarian or, in Lange's case, from Southeast Community College.[121] The NCW inmate legal aide was supervised by Ms. Axdahl, who has also received legal research training.

Lange testified that after her training in legal research, "I could help them look up a case." (2733:23–24.) At first Lange did not know how to use legal "forms," but she developed a familiarity with a "few" forms for filing cases "by trial and error." (2734:5–6.) In fact, the testimony indicated that although the results were not satisfactory to her, Lange was able to file suit in a variety of situations. As the Court stated in *Bounds*, "our main concern here is 'protecting the ability of an inmate to prepare a petition or complaint.'" *Bounds*, 430 U.S. at 828 n. 17, 97 S.Ct. at 1498 n. 17 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 576, 94 S.Ct. 2963, 2984, 41 L.Ed.2d 935 (1974)). Lange and the other legal aides had the basic ability to assist other inmates in preparing a petition or complaint.

Thus, whatever the problems with the law library, I believe NCW provided its inmates with the minimum required by *Bounds* when it provided the inmates with trained and independent legal aides starting sometime in January, 1989.

In summary, the NCW inmates have established that the general population at NCW was denied their right of access to the courts until January, 1989, because the law library was inadequate and NCW provided no assistance from a trained inmate legal aide.[122] Starting in January, 1989, despite

---

**120.** The NCW inmates are, for example, quite concerned with the lack of Shepard's Citations during certain times. The Supreme Court recognized in a footnote that Shepard's Citations was included in a minimum collection list for prison law libraries. *Bounds*, 430 U.S. at 819–20 n. 4, 97 S.Ct. at 1493–94 n. 4. Although the Court considered the failure to include Shepard's Citations in the collection list a "questionable omission," the Court apparently concluded that such an omission did not establish a violation of the right of access to the courts. Since *Bounds*, the courts have generally found the failure to include Shepard's Citations in a prison law library to be a questionable, but not fatal, omission. See, e.g., *White v. Batson*, 907 F.2d 156 (9th Cir.1990) (Table, Text in Westlaw, No. 89–15689); *Lind-*

*quist v. Idaho State Bd. of Corrections*, 776 F.2d 851, 856 (9th Cir.1985).

**121.** The course appears to have been taught by instructors from the University of Nebraska College of Law library, and included about 30 hours of in-class work. (Ex. 50, Course Syllabus.) If the syllabus was followed, Lange would have completed her training on August 15, 1988. The course was broad in scope and covered a wide variety of matters. It appears to have been well designed to meet the needs of inmate legal aides.

**122.** For the testimony of an inmate who was harmed by this policy, see the testimony of Lange, particularly regarding her difficulty in preparing the grievance that led to this lawsuit.

problems with the NCW law library, the minimum requirements of *Bounds* were satisfied when trained and independent legal aides were provided.[123]

## B. Medical Claims

 The plaintiffs assert a separate claim for an alleged violation of their Eighth Amendment right to be free from cruel and unusual punishment. Specifically, the plaintiffs claim that defendants have been deliberately indifferent to the serious medical needs of the NCW inmates. See, e.g., *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). The plaintiffs argue that the "systemic inadequacies in the medical and dental care provided inmates at NCW generally" justify a finding of an Eighth Amendment violation. (Pls.' Post–Trial Reply Br. at 37.) I disagree.

As noted earlier, I believe the plaintiffs have established a violation of their equal protection rights in the medical and dental area regarding the failure to provide medical coverage 24 hours a day and because of the inability, for a time, to provide timely dental care respecting a dental-care backlog. Otherwise, I do not believe the NCW inmates have established that their equal protection rights have been violated. Although I agree that in these two important areas the women have been substantially burdened by the differences in treatment they received compared to the treatment received by the NSP men, the evidence falls short of establishing sufficient "systemic inadequacies" such that it can be concluded that the defendants were indifferent to the serious medical needs of the plaintiffs for Eighth Amendment purposes.

In *Canterino I*, 546 F.Supp. at 214–15, the court was confronted with a similar Eighth Amendment claim alleging "systemic deficiencies." The evidence presented in *Canterino I* was that:

> Medical care at KCIW is provided by a consulting physician who spends two mornings per week at the institution. In addi-

tion, there is one full-time resident nurse who has two licensed practical nurses under her supervision. The physician is on call when he is away from the prison. Nursing coverage is from 8:00 a.m. to midnight Monday through Friday, and noon to 8:00 p.m. on weekends. KCIW also receives service from the South Oldham Emergency Medical Squad and a group of inmates who have completed emergency medical technician training. A dentist visits KCIW one afternoon per week.

> The infirmary at KCIW has 12 beds. As previously noted, this area is serving as overflow housing for the A & O unit. Office space for the doctor and nurses is located next to the infirmary. Due to overcrowding in A & O, double bunking has been resorted to in the infirmary.

> The medical records kept by the physicians list medication only, with no notation of history, physical exams or diagnosis. Patients requiring specialty care or hospitalization are sent to University Hospital in Louisville. The record shows that outside referrals are made on a regular basis.

Id. at 199–200 (citations to the record omitted).

The *Canterino I* evidence is, in most important respects, very similar to the evidence presented in this case. The *Canterino I* court concluded that no Eighth Amendment violation had been established. Id. at 215. I come to a similar conclusion in this case.

However, unlike *Canterino I*, where there was "[n]o evidence . . . that any female inmate had been denied treatment for a serious medical need," 546 F.Supp. at 200, there was troubling evidence in this case of either lack of treatment or delay in treatment respecting serious medical or dental problems—the so-called "bee-sting" incident involving inmate Younger who went into shock; the postsurgery troubles of inmate Griffin who had significant bleeding and related problems with her surgical incision; and the incident involving inmate Williamson who

---

**123.** Even though *Bounds* clearly does not require NCW to provide both an adequate law library and trained legal aides, the combination of the equal protection violations that I have heretofore found, coupled with the violation of *Bounds* until

January, 1989, may justify a remedy greatly exceeding the minimum requirements of *Bounds*. *Canterino II*, 644 F.Supp. at 740–41. I shall leave this question for resolution during the remedy stage of the trial of this case.

waited about a year to receive dental care, which, according to the dentist, required treatment "ASAP." [124] See *Johnson v. Lockhart*, 941 F.2d 705, 707 (8th Cir.1991) (stating that abdication of policy-making and oversight responsibilities by top prison officials can reach the level of deliberate indifference to prisoner's medical needs, and holding that the district court erred when it dismissed a complaint alleging that plaintiff did not receive prompt surgery even though prison made doctors and 24–hour hospital available to inmates). I turn to those incidents in relationship to the Eighth Amendment claims.

First, I consider the actions of defendant Wehland regarding these three incidents. As to the bee-sting incident, the specific actions of nurse Wehland are not attacked by the plaintiffs. Clearly, she responded as soon as she was called on the telephone, and she responded appropriately and in a timely fashion. She directed that inmate Younger receive immediate treatment at the hospital. The same is true of the incident involving inmate Griffin. To the extent that Wehland participated in any treatment that Griffin received, there is no claim that Wehland failed to provide timely and appropriate treatment. Similarly, with regard to Williamson, there is no claim that Wehland failed to provide either appropriate or timely dental care to the extent she was personally able to render care. Thus, with regard to the actual treatment these three NCW inmates received, to the extent Wehland was involved in the treatment there is no basis to conclude that she "consciously refuse[d] to take steps to deal with the problem." Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit § 4.04, at 61 (Sept.1992) (Committee Comments) (defining deliberate indifference in context of claim for denial of medical care). Absent such evidence, there is no basis to hold Wehland liable under the Eighth Amendment for

the specific treatment she provided these three inmates.

Second, what the plaintiffs really attack is the failure of all the defendants to take prompt action to remedy the lack of around-the-clock medical care and the need for additional dental personnel to deal with the dental backlog. As evidence of the bad motive behind these failures, plaintiffs point out that a DCS staff person informed the Nebraska legislature that the lack of around-the-clock nursing coverage "jeopardizes adequate response to medical emergencies." (Ex. 1305, at 9.) Yet, when money was appropriated to serve that need, the funds were used to engage nurses at other times.

While I am very troubled by this evidence, I do not believe it permits me to conclude that any of the defendants **intended** by their actions, or inaction, to **punish** the NCW inmates. The Supreme Court recently reiterated that in all Eighth Amendment cases the evidence must establish "the requisite culpable state of mind." *Wilson v. Seiter*, ––– U.S. –––, –––, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991). In *Wilson*, the Supreme Court reversed the decision of the Sixth Circuit Court of Appeals applying a "malicious cruelty" standard to a conditions-of-confinement case, holding instead that such a claim should be judged under the "deliberate indifference" standard. Id. ––– U.S. at –––, 111 S.Ct. at 2328.

In so holding, the Court took pains to advise that "the Eighth Amendment itself ... bans only cruel and unusual **punishment**." Id. ––– U.S. at –––, 111 S.Ct. at 2325 (emphasis in original). Quoting Judge Posner with approval, the Court noted that " 'The infliction of punishment is a deliberate act intended to chastise or deter.' " Id. (quoting *Duckworth v. Franzen*, 780 F.2d 645, 652 (7th Cir.1985), cert. denied, 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986)). And, the Court emphasized, quoting Judge Friendly, " 'The thread common to all

---

124. These incidents are discussed in more detail in the preceding portion of this memorandum dealing with plaintiffs' equal protection claims, and I shall not restate these incidents in any detail here. In any event, I find that each of these three incidents satisfies the so-called "objective" component of an Eighth Amendment

claim of cruel and unusual punishment; that is, each incident was sufficiently "serious" so as to implicate the Eighth Amendment. *Hudson v. McMillian*, ––– U.S. –––, ––––, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992) (explaining the "objective" component of Eighth Amendment claims).

[Eighth Amendment prison cases] is that "punishment" has been deliberately administered for a penal or disciplinary purpose.'" Id. (quoting *Johnson v. Glick*, 481 F.2d 1028, 1032 (2d Cir.1973), cert. denied sub nom. *John v. Johnson*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). The Court then made it clear that the "deliberate indifference" standard was to be applied in prison cases involving conditions of confinement as well as medical care. Id. —— U.S. at —— ——, 111 S.Ct. at 2326–2327.

In this case, both the failure to provide around-the-clock medical care and the failure to provide sufficient dental personnel were founded upon considerations having to do with costs and the allocation of resources. The defendants provided nursing coverage throughout most of the day, but not the entire day. Instead of using the money appropriated by the Nebraska legislature to engage nurses during the entire evening, additional nurses were hired to staff NCW at peak times. The defendants provided dental care—although not enough dental care—to many NCW inmates each and every week. When the dental backlog was belatedly recognized, dental personnel from NSP in Lincoln were sent to assist the NCW dentist. Aside from the two areas found comparatively wanting, which resulted in three serious incidents, in every other respect the NCW females were provided medical and dental care comparable to the NSP males. Thus, while the conduct was questionable at best, there is no convincing evidence that the defendants objectively or subjectively "intended" to "punish" the NCW inmates by any action they took or failed to take.

Therefore, I find and conclude that, notwithstanding the three serious incidents previously referred to, the defendants lacked the "requisite culpable state of mind," *Wilson*,

—— U.S. at ——, 111 S.Ct. at 2323, which is necessary to prove that any of the defendants were deliberately indifferent to the serious medical or dental needs of the NCW inmates. This being true, and since I am also satisfied that, as in *Canterino I*, 546 F.Supp. at 214–15, there are no "systemic deficiencies" rising to the level of an Eighth Amendment violation, I find and conclude that plaintiffs' Eighth Amendment claim should be denied.

## V. Individual Defendants

It is necessary to determine whether the individual defendants have any liability to the plaintiffs, keeping in mind that the remedy phase of this case (including the question of damages) has been deferred. Two issues are presented. First, did the plaintiffs prove some act or failure to act on the part of the individual defendants that renders them responsible for the violations heretofore found to have occurred? Second, are the individual defendants entitled to qualified immunity? Moreover, since the answers to these questions depend, in part, upon the type of violation which has been proved, I shall further refine the analysis by reference to the type of violation which has been established. I turn to those questions.

### A. Personal Involvement of Individual Defendants

The remaining individual defendants held supervisory positions with DCS or NCW. The pretrial conference order, (Filing 409, Uncontroverted Facts at 2–4), provides the following information:

Frank Gunter, who is sued solely in his individual capacity, was the director of DCS until February 24, 1990. Harold Clarke has been the director of DCS since August 27, 1990, and he is sued solely in his official capacity.[125] Victor Lofgreen was superinten-

125. As Judge Urbom found when he partially granted a motion for summary judgment in this case, the defendants who are sued in their official capacity alone cannot have liability to respond in damages for the constitutional violations because that would be the equivalent of suing the state in violation of the Eleventh Amendment. (Filings 486 at 3 & 487, ¶ 3(a), (quoting *Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 102, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984)).) But such officials may be enjoined to prevent a violation of federal law even though such relief may have a profound impact upon the state treasury. *Nix v. Norman*, 879 F.2d 429, 432 (8th Cir.1989) (citing *Edelman v. Jordan*, 415 U.S. 651, 667–68, 94 S.Ct. 1347, 1357–58, 39 L.Ed.2d 662 (1974)). Furthermore, to the extent the state's Eleventh Amendment immunity has been abrogated regarding the Title IX claim, there would appear to be no constitutional impediment to imposing any type of relief

dent of NCW until August 3, 1988, and is sued solely in his individual capacity. Larry Tewes was the acting superintendent of NCW from August 4, 1988, to January 5, 1989, but the pretrial conference order is silent as to the capacity in which he became a defendant. I conclude that he was sued in his individual capacity as a superintendent of NCW.[126] Larry Wayne has been the superintendent of NCW since January 5, 1989, and he is sued in his individual and official capacity. Margrett Wehland, a nurse at NCW, is sued in her individual and official capacity.

Title 42 U.S.C. § 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370–71, 96 S.Ct. 598, 603–04, 46 L.Ed.2d 561 (1976). However, a defendant who is a supervisory official is not legally responsible for the constitutional violations when "there [is] no affirmative link between the occurrence of the various incidents ... and the adoption of any plan or policy by [the defendants]—express or otherwise—showing their authorization or approval of such misconduct." Id. at 371, 96 S.Ct. at 604.

A prison official may be held responsible under § 1983 "if culpability is established in one of three ways: personal administrative involvement, personal knowledge, or through the breach of a legal duty that proximately causes the injury." *Johnson–El v. Schoemehl*, 878 F.2d 1043, 1049–50 (8th Cir.1989) (citations omitted) (mayor could not be held liable for conditions at city jail in absence of allegations regarding some specific action or particular form of inaction on the part of mayor). See also *Ouzts v. Cummins*, 825

F.2d 1276, 1277–78 (8th Cir.1987) (finding that complaint failed to state a claim against warden arising out of an alleged beating of a prisoner by corrections officers where there was no allegation of prison policy of, or deliberate indifference to, corrections officers beating prisoners); 1 M. Schwartz & J. Kirklin, Section 1983 Litigation § 7.11 (2d ed. 1991).[127]

### 1. Equal Protection/Title IX Violations—Gunter and Clarke

■ I turn first to the question of liability on the part of the directors of DCS—Gunter and Clarke[128]—with regard to the proven violations of the Equal Protection Clause and related claims under Title IX.[129] There is sufficient evidence to hold Gunter and Clarke responsible for these violations, and I am convinced that I should do so.

I do not hold Gunter and Clarke vicariously responsible. Rather, I hold them responsible for their own acts or failures to act because there is convincing evidence that these men were on notice of the constitutional violations, and, despite having the authority to make policy to counteract the violations, failed to do so. See, e.g., *Santiago v. Miles*, 774 F.Supp. 775, 790–91 (W.D.N.Y.1991) (holding that superintendent and deputy superintendent of prison had actual or constructive notice of race discrimination between white and black prisoners in housing, job assignments and discipline, but failed to adequately eliminate such violations; therefore, they had sufficient personal involvement to be held liable). As the court stated in *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986): "A supervisory [prison] official may be liable because he or she created a

---

on a defendant sued in his or her official capacity for a violation of Title IX.

**126.** Tewes also was an assistant director at DCS before and after his tenure at NCW. I conclude that Tewes was sued only in his individual capacity because the third amended complaint discussed his conduct in relationship to his tenure at NCW. (Filing 333, ¶ 22.)

**127.** These same concepts would seem to apply to individual defendants charged with violating Title IX. *Canterino III*, 564 F.Supp. at 714–15 (imposing liability on individual defendant for

violations of the Equal Protection Clause and Title IX).

**128.** As noted previously, since Clarke is sued in his official capacity, he cannot have liability to respond in damages except to the extent that the Eleventh Amendment immunity has been abrogated for violation of the Title IX claim.

**129.** Title IX violations regarding discrimination in educational matters are, of course, very similar in nature to the equal protection violations regarding educational matters. *Canterino I*, 546 F.Supp. at 210.

policy or custom under which unconstitutional practices occurred, or allowed such a policy to continue." See also *Martin v. Sargent,* 780 F.2d 1334, 1338 (8th Cir.1985) (noting that in order to survive motion to dismiss in a 42 U.S.C. § 1983 action, prisoner need not plead more than that warden was directly involved in the decision).

These men had both the right and the affirmative responsibility to make policy for institutions which housed male and female prisoners. (Ex. 78 (copy of the laws of the State of Nebraska at pertinent times).) The pertinent Nebraska statutes provide, among other things, that the Director "shall ... [e]stablish and administer policies and programs for the operation of the facilities in the department and for the custody, control, safety, correction, and rehabilitation of persons committed to the department." Neb. Rev.Stat. § 83–173(3) (Reissue 1987) (emphasis added). The director is further authorized to "[a]ppoint and remove the chief executive officer of each facility and delegate appropriate powers and duties to him or her." Id. at § 83–173(4). Clearly, the director of DCS had the power and obligation to make policy, the power to delegate powers and duties to the chief executive officer of NCW, and the power to remove the chief executive officer of NCW if that executive failed in his or her duties.

### (a)

With these duties in mind, I turn to the facts. On January 29, 1988, at a meeting of the heads of all adult institutions, Victor Lofgreen, superintendent at NCW, reported that the female inmates at NCW had corresponded with an inmate legal aide at NSP.[130] Lofgreen advised the staff that the women had become aware of "differences between the institutions in the fact that there is not a variety of vocational training and academic education available at [NCW] compared to what is available at the other institutions." (Ex. 463, at 2.) Lofgreen stated it was possible that NCW might be able to "work something out" with Peru State College; "howev-

er, it would not be anywhere near as comprehensive as what [SECC] offer[s] here [NSP and LCC] or in Omaha [OCC]." (Id.) Lofgreen warned that "this will probably be coming in the form of a grievance and that the legal aide at [NSP] is interested in filing suit with the Federal District Court on behalf of the female inmates." (Id.)

Gunter was absent from the meeting, but Gary Grammer, assistant director, was present. Grammer and an administrative secretary prepared a memorandum of the meeting dated February 10, 1988, addressed to Gunter. (Ex. 463.) It is likely that Gunter received the memorandum addressed to him, although he does not recall it.

On or about March 8, 1988, Lofgreen received a grievance from more than half the inmates at NCW complaining of the lack of parity between females and males in Nebraska prisons. (Ex. 9.) The grievance was quite detailed. Its preamble stated:

> The women whose names appear below bring this grievance based upon what we feel is clear cut evidence of discrimination against women by administration at NCW. We feel that we are discriminated against because we are women, because the number of women incarcerated in Nebraska is smaller than the number of men incarcerated in Nebraska, and because the Center is located in a rural area with no access to secondary educational opportunities.

(Id. at 1.)

The grievance raised specific parity issues in nine single-spaced pages of text, (id. at 2–10), including concerns about: (1) vocational and academic programs; (2) inmate work and program assignments; (3) inmate wages; (4) medical and dental care; (5) mental health; (6) grievance procedures; (7) rehabilitation opportunities; (8) inmate dress; (9) recreation; (10) law library and assistance in use of the law library; (11) classification; (12) visitation during orientation; and (13) miscellaneous concerns.

Lofgreen received the grievance, but instead of responding to it himself, he advised

---

130. Lofgreen knew of the activity of these inmates because a guard had evidently been handed the inmate grievance that was being circulated among the prisoners, and the guard had con-

sulted Lofgreen. Although it is not entirely clear what actually happened, it is probable that the guard had been asked to assist in the circulation of the grievance.

the inmates: "Most of the issues addressed in this grievance concern comparisons in policy and practice between institutions of [DCS]. Because the NCW staff does not have the factual information to address these questions it is recommended that they be addressed to the Director of DCS." (Ex. 9, at 11.)

The inmates then submitted a so-called "step–2" grievance to Gunter because the "Chief Executive Officer of said facility recommends that we address the Director of [DCS] about this grievance." (Ex. 10, at 1.) The grievance presented to Gunter was identical to that submitted to Lofgreen.

On March 25, 1988, a meeting of the heads of the adult institutions was held. This meeting is memorialized in minutes dated March 29, 1988. (Ex. 37.) Gunter was present along with other DCS staff and the heads of all adult institutions.[131] Those present discussed the draft of a letter prepared for Gunter's signature by general counsel for DCS. It was agreed that the letter should be sent as Gunter's response to the grievance. (Id. at 6.) Gunter concluded the meeting with the following direction and appointment: "Director Gunter stated this committee is appointed as the Task Force to maintain consistency in operations and programs within the institutions and the review of this grievance is its first task." (Id.)[132]

The letter drafted for Gunter's signature,[133] dated March 15, 1988, denied the inmates' essential complaints. Concessions were made in a few areas.[134] For example, the letter stated that the "inmate pay policy at NCW will be revised to promote consisten-cy among all institutions." (Ex. 10, Attach. at 2.) The letter indicated that orientation inmates would be accorded visits and telephone privileges. (Id. at 3.) The letter also indicated that inmates in general, including NCW inmates, who wished to become inmate legal aides would receive training "in the coming months." (Id. at 4.) Other very minor concessions were made, such as formulating consistent policies about receiving stamps or when inmates had to turn off their lights. (Id. at 5.)

Aside from whatever investigation the DCS lawyer may have made between March 8, 1988 (the date of the grievance), and the date the response was drafted on March 15, 1988, Gunter was aware of no other investigation to determine the validity of the complaints of the NCW inmates. Except for a conversation with Lofgreen about the orientation visitation issue and some unspecified general discussions, Gunter testified that he knew of no follow-up. Gunter testified, somewhat evasively, as follows:

Q. Did you appoint any person, direct anybody to do an investigation of this inmate complaint other than the investigation done by the counsel and reflected in the March 15, 1988 letter?

[Defense counsel]: Your Honor I will object on the basis of foundation could we have a time period.

Q. Did you at anytime?

The Court: You may answer. You may answer.

A. What was it again please?

---

**131.** This included defendant Harold Clarke, who was then warden at NSP.

**132.** Although it is not entirely clear who made up this "committee," it apparently included the heads of the adult institutions and the central office staff who were present on March 25, 1988: Gunter, deputy director Falconer, assistant director Grammer, personnel director Burger, and general counsel Camp. (Ex. 37.) Gunter testified his intention was that "this committee of people which included CEO's, central office staff would be a group of people that would determine consistency in the operations so that I didn't want a person to be the person to say you can make an exception to this policy. I wanted it to be a group ... [decision]." (4537:22–4538:2.)

**133.** The letter was ultimately signed by an assistant director for Gunter, and Gunter acknowledged that the letter was sent at his direction. Although it is difficult to read the date on "Part B" of the response to the grievance, it appears that Gunter's response was actually given on March 28, 1988. (Ex. 10.)

**134.** The letter concluded by adding: "I have appointed a task force to monitor policies and procedures of this Department's adult institutions to help ensure that there is a reasonable basis for any inconsistencies in the policies and procedures enforced in those facilities." (Id. at 6.)

Q. Did you at anytime direct anybody to follow-up on this inmate grievance other than the investigation done by the department counsel that is reflected in the March 15th letter?

A. No I did not because they had the ability to get assistance in [their] investigations if need be.

Q. Isn't it a fact that after the investigation done by counsel and reflected in the response that there was no further investigation done at anytime into that inmate complaint?

A. Investigation?

Q. Yes?

A. Not to my knowledge was there an additional investigat[ion] that was conducted—as far as conversations with people about it, yes that did occur.

Q. And there was—but it would have been conversation between whom?

A. Superintendent [Lofgreen], myself and others that were responsible for different areas of the grievance and that were members of the CEO team.

Q. Was there ever any evaluation done or study done of this inmate complaint other than the investigation done by counsel?

A. I don't know. There [could] well have been at the institution, could well have been by one of the assistant directors or their staff. I do not know that that did not occur—they were well aware [of] the grievance and I can't say that it did not occur because I was not involved at all levels of review.

Q. But you are not aware that it ever occurred isn't that true?

A. As far as any investigation is concerned.

Q. Right?

A. I have no knowledge of further investigation.

Q. And there were no studies or further evaluations done unless the report by Dr. Ryan is in that category[135] isn't that true?

A. I don't know.

Q. Okay.

Q. You certainly didn't do any personally did you?

A. That's correct.

Q. And you didn't do any follow-up except what you've just testified to [here] today isn't that true?

A. Yes.

(4615:25; 4616:1–4618:3.)

There is little or no evidence that the "task force" made any effort to further evaluate the grievance or examine "consistency" issues in general. Of the promised changes, only one—the orientation visitation and telephone policy—was made promptly and before suit was filed. The pay policy was not changed until May, 1989. The promised inmate legal aide training did not come about until August, 1988, and an inmate legal aide was not formally appointed at NCW until January, 1989.

Suit was filed in this case on July 20, 1988. Attached to the Complaint were pages 2–10 of the original grievance. (Filing 2, Attach.) When Gunter was notified of the suit, he referred it to DCS counsel, but ordered no additional investigation.

Nearly 10 months after suit was filed, 14 months after Gunter denied the NCW inmate grievance, and 16 months after Lofgreen reported that NCW could not provide comparable educational programming to the male institutions, Gunter received the May, 1989, Ryan report. (Ex. 34.) The Ryan report specifically warned Gunter that the lack of college courses at NCW "ha[d] been the subject of litigation in other states," (id. at 38), that a Correctional Education Association standard regarding education for women had been violated, (id. at 65), that the "vocational program for female offenders was inadequate," (id. at 69), that "there was only one vocational program for women and this was the traditional clerical arts or office occupations," (id. at 65–66), and that the limited opportunity for women for vocational training "ha[d] been addressed in court cases in other states in which inequity for female inmates has been charged." (Id. at 38.)

---

**135.** The evidence reflected that the Ryan study was not initiated as a result of the complaints by the NCW inmates, but rather was a system-wide study.

Gunter met with Ryan personally, but testified: "I can't recall what we discussed" and "I don't recall reading [the report]." (4619:1–7.) In any event, the Ryan report did not cause Gunter to do anything with regard to this suit.

Clarke became director of DCS in August, 1990. He was promptly substituted as a defendant, in his official capacity.

There is little evidence that Clarke has done much to investigate the facts surrounding the grievance of the NCW inmates since his appointment.[136] Soon after Clarke was appointed director of DCS, his deposition was taken. In that deposition he acknowledged that he had "definite intentions" to become familiar with the "equity issue." (4890:4–15.) Yet, the only specific things he did in this regard were to obtain a listing of programs at NCW and tour NCW as part of his general orientation as director of DCS. There was no testimony that Clarke did anything concrete with the information he gathered from the list or the tour in terms of the complaints of the NCW inmates.

Clarke evidently relied upon what Gunter had done (or failed to do): "I know that the department has—this occurred again prior to my becoming director, the department took a look at the issues raised in the lawsuit and the grievance, and took steps to address some concerns." (4888:25–4889:3.) As to specifics, however, "I could not testify to that." (4889:22.)

### (b)

I turn next to an effort to place the foregoing facts in an appropriate framework. In a slightly different context, the United States Court of Appeals for the Eighth Circuit has set forth an appropriate framework to review this evidence.

In *Jane Doe A v. Special Sch. Dist.*, 901 F.2d 642, 645–47 (8th Cir.1990), the court

was confronted with a § 1983 suit against a school superintendent and others arising from the alleged abuse of school children by a school bus driver. In that case, the court affirmed the district court's grant of summary judgment in favor of the individual defendants. The court set forth a four-part test.

The court said the individual defendants were subject to liability if they: "(1) received notice of a pattern of unconstitutional acts committed by subordinates; (2) demonstrated deliberate indifference to or tacit authorization of the offensive acts; (3) failed to take sufficient remedial action; and (4) that such failure proximately caused injury to the children." Id. at 645.

*Jane Doe A* involved a case of so-called "supervisory liability" where the school superintendent was not actually involved in the unlawful conduct, but was alleged to be liable because of the conduct of a subordinate. This case is slightly different because it involves the programming at an institution— NCW—and not, at least primarily, the conduct of a particular subordinate. This case is also different because the inmates appealed directly to Gunter for help; therefore, his actions (or inactions) are directly implicated. Moreover, this case is different inasmuch as the unconstitutional behavior implicated policy issues normally dealt with only by administrators such as Gunter and Clarke. Nevertheless, the framework set out in *Jane Doe A* would seem to be applicable.[137]

First, it is beyond question that Gunter and Clarke received notice of a pattern of unconstitutional behavior at NCW. Lofgreen's warning in January, 1988, that, even if improved, the academic and vocational programs at NCW would not be "anywhere near as comprehensive" as those at NSP and other male institutions surely constituted such notice. The March, 1988, grievance ad-

---

**136.** Clarke clearly knew of the NCW grievance as he was at the March 25, 1988, meeting and was, if one believes Gunter, appointed to the "task force."

**137.** In cases where the defendant is not the person or entity who actually committed the unconstitutional act, the ultimate concern of the lower federal courts is to comply with the Supreme

Court's mandate in *Rizzo v. Goode*—that before liability is imposed a link must be established between the unlawful act and authorization or approval of the act by an otherwise passive defendant. The *Jane Doe A* approach is sensitive to the concerns of the Supreme Court in *Rizzo*. See also *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

dressed specifically to Gunter, but also presented at a meeting attended by Clarke, was explicit and detailed notice to the director of DCS that there was an institution-wide denial of equal protection taking place at NCW which implicated nearly every facet of prison life. This federal lawsuit, filed in July, 1988, and based on the same grievance submitted to Gunter, was further notice. Moreover, Dr. Ryan's May, 1989, report served not only to notify Gunter of the inequality in vocational and educational programs at NCW, but also to inform him that in other jurisdictions those inequities had resulted in litigation.

Second, I believe Gunter, and later Clarke, displayed deliberate indifference to, or tacit authorization of, the unconstitutional practices.[138] For example, aside from the investigation by DCS counsel that evidently took not much more than seven days to complete, Gunter caused little or no investigation to be made of the detailed grievance that implicated virtually every facet of prison life at NCW. This is particularly noteworthy in light of Lofgreen's warnings about the lack of comparability of the vocational and academic programs at NCW even if improved.

Furthermore, although the inmates at NCW were informed of a "task force," Gunter's "task force" did nothing of substance to pursue the inmates' grievance even though "review of this grievance [was] its first task." After creating the "task force," Gunter did nothing to invigorate it. Still further, of the significant reforms promised, only one was implemented in a timely fashion. There was little, if any, follow-up by Gunter.

Indeed, it took the filing of this lawsuit before the NCW inmates obtained the promised equal pay and training for inmate legal aides. Even the lawsuit did not prompt Gunter to investigate further, however.

After this lawsuit was filed, Gunter met personally with Dr. Ryan. Dr. Ryan's report detailed serious problems of "parity" in the academic and vocational areas at NCW. Yet Gunter could not recall what was discussed at the meeting, or even that he read the report. In any event, Dr. Ryan's warnings did not prompt Gunter to act regarding the complaints of the NCW inmates.

When Clarke became director, he had "definite intentions" to become familiar with the "equity issues," but did not pursue the matter to any significant degree, apparently relying upon Gunter instead.

As the United States Court of Appeals for the Eighth Circuit has stated:

> Proof of actual knowledge of constitutional violations is not ... an absolute prerequisite for imposing ... liability.... [R]eckless disregard on the part of a supervisor will suffice to impose liability.... Thus, the issue is not whether [the defendants] had actual knowledge of the violations, but whether they knew or should have known of them....
>
> A single incident, or a series of isolated incidents, usually provides an insufficient basis upon which to assign supervisory liability. However, as the number of incidents grow[s], and a pattern begins to emerge, a finding of tacit authorization or reckless disregard becomes more plausible.

*Howard v. Adkison,* 887 F.2d 134, 138 (8th Cir.1989) (citations omitted).

Third, it is clear that Gunter and Clarke failed to take sufficient remedial measures. Indeed, more than four years after the NCW

---

**138.** As previously discussed, I doubt that plaintiffs are obligated to prove discriminatory intent regarding the equal protection violations or to obtain injunctive relief under Title IX inasmuch as the classification in this case is explicitly based upon gender. *Canterino III,* 564 F.Supp. at 714–15 (citing *Hogan* and holding that discriminatory intent need not be proven in order to hold prison administrator liable under the Equal Protection Clause and Title IX inasmuch as "[d]efendants enforce a gender-based policy classifying all women prisoners to KCIW [the women's prison] where they are offered inferior voca-

tional programs."). It is likely that plaintiffs must show intentional discrimination to recover damages for a proven violation of Title IX. *Franklin v. Gwinnett County Pub. Schs.,* —— U.S. at ——, 112 S.Ct. at 1035; *Beehler v. Jeffes,* 664 F.Supp. at 940. If discriminatory intent is an element of liability, as noted earlier, I am persuaded that the findings I have made under the *Hogan* and *Pitts* heightened scrutiny test, coupled with the finding of deliberate indifference, are the equivalent of a finding of discriminatory intent.

inmate grievance was submitted, some of the unconstitutional practices still exist.

Finally, there is no question that the failure to take adequate and timely remedial measures was a proximate cause (if not the only cause) of the damage and injury suffered by the plaintiffs, and the class represented by the plaintiffs, from and after January, 1988.

### (c)

Little, if any, attention is given to these issues in the posttrial briefs submitted by the defendants.[139] But, from the evidence presented at trial, Gunter and Clarke apparently contend that they were not indifferent because: (1) the process of adopting and reviewing administration regulations and operational memoranda indicated that they strove for consistency; (2) the fact that all DCS institutions were accredited indicated that they were not indifferent to parity issues; and (3) the regular meetings of the heads of all institutions indicated that the directors endeavored to provide consistency of treatment. In sum, the directors apparently argue that because they put procedures in place to assure consistency of treatment it is wrong to conclude that they were indifferent. I am not convinced.

As Clarke admitted: "No one person in [DCS] is charged with ensuring that males versus females are equally situated in every aspect." (4861:16–18.) Thus, although there may have been a general concern about consistency, there was no specific compliance mechanism to assure parity of treatment between men and women. A general concern about consistency does not equate to a concern about parity.

Indeed, the fact that Gunter appointed a "task force" is highly probative evidence that the systems which were in place were not effective, and the fact that the "task force" did nothing is likewise highly probative evidence that the directors were indifferent to the parity problems. Furthermore, the fact that Dr. Ryan found significant disparities in

the educational and vocational programs at NCW compared to the male institutions is likewise highly probative evidence that the touted mechanisms for consistency did not work. And, the fact that Gunter did little or nothing in response to the report is highly suggestive of indifference.

Moreover, the process of reviewing the administrative regulations of DCS and operational memoranda of each institution was also quite obviously not intended to address parity concerns. It is one thing to assure that NCW operational memoranda are consistent with DCS administrative regulations, and quite another to determine whether women at NCW are provided with parity of treatment compared to men at NSP. Indeed, there was no attempt to compare an operational memorandum from one institution with that of another institution. Therefore, the "AR/OM" review process could not realistically be relied upon by the DCS directors to identify disparities in the treatment of women.

Insofar as accreditation is concerned, I do not understand the accreditation process to provide for a specific review of parity issues in the sense of a comparative analysis of institutions to assure parity of treatment. Thus, there is no reason to believe that the directors of DCS could reasonably expect the accreditation process to inform them of disparities at NCW when compared to NSP. Simply put, the accreditation evaluators made no such study.

As for the meetings of the heads of the various prisons, those meetings would not have informed the directors (or anyone else) of parity issues. In fact, Clarke admitted in a deposition that these meetings did not even discuss or compare programs:

> I don't think we ever discussed or compared educational programs and for that matter any other programs. Basically the programs are set at the DCS level that we have in the institutions and the CEO is

---

**139.** In fact, with the exception of a brief discussion of the defense of qualified immunity, the defendants' posttrial briefs are curiously silent on the question of the liability of the individual defendants. Plaintiffs, on the other hand, devoted 45 pages of their first posttrial brief to this question. (Pls.' Post–Trial Br. at 124–169.)

basically [to] administer the program to the extent that DCS policy allows them to. (4895:5–18.)

In summary, I find that Gunter and Clarke were sufficiently personally involved that they may be held accountable for the equal protection and Title IX violations found to have existed.

### 2. Equal Protection/Title IX Violations—NCW Staff

■ As to the remaining defendants— Lofgreen, Tewes, Wayne and Wehland—I do not believe they can be held personally responsible for the equal protection or Title IX violations.

Wehland was the "medical director" or "head nurse" at NCW and, as such, had certain programming responsibilities for medical and dental services at NCW. I do not understand the plaintiffs to claim that Wehland was so personally involved in the policy-making decision process that she would have liability for the equal protection or Title IX violations. If plaintiffs do make such a claim, I do not find sufficient evidence to so conclude.[140]

The much more difficult question is whether the superintendents of NCW had sufficient personal involvement to hold them responsible for the equal protection and Title IX violations. Although not free from doubt, I conclude that these men did not have sufficient personal involvement to be held responsible.

It would seem axiomatic that before the superintendents could be held liable for the equal protection and Title IX violations, they must have had the ability to make a comparison between NSP and NCW and the power to change the situation when, and if, a disparity became evident. See, e.g., *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir.1984) (noting that state law which establishes a prison administrator's legal duties provides "a useful guide in determining who had the **responsibility and capability** to end the offensive practices") (emphasis added); 1 M. Schwartz

& J. Kirklin, Section 1983 Litigation § 7.11 at 386 & n. 334 (collecting cases).

In denying the superintendents' motion for summary judgment, Judge Urbom identified the issue early on: "I find no evidence in the record as to the authority delegated to the superintendent at NCW. Whether defendants Tewes, Lofgreen or Wayne made policy decisions which resulted in the alleged constitutional violations remains a disputed issue to be resolved at trial." (Filing 486, at 6.)

It is clear to me that the superintendents rightly believed that the complaints of the NCW inmates implicated policy and fact questions beyond their authority. For example, when the original grievance was submitted to Lofgreen, he declined to rule, and instead referred the grievance to Gunter: "Most of the issues addressed in this grievance concern comparisons in policy and practice between institutions of [DCS]. Because the NCW staff does not have the factual information to address these questions it is recommended that they be addressed to the Director of DCS." (Ex. 9, at 11.) There were good reasons for the refusal of the NCW superintendent to deal with the grievance.

First, the power and authority of the NCW superintendent under Nebraska law is limited. The superintendent is "responsible to the director for the custody, control and correctional treatment of persons committed to the department." Neb.Rev.Stat. § 83–177 (Reissue 1987). The director, and the director alone, sets policy. Neb.Rev.Stat. § 83–173(3). It is the director who "delegate[s] appropriate powers and duties to" the facility heads. Neb.Rev.Stat. § 83–173(4).

The evidence strongly suggests that the superintendents did not have the delegated authority to make decisions about what programs to offer; rather, these decisions were made at the DCS level. The evidence also strongly indicates that the facility heads were instructed not to question programming decisions.

---

140. DCS made the assignments of doctors, dentists, and nurses at NCW. For example, it was a DCS staff person (Whitson) who ultimately decided that nursing coverage would not be provided at NCW 24 hours a day.

For example, Clarke, who had been a facility head at NSP prior to becoming director, testified that "[b]asically the programs are set at the DCS level that we have in the institutions and the CEO is basically [to] administer the program to the extent that DCS policy allows them to." (4895:5–18.) As Clarke pointedly stated, "[W]e did not question … why." (4896:2–3.)

Moreover, when Gunter appointed the "task force," he made it clear that he did not want one person to deal with these "consistency" issues: "I didn't want [one] person to be the person to say you can make an exception to this policy. I wanted it to be a group … [decision]." (4537:25–4538:2.) Once Gunter essentially denied the grievance and refused to change most of the existing programs at NCW, the superintendents had no authority to even consider "parity" issues.

I find and conclude that as a general matter Gunter did not delegate to heads of facilities the power to select or design programs, and superintendents were not to question programming decisions. Moreover, with this case specifically in mind, I also find that Gunter explicitly refused to delegate to the NCW superintendents the power to select or design programs or to deal with "parity" issues.

Second, the superintendents were ill-suited to deal with the far-reaching policy implications of the NCW grievance to the extent it required a comparison between institutions housing males and females. Without an appropriate fund of knowledge about institutions other than their own, the NCW superintendents would have been hard pressed to realistically assess and deal with the claims of the female inmates even if they had the power to do so.[141]

Director Clarke testified that a "particular superintendent is not positioned to know what's occurring in one facility vs. [another]." (4896:23–25.) Larry Wayne, who I found to be both credible and dedicated to the welfare of the prisoners at NCW, testified that while "I'm in a very good position to determine the quality of programming as offered to the female inmates in the institution where I'm chief executive officer," (3606:19–22), he was not in a position to ensure parity of treatment because "I'm not intimately familiar with the operations in other institutions where male inmates are housed." (3606:6–7.)[142]

I find and conclude that the NCW superintendents are not personally responsible because they lacked both the power and the information necessary to remedy the equal protection and Title IX violations.[143]

### 3 Access-to-the-Courts Violations

■■■■ I have found that the plaintiffs were denied their right of access to the courts in two ways. First, I found that for the time period prior to January, 1989, plaintiffs have proven a violation of the right of access to the courts because segregation and orientation inmates were accorded neither direct access to the law library nor the assistance of a trained and independent legal aide.

---

141. This fact distinguishes *Santiago v. Miles*, 774 F.Supp. at 790–91. In that case, the prison wardens were held to have known about race discrimination among prisoners in one institution. It is a very different matter to charge a superintendent of one prison housing females with knowledge about another prison housing males.

142. This is obviously not to say that the NCW superintendents were entirely ignorant of the policies and programs at the male institutions. For example, Wayne had worked at NSP for a substantial period of time; Tewes worked at the DCS central office before going to NCW; and Lofgreen acquired knowledge about other institutions when he dealt with specific inmate grievances. (See, e.g., Ex. 47.) However, if the parity issue was to be dealt with seriously, the far-reaching question required detailed knowledge of

all the challenged programs and policies at all the DCS institutions. This is clearly why Lofgreen refused to deal with the "parity" grievance and instead referred it to the person who had the responsibility to possess such knowledge—the director of DCS.

143. These factors distinguish *Canterino III*, 564 F.Supp. at 714–15. In that case, Superintendent Barber was held liable because he played a "direct role in the provision of the vocational education programs **for both men and women**," and he gave express assurances of compliance with Title IX. Id. at 714 (emphasis added). In this case, Gunter gave the express assurances of compliance with Title IX, (Ex. 81A), the NCW superintendents had no responsibility for programming at NSP, and, at Gunter's direction, no one person was to deal with "consistency" issues.

Second, I found that the general population at NCW was denied the right of access to the courts until January, 1989, because the law library was inadequate and NCW provided no assistance from a trained and independent inmate legal aide. The question remains which, if any, of the individual defendants are responsible for these violations.

Since these violations ended sometime in January, 1989, Wayne and Clarke can have no liability for denial of access to the courts. Wayne did not become superintendent of NCW until January 5, 1989. Clarke did not become director of DCS until August 27, 1990, and, as subsequently noted, there is no evidence that the directors of DCS were aware of or sanctioned the access-to-the-courts violations at NCW.

On the other hand, Gunter, Lofgreen and Tewes were all "on board" during the pertinent time frame. Gunter was director until February 24, 1990; Lofgreen was superintendent of NCW until August 3, 1988; and Tewes was acting superintendent from August 4, 1988, until January 5, 1989. I must, therefore, examine their conduct with regard to the access-to-the-courts violations.

Insofar as Gunter is concerned, I do not believe he had sufficient personal involvement in the access-to-the-courts violations to be held liable for them independent of liability for the equal protection violations. There is no claim that Gunter knew about the specific violations.

The grievance presented to Gunter in March, 1988, was phrased in terms of parity issues. It complained that the library hours were insufficient, that there was a lack of legal assistance "in preparing documents, doing research, etc.," and that the activities

director would not help the inmates with their legal problems. (Ex. 9.) Viewed in context, these were complaints about how the women at NCW were treated compared to male inmates. The grievance did not specifically complain about the inadequate law library or the restrictions on the use of the law library by inmates in segregation or orientation.

As noted above, it is fair to assess the equal protection and Title IX violations against Gunter because he was specifically charged with handling those parity issues in the March, 1988, grievance. However, it is an entirely different thing to hold Gunter responsible for specific access-to-the-courts violations taking place at a specific institution when he had no knowledge of the violations and played no part in adopting or implementing the law library policy which in part caused the violations.[144]

Insofar as the segregation/orientation law library policy is concerned, plaintiffs argue that Gunter had notice. It is true that the issues presented in *Reutcke v. Dahm*,[145] or very similar issues, were discussed in a meeting of institutional heads on January 29, 1988. (Ex. 463.)[146] In that meeting, Dahm (the defendant in *Reutcke*) stated "they would prefer inmate legal aides be trained in some fashion" and "[t]hey do not like the idea of taking inmates out of segregation." (Id. at 1.) There followed a discussion about what type of training had been given. After that discussion, it was "agreed that it would be nice to have whatever is done be consistent throughout the Department." (Id.) The assistant director then agreed to set up a meeting with DCS counsel to discuss "litigation issues/concerns relative to personal

---

**144.** This does not mean Gunter would escape liability for an equal protection violation that also constituted an access-to-the-courts violation. Take, for example, the inadequacy of the law library. Gunter is liable for the equal protection violation because the NCW law library was poor when compared to the NSP law library. The issue of "parity" was Gunter's responsibility. He had specific notice of the claim of inequality and did nothing of substance to deal with it. It is not inconsistent to also conclude that Gunter escapes liability because the law library did not comply with *Bounds*, inasmuch as compliance with *Bounds* was the responsibility of the individual

wardens and Gunter was not notified of the noncompliance with *Bounds*. Obviously, there can be more than one proximate cause of injury or damage and different liability theories for each proximate cause.

**145.** Judge Piester issued a report and recommendation holding Dahm liable in the *Reutcke* case on January 13, 1988. (Ex. 1379.)

**146.** This was the same meeting where Lofgreen gave notice about the activities of the NCW inmates respecting the grievance.

liabilities." (Id.) As indicated previously, exhibit 463 was a memorandum, essentially minutes of the meeting, addressed to Gunter, dated February 10, 1988. It is likely that Gunter received the memorandum, although he could not remember reading it.

While this memorandum may have given Gunter actual notice of *Reutcke*, I do not believe the memorandum gave him notice that NCW was not in compliance with *Reutcke*. Thus, I do not think the memorandum can be used to establish that Gunter had notice of the *Bounds* violation regarding segregation/orientation inmates at NCW such that he may be held liable under the second part of the four-part supervisory liability test of *Jane Doe A*, 901 F.2d at 645–47.

I turn next to the liability of Lofgreen and Tewes regarding the access-to-the-courts violations. I have previously held that insofar as the equal protection violations and Title IX violations are concerned, the NCW superintendents have no liability because they lacked both the power and the knowledge to deal with issues of parity. The same is not true for NCW superintendents regarding the access-to-the-courts violations.

Quite apart from whether the NCW superintendents had the power or knowledge to deal with "parity" concerns, the NCW superintendents had the power and knowledge to provide meaningful access to the courts for inmates in the prison they ran. Since it was their policies which ran afoul of *Bounds*, the superintendents are liable. *Reutcke*, 707 F.Supp. at 1134 (quoting *Martin v. Sargent*, 780 F.2d at 1338: " '[a] prison warden can be held liable for policy decisions which create unconstitutional conditions,' " and holding that Warden Dahm was "ultimately responsible for the policy of the institution concerning access to legal materials and assistance").

There is little doubt that the physical condition of the law library was a "policy" of the superintendents, particularly given the small size of NCW. Indeed, Wayne testified that as a matter of "law library policy" he moved the law library when he became superintendent so it "would be easier to find volumes and reference material they were seeking." (3755:1–11.) [147]

There is also little doubt that the restrictions on segregation and orientation inmates' physical access to the law library was a "policy" of the superintendents. For example, former inmate Younger testified that prior to 1988 Lofgreen personally denied her physical access to the law library while she was in segregation.[148] According to Younger, Lofgreen told her that "under current programming there was no access for segregation inmates to legal materials." (5464:15–16.) Tewes approved of this policy of denying physical access when he authorized segregation inmates to have law books in segregation. (Ex. 146.) [149]

Finally, there is little doubt that the superintendents denied physical access to the law library for segregation and orientation inmates when they knew that NCW had not appointed trained inmates as legal aides.

For example, inmate Lange submitted a law library grievance to Lofgreen in June, 1988, which specifically alleged, among other things, that "most of the inmates here do not know what they are doing" and "[w]e need some one [*sic*] to help the [inmates] use the library." (Ex. 47.) Shortly after Tewes arrived at NCW, he received a request by inmate Lange (originally addressed to Lofgreen) to write to an NSP inmate legal aide regarding legal matters. (Ex. 48.) Tewes denied the request, telling Lange to write to legal counsel for DCS "[i]f you are in need of addition [*sic*] legal counseling or training." (Id.) Moreover, during Lange's legal aide

---

147. Moreover, Wayne's conclusion that the law library needed to be moved is strong corroboration of the inmate testimony about the inadequacy of the library until it was moved.

148. Younger indicated her reason for being in segregation was that "the center believed I had been hurt by another inmate." (5463:13–14.)

149. This policy also violated *Bounds* for the reason that " '[i]t is unrealistic to expect a prisoner

to know in advance exactly what materials he needs to consult.' " *Reutcke*, 707 F.Supp. at 1130 (quoting *Toussaint v. McCarthy*, 801 F.2d 1080, 1110 (9th Cir.1986), cert. denied, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987) and *Williams v. Leeke*, 584 F.2d 1336, 1339 (4th Cir. 1978), cert. denied, 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 276 (1979)).

training in August, 1988, but before she was appointed, Tewes denied Lange the opportunity to assist an inmate in segregation. (Ex. 80.)

In summary, superintendents Lofgreen and Tewes are liable for the access-to-the-courts violations because it was their policies that violated *Bounds*.

### B. Qualified Immunity

▇▇ The defendants raise the defense of qualified immunity. I am not persuaded by their arguments.

In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818, 102 S.Ct. at 2738; *Anderson v. Creighton*, 483 U.S. 635, 638–41, 107 S.Ct. 3034, 3038–40, 97 L.Ed.2d 523 (1987). A decision as to whether a "clearly established" right has been violated requires an inquiry into both the particular acts or omissions complained of and the case or statutory law which would have given a reasonable person cause to know that such acts or omissions would violate a constitutional right. *Myers v. Morris*, 810 F.2d 1437, 1459 n. 16 (8th Cir.1987), cert. denied, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987). Qualified immunity will apply if it was not clear that the actions complained of would violate a constitutional right, or if the defendants could reasonably have believed that their actions would not violate such a right. See *Robison v. Via*, 821 F.2d 913, 920–21 (2d Cir.1987).

As to the equal protection claims, similar suits have been successfully brought in different jurisdictions since 1974. See, e.g., *Canterino I*, 546 F.Supp at 209–12; *Bukhari*, 487 F.Supp. at 1171–72 (quoting *Barefield v. Leach*, No. 10282 (D.N.M.1974)); *Glover I*, 478 F.Supp. at 1079–83. These cases have established the general rule that disparity

between programs offered to female and male inmates violates the Equal Protection Clause. This rule is settled enough to deny the defendants qualified immunity as to the equal protection claims.

Similarly, the second cause of action, alleging a Title IX claim, turns on the question of gender parity in the context of prisons. *Canterino I*, 546 F.Supp. at 209–10; *Canterino III*, 564 F.Supp. at 714–715. See also *Beehler v. Jeffes*, 664 F.Supp. at 938–41. The contours of Title IX in the prison context are sufficiently well established so as to deny the defendants qualified immunity as to this cause of action. *Canterino I*, 546 F.Supp. at 209–10; *Canterino III*, 564 F.Supp. at 714–715. See also *Beehler v. Jeffes*, 664 F.Supp. at 938–41.

Finally, the claims regarding access to the courts involve well-established areas of the law of which the defendants should reasonably have known. *Bounds* stated in 1977 that "[i]t is now established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds*, 430 U.S. at 821, 97 S.Ct. at 1494. In January and June, 1988, Judges Urbom and Piester observed in *Reutcke v. Dahm*, 707 F.Supp. at 1135, on facts very similar to the ones presented here, that "even a cursory review of the preexisting constitutional law demonstrates the unconstitutionality of such a policy as the one challenged here." Therefore, qualified immunity is also denied as to these claims.

### VI. Conclusion

Because of the length of this opinion, it may be helpful to summarize my findings of fact and conclusions of law. Such a summary follows.[150]

### UNCONTROVERTED FACTS

1. The plaintiff Cheryl Klinger was an inmate assigned to the Nebraska Center for Women (NCW) from October 26, 1987, to July 11, 1988.

2. The plaintiff Linda Lange was an inmate assigned to NCW from October 21, 1987, until October 12, 1989.

---

**150.** The foregoing is a summary and is not necessarily intended as a complete restatement of each

finding of fact and conclusion of law.

3. The plaintiff Stacy Finn was an inmate assigned to NCW from December 28, 1987, to December 14, 1989.

4. The plaintiff Gweniver Lay was an inmate assigned to NCW from February 9, 1988, through November 28, 1988, and from June 16, 1989, through August 28, 1989.

5. The defendant, Nebraska Department of Correctional Services (DCS), is and was, at all times relevant to the third amended complaint, the state agency in charge of matters involving the control and operation of Nebraska's correctional facilities.

6. The defendant, DCS, operates the Nebraska State Penitentiary (NSP) in Lincoln, Nebraska, and the NCW in York, Nebraska.

7. NSP houses only male inmates.

8. NCW houses only female inmates.

9. The defendant, DCS, receives federal funds to operate some educational programs in the Nebraska correctional facilities.

10. The defendant, Frank Gunter, was the director of the DCS until February 24, 1990, and was an employee of the State of Nebraska, in that capacity.

11. The defendant, Harold Clarke, has been the director of DCS since August 27, 1990, and is an employee of the State of Nebraska.

12. The defendant, Larry Tewes, was the acting superintendent of the NCW from August 4, 1988, to January 5, 1989, and was an employee of the State of Nebraska, in that capacity.

13. The defendant, Victor Lofgreen, was the superintendent of the NCW until August 3, 1988, and was an employee of the State of Nebraska, in that capacity.

14. The defendant, Larry Wayne, has been the superintendent of the NCW since January 5, 1989, and is an employee of the State of Nebraska.

15. At all times relevant to the third amended complaint, the superintendent of the NCW was and is responsible for the custody, control and correctional treatment of persons committed to that correctional facility and for the general administration of that correctional facility in accordance with the laws and the Constitution of the United States.

16. The defendant, Margrett Wehland, is and was at all times relevant to the third amended complaint, a medical nurse at NCW and an employee of the State of Nebraska.

17. The defendant, Judith Danielson, is and was at all times relevant to the third amended complaint, a psychologist at NCW and an employee of the State of Nebraska.

18. The defendants, Frank Gunter and Victor Lofgreen, are sued solely in their individual capacities.

19. The defendant, Harold Clarke, is sued solely in his official capacity.

20. The defendants, Larry Wayne, Margrett Wehland, and Judith Danielson, are sued in both their official and individual capacities.

## PROCEDURAL MATTERS

21. This court has jurisdiction over the persons of the defendants and the subject matter of this action.

22. The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), and this action is brought pursuant to 42 U.S.C. §§ 1983 and 1985 and 20 U.S.C. § 1681(a).

23. This case was properly certified as a class action pursuant to Fed.R.Civ.P. 23(a) and 23(b)(2).

24. The class has been defined as "all female prisoners confined at NCW in York, Nebraska as of January 1, 1988 and all female prisoners who will be confined at NCW until the conclusion of this lawsuit."

25. For practical purposes, the class consists of all women who were NCW inmates at any time on or after January 1, 1988, through the conclusion of this case.

26. When Judge Urbom granted summary judgment, he terminated this case as against Judith Danielson.

27. The defendant, Larry Tewes, is sued in his individual capacity, not his official capacity, and then only regarding his actions as the acting superintendent of NCW.

28. Evidence regarding events which took place prior to January 1, 1988, if otherwise relevant, is admissible despite the fact that the class definition period began January 1, 1988.

## EQUAL PROTECTION GENERALLY

29. The proper test to judge the defendants' actions insofar as the equal protection claims are concerned is the test set forth in *Hogan*, 458 U.S. at 724–725, 102 S.Ct. at 3336–37, sometimes called the "heightened scrutiny" test, because women are assigned to NCW on the basis of their sex.

30. *Hogan* requires proof of two things in order to sustain the validity of a gender-based classification: (a) the classification must be shown to serve an important governmental objective, and (b) the means chosen to further the objective must be directly and substantially related to achievement of that objective.

31. Most of the cases involving women's prisons have employed the "heightened scrutiny" test. *Pitts,* 866 F.2d at 1455; *Canterino I,* 546 F.Supp. at 209–12; *Glover I,* 478 F.Supp. at 1079–83.

32. According to *Pitts,* the *Hogan* test is applicable to cases involving equal protection challenges based upon classifications which assign women to prison according to gender: (a) where the women are substantially burdened by the challenged policies or programs compared to similarly situated males; (b) where the challenged policies or programs do not implicate the concerns set forth in *Turner,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64, regarding prison security or the day-to-day operations of the prison; (c) because facial gender classifications have traditionally drawn heightened scrutiny; and (d) because heightened scrutiny is appropriate inasmuch as the right sought to be enforced is the right to be treated equally as opposed to a personal right which is often limited as an inherent part of incarceration.

33. NCW inmates are similarly situated to male inmates at NSP because: (a) the inmates at both places are incarcerated as a result of a criminal conviction; (b) both NSP and NCW hold prisoners of similar classifications—medium and maximum; (c) minimum custody inmates at NCW are treated essentially the same as higher custody classification inmates at NCW and thus the minimum custody classification is irrelevant for comparison purposes; (d) the general purposes of the State of Nebraska in administering the challenged programs appear to be similar at both NCW and NSP; (e) *Timm v. Gunter,* 917 F.2d at 1102, is not applicable because that case involved programs which directly implicated security issues and this case does not; and (f) the fact that there may have been a justifiable reason for segregating men from women in the first place does not render men and women dissimilarly situated, and the proper place to consider the reasons for segregation is when a comparison of the relationship between the objective and the means is made.

34. Insofar as prisons for women and equal protection are concerned, NSP and NCW are not required to have identical programs, but rather programs which are "substantially equivalent"; that is, equal protection requires parity of treatment. *Glover I,* 478 F.Supp. at 1079; *Bukhari,* 487 F.Supp. at 1171–72.

35. Programs are not substantially equivalent solely because each institution has similar programs if the programs available to women are inferior in design, execution, or both. *Glover IV,* 721 F.Supp. at 837.

36. Expenditures of money do not substitute for reasoned analysis. *Glover III,* 855 F.2d at 288–89 (Engel, C.J., concurring).

37. Economic considerations, such as the lack of an economy of scale at prisons housing women, cannot serve as an excuse for a failure to meet constitutional standards. *Glover I,* 478 F.Supp. at 1078; *Canterino I,* 546 F.Supp. at 207.

38. The difference in cost at NCW as compared to NSP is a function of the number of inmates, and not some attribute of womanhood.

39. In every category except administrative, the inmate-to-staff ratios at NCW and NSP are comparable, which suggests that given the lack of an economy of scale, NCW receives inadequate resources.

40. Spending is not a very good measure of equivalency.

41. Although defendants did not articulate what governmental objective might warrant differences in treatment as between the inmates at NCW and NSP, the evidence suggests that the State of Nebraska has an important governmental objective in seeing to the remediation of effects of gender bias suffered by female inmates prior to their entry into prison in order that the prison system might better address its statutory mission of preparing inmates for "lawful community living." Neb.Rev.Stat. § 83–901.

## EMPLOYMENT/ECONOMIC PROGRAMS

### Hobbycraft

42. At NSP, inmates can take orders to produce hobbycraft items, but at NCW, the crafts must be purchased from a display case.

43. The differences in the hobbycraft policy are slight, do not substantially burden the NCW inmates, and involve day-to-day operational details in which the court ought not to involve itself—no equal protection violation has been established with regard to this policy.

### Private Venture

44. Since June, 1990, there has been a private venture business employing inmates at NSP but not at NCW.

45. The defendants are not responsible for the decision of a private venture to leave NCW, and where there is no evidence to suggest that defendants adopted a policy or practice of pursuing or encouraging private venture employment for men and not women, the defendants are not liable for the lack of private venture employment opportunities— no equal protection violation has been established with regard to this policy.

### State-paid Work Assignments

46. There have been more categories of assignments at NSP than at NCW, but the general policy was to provide the same types of assignments to both sets of inmates.

47. NSP inmates are not substantially better off than NCW inmates regarding either the quality or quantity of state-paid work assignments—no equal protection violation has been established with regard to this policy.

### Pay Policy

48. Before May, 1989, when the policy changed, female inmates at NCW were paid on an hourly basis for their state-paid work assignments, but male inmates at NSP were paid for a day's work even if they worked only 15 minutes.

49. The cost justification for the disparity in the pay policy is not a good enough reason for the evident discrimination. *Canterino I,* 546 F.Supp. at 211.

50. Paying women less than men is not related to the reason for segregating men from women; such a policy proclaims that women, because they are women, are worth less than men; and the policy conflicts with any legitimate state objectives—an equal protection violation has been established with regard to this policy.

## EDUCATIONAL/VOCATIONAL TRAINING PROGRAMS

### Academic

51. Prior to October, 1990, the failure to offer on-site postsecondary education at NCW substantially burdened inmates at NCW given the fact that such offerings were available to males at NSP—men could literally go to college and women could not.

52. After October, 1990, the failure to offer on-site postsecondary education to females at NCW which would lead to a degree, and the failure to have a sufficient number of operational computers, substantially burdened the female inmates given the fact that male inmates at NSP could pursue on-site degree programs with operational computers—men can get college degrees using adequate computers in their courses and women can not.

53. Although traditionally female in nature, the secretarial technology course at NCW did not substantially burden females at NCW compared to the business administra-

tion course at NSP because the NCW course was generally responsive to inmate needs; the representative from SECC frequently surveyed inmate needs; some business courses are now being offered; and some of the courses which are offered constitute core courses for other areas of study including business—no equal protection violation has been established in this regard.

54. The prerequisites to the college correspondence courses, particularly during the time there were no on-site college courses taught at NCW, substantially burdened the female inmates, given the fact that there were no similar prerequisites for males at NSP who desired to take college correspondence courses.

55. The Peru State College offering did not establish that the female inmates at NCW were uninterested in postsecondary education because: (a) the inmates were led to believe that they had to pay $33.00 an hour in advance without financial assistance; (b) the proposed teachers were either high school teachers or a disliked NCW staff member; and (c) the Peru State College offerings were not as extensive as those at NSP.

56. The fact, if it is a fact, that 60 percent of the males at NSP had either 12 years of education or a GED is not a valid reason for denying educational opportunities to the females at NCW because: (a) NCW inmates tested well above the adult national average for reading; (b) 25 percent of the NCW women had the ability to do college work; (c) the evidence fails to reveal the tested grade level for males and thus no comparison between males and females regarding achievement can be made; and (d) the difference in grade levels attended (12th grade vs. 11th grade) between the two inmate populations is insignificant.

57. The average-length-of-stay data does not provide a valid reason for denying educational opportunities to the females at NCW because: (a) length of stay is not used to determine eligibility for males at NSP; (b) the differences in average length of stay between NCW and NSP "medium" custody inmates are small; and (c) even if one concentrates on the average length of stay for

"maximum custody" inmates, one out of five males stays less than 12 months, 40 percent stay less than 24 months, and since college work was offered to these inmates regardless of "length of stay," it is obvious that the "length-of-stay" justification is not a good reason for denying educational opportunities to women.

58. Dr. Ryan, who found that NCW violated an educational standard regarding "equity," provided data which indicated that males at OCC, who had similar levels of educational attainment compared to the women, but who had lesser security classifications, were offered college courses even though length-of-stay data for these males was similar to such data for a large proportion of females, thus suggesting that the "length-of-stay" justification is not a good reason for denying educational opportunities to women.

59. Regarding the programs described above which have been found to have substantially burdened the female inmates at NCW, (a) there is nothing about the need to segregate women from men that requires or justifies unequal educational opportunities for women; (b) to the extent that such unequal opportunities are postulated on the "special needs" of women, such notions are an afterthought, predicated on stereotypical assumptions about women which are inaccurate or irrelevant; (c) there is virtually no evidence that the differences in educational programming were the product of the exercise of reasoned discretion as opposed to being based on the untested assumption that women required different treatment; (d) the fact that women may have "special needs" is not a reason to provide them lesser educational opportunities; and (e) these programs are not directly and substantially related to an important governmental objective—an equal protection violation has been established regarding these programs.

### Vocational

60. Before July 1, 1991, the females at NCW who were enrolled in the clerical arts program were not substantially burdened because the program lacked sufficient computer capacity as the goal of the program was

modest (to provide entry-level skills), and the vocational programs at NSP were of comparable quality if not taken for a degree—no equal protection violation has been established in this regard.

61. Before July 1, 1991, the females at NCW were substantially burdened because they lacked the range of options that were made available to the men in vocational education in that: (a) the women had only one course to choose from during most of the period of time (clerical arts); (b) they could not receive college credit or a degree pursuing such a program; (c) even when horticulture was offered for approximately a year, such a program could not be taken for college credit or a degree, whereas the men at NSP had two courses to choose from (culinary arts and welding) which could be taken for college credit and a degree could be received for pursuing such studies.

62. After July 1, 1991, since NCW maintained at least one vocational education program and NSP none, the females were not substantially burdened for vocational education purposes—no equal protection violation has been established in this regard.

63. The women at NCW were not substantially burdened by the number of CSI employment options or the quality of CSI jobs at NCW as compared with NSP inasmuch as the women had options, albeit fewer in number than the men, and the jobs appeared to be of comparable quality—no equal protection violation has been established in this regard.

64. Prior to July, 1991, the inmates at NCW who took jobs in the CSI sewing factory were substantially burdened since they did not receive preemployment training of the quality the men received at NSP.

65. Regarding the CSI sewing factory and preemployment training, after July, 1991, the women were not substantially burdened since they received preemployment training which was similar in quality to that received by the men—after July, 1991, no equal protection violation has been established.

66. Regarding preemployment training for the data-entry program, the females at NCW are substantially burdened in that they receive no formalized preemployment training of any kind unless they need to know how to type, and, in any event, the preemployment training is not similar in quality to that received by the men.

67. The fact, if it is a fact, that NCW offered a truck-driving course and apprentice programs in the past but few, if any, inmates completed the programs is not persuasive evidence that the NCW inmates were not interested in vocational education options because: (a) the evidence about these past offerings is sketchy; (b) given the fact that it would be difficult to obtain a job driving a truck with a felony record, it is not surprising that few people completed the course; (c) the apprentice programs were probably too difficult for males or females; (d) Dr. Ryan evidently thought there was a sufficient need for options in that she recommended that the apprentice program be reactivated, thereby confirming the need for more vocational programs; and (e) when a properly designed course, such as horticulture, was offered as an option, the program was very successful.

68. While the prevocational courses offered by NCW known as Living Skills and MOLD were excellent, these programs did not address the vocational needs of the women and thus cannot be considered a substitute for a vocational program.

69. The fact, if it is a fact, that a greater percentage of women take advantage of vocational training at NCW compared to males at NSP is not persuasive evidence that the females are not burdened by inferior vocational programs because: (a) the order of magnitude between the statistics reveals little—7% of 560 NSP inmates is 40 inmates and 14% of 112 NCW inmates is 16 inmates; (b) the NSP programs take more time to complete and thus it is not surprising that a greater number of inmates at NCW could take advantage of vocational programs; (c) 25% to 30% of the NSP inmates would rather be idle, and since the percentage figures concerning use of programs fail to account for the desire of a substantial proportion of NSP males to do nothing, the use data is misleading; (d) if one excludes the males who do not want to be active, the percentage of males

using vocational programs increases by over 45% to about 10% of the NSP population; (d) on any given day there are more male inmates at NSP who do not wish to be busy than there are female inmates in total at NCW; and (e) the fact that a relatively large percentage of the females wanted vocational education attests to the motivation of the females and not some perceived equality of programs.

70. The fact, if it is a fact, that fewer women are "idle" at NCW compared to men at NSP is not persuasive evidence that the females are not burdened by inferior vocational programs because: (a) the survey was hurriedly prepared and may be grossly misleading since it counts as idle NSP men who worked half time and went to school half time; (b) the "idleness" study may have counted as "idle" a majority of inmates at NSP who both worked and went to school; (c) the study does not account for the great number of men (25% to 30%) who want to be "idle"; (d) the "idleness" data may be contradicted by Dr. Ryan's study in that if one took her data and applied the methodology used to obtain the "idleness" data, 75% of the females were "idle"; and (e) there was no showing that the "idleness" data was a factor in programming decisions at NSP or NCW.

71. Even setting aside the inherent difficulty in comparing costs between institutions of substantially different sizes, the cost data put forth by defendants is not persuasive since it includes costs for Living Skills and MOLD which are prevocational in nature, and thus the defendants' cost data wrongly inflates to an unknown degree the per capita costs for educating females.

72. Regarding the programs described above which have been found to have substantially burdened the female inmates at NCW, (a) there is nothing about the need to segregate women from men that requires or justifies unequal vocational opportunities for women; (b) to the extent that such unequal opportunities are postulated on the "special needs" of women, such notions are an afterthought, predicated on stereotypical assumptions about women which are inaccurate or irrelevant; (c) there is virtually no evidence that the differences in vocational program-

ming were the product of the exercise of reasoned discretion as opposed to being based on the untested assumption that women required different treatment; (d) the fact that women may have "special needs" is not a reason to provide them lesser vocational opportunities; and (e) these programs are not directly and substantially related to an important governmental objective—an equal protection violation has been established regarding these programs.

### Prerelease

73. Prerelease programs are designed to prepare an inmate for reentry into society, are considered by DCS to be academic and vocational in nature, and are important because there is evidence that such programs reduce recidivism.

74. Prerelease was fairly raised as an issue in the pretrial conference order, but even if it were not, I would grant leave to amend under Fed.R.Civ.P. 16 as it is clear that defendants were not surprised by the issue.

75. The prerelease programs at NCW and NSP are not identical, but from a qualitative standpoint they are comparable.

76. Prerelease programs have not been offered at NCW on a regular basis since 1988; as a result, the NCW inmates have been substantially burdened since January 1, 1989.

77. Programs like MOLD do not serve as a substitute for prerelease programs since prerelease programs, as such, were admittedly very important.

78. Regarding the prerelease program described above which has been found to have substantially burdened the female inmates at NCW, (a) there is nothing about the need to segregate women from men that requires or justifies unequal prerelease opportunities for women; (b) to the extent that such unequal opportunities are postulated on the "special needs" of women, such notions are an afterthought, predicated on stereotypical assumptions about women which are inaccurate or irrelevant; (c) there is virtually no evidence that the difference in prerelease programming was the product of the exercise

of reasoned discretion as opposed to being based on the untested assumption that women required different treatment; (d) the fact that women may have "special needs" is not a reason to provide them lesser prerelease opportunities; and (e) this program is not directly and substantially related to an important governmental objective—an equal protection violation has been established regarding this program.

## LAW LIBRARY PROGRAMS

### Segregation and Orientation

79. Prior to and until November, 1989, the women inmates who were segregated from the general population had no means of physical access to the law library and had to submit requests for materials to Ms. Axdahl, but males seem to have been similarly burdened according to *Reutcke*, 707 F.Supp. at 1127–32—while the female inmates may have proven a violation of *Bounds*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 they have not proven they were substantially burdened for equal protection purposes.

80. Prior to November, 1989, the women inmates segregated from the general population because they were in orientation had no means of physical access to the law library and had to submit requests for materials to Ms. Axdahl. It is unclear how the NSP males in orientation were treated. While the female inmates may have proven a violation of *Bounds*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72, they have not proven they were substantially burdened for equal protection purposes.

### Facilities, Research Materials and Hours

81. Simply because law libraries at prisons housing males and females are different in size or are operated differently does not mean that the women are substantially burdened for equal protection purposes. *Glover I*, 478 F.Supp. at 1096.

82. Simply because the state provides a law library acceptable under *Bounds* does not mean that women are treated appropriately for equal protection purposes. *Canterino II*, 644 F.Supp. at 739–40.

83. Prior to November, 1989, the law library was located in such a small room that individuals who wished to do research had to stand in an aisle, and the legal materials, until they were organized, were "piled all over" in an unusable condition; accordingly, the NCW inmates were substantially burdened in comparison to the NSP inmates who always had adequate facilities and an organized law library.

84. Until either late 1989 or early 1990, the NCW law library did not contain a "Shepard's" citator for Nebraska cases, and until October, 1990, the NCW law library did not contain a "Shepard's" citator for federal cases; accordingly, the NCW inmates were substantially burdened in comparison to the NSP inmates who always had adequate research materials.

85. Throughout the relevant time period, the NCW inmates had only about 1/3 of the time available to the NSP men to use the law library; accordingly, the NCW inmates were substantially burdened in comparison to the NSP inmates.

86. The fact, if is a fact, that the women could order research regarding Shepard's citations from the NSP law library does not lessen the burden on the NCW inmates occasioned by the lack of Shepard's citations because: (a) the process required the women to disclose their research projects to NCW staff, unlike the male inmates at NSP; and (b) the process of using Shepard's citations by mailing research requests is slow and cumbersome.

87. The fact, if it is a fact, that the NCW inmates can ask for extra time to use the law library does not lessen the impact of the time restrictions on the NCW inmates because: (a) the policy is new and perhaps an accident; (b) the policy is not written and is ripe for arbitrary enforcement; (c) the policy requires the NCW inmate to disclose why the extra time is needed; and (d) the policy is subject to the availability of NCW staff, and staff availability has been a significant problem.

88. The fact, if it is a fact, that more men use the NSP law library than females use the NCW law library is not indicative that the

females are not burdened, inasmuch as NCW law library usage has doubled since 1988.

89. With regard to the programs described above which have been found to have substantially burdened the NCW inmates, (a) there is nothing about the need to segregate women from men that requires or justifies unequal law library opportunities for women; (b) the suggestion, implicit in the substantially unequal programs, that women do not need law library facilities similar to those provided the men at NSP smacks of archaic notions of gender roles; and (c) the programs are not directly and substantially related to an important governmental objective—an equal protection violation has been established regarding these programs.

## MEDICAL AND DENTAL PROGRAMS

### Facilities and Doctors

90. While NCW relies upon the facilities of a local hospital and NSP has a hospital on its grounds, the inmates at NCW are not substantially burdened by these differences because there was no showing that the local hospital provided less than comparable care—no equal protection violation has been established regarding this program.

91. While NCW does not have a full-time doctor, and NSP does have a full-time doctor, there is no convincing evidence that the lack of a full-time doctor results in poor care compared to the care received by the male inmates at NSP—no equal protection violation has been established regarding this program.

92. Both NSP and NCW use the same type of procedure for referral to a doctor— no equal protection violation has been established regarding this program.

### Emergency Medical Coverage and Dental Care

93. At NSP, there is a full-time nurse on duty around the clock, while at NCW there is no around-the-clock medical coverage on grounds; accordingly, the NCW inmates are substantially burdened by the lack of such coverage in the event of a medical emergency.

94. The fact, if it is a fact, that the NCW nurses are available by telephone to consult in the event of a medical emergency is not an adequate substitute for on-grounds nursing coverage, as particularly evidenced by the incidents involving inmates Younger and Griffin.

95. The fact, if it is a fact, that no around-the-clock nursing coverage exists at OCC and HCC does not disprove an equal protection violation because: (a) DCS is endeavoring to provide such coverage for the great majority of male inmates in DCS custody; (b) there was little evidence about the ability of HCC or OCC to respond in the event of a medical emergency and thus no comparison can be made; and (c) the comparison institution is NSP, not OCC or HCC.

96. From 1988 through August, 1990, a contract dentist provided dental care about 4 hours per week at NCW, whereas during this time frame, a dentist and a dental hygienist were engaged full time at NSP; inasmuch as there was a backlog of NCW patients needing dental care from December, 1988, to August, 1990, the resulting lack of timely dental care substantially burdened the NCW inmates, as particularly evidenced by the lack of treatment of inmate Williamson.

97. The fact, if it is a fact, that the backlog in dental care did not amount to a violation of the Eighth Amendment does not disprove an equal protection violation.

98. The court does not second-guess DCS with regard to the need for around-the-clock nursing coverage inasmuch as DCS informed the Nebraska legislature that such coverage was needed, and the willingness to risk the safety of NCW female inmates but not NSP male inmates devalues the female inmates, which is an historic characteristic of gender bias.

99. The fact, if it is a fact, that the NCW inmate population increased during part of the period of the dental backlog does not establish a noninvidious explanation for the dental backlog since prior to the increase in population the inmate-to-available-dental-hour ratio greatly favored the NSP men.

100. With regard to the programs described above which have been found to have

substantially burdened the NCW inmates, (a) there is nothing about the need to segregate women from men that requires or justifies unequal medical or dental care for women; (b) the willingness to take risks with the NSP women but not the NSP men regarding around-the-clock nursing coverage devalues women inmates, a historic characteristic of gender discrimination; and (c) the programs are not directly and substantially related to an important governmental objective—an equal protection violation has been established regarding these programs.

## MENTAL HEALTH PROGRAMS

### Substance Abuse Treatment

101. As to substance abuse treatment which does not require inpatient treatment, with the exception of a few months, NCW inmates have always had available to them specific education and counseling regarding substance abuse problems from a certified drug and alcohol counselor, whereas at NSP, in contrast, no treatment groups are held specifically to address substance abuse problems; accordingly, the NCW inmates are not substantially burdened by any differences in treatment—no equal protection violation has been established regarding this program.

### Regular or "Straight" Treatment

102. Until August, 1990, when Deb Fitzgerald was hired, the NCW women were substantially burdened by the comparative lack of "straight" or regular treatment in that Judith Danielson was the only person at NCW who could provide such treatment and she was too busy to do so, whereas the males at NSP were able to receive such treatment from a psychologist and four mental health counselors.

103. Indeed, the DCS chief of psychology described the situation at NCW as one where "little on-going treatment previously occured [sic]."

104. The per capita cost figures do not disprove an equal protection violation, and, given the lack of an economy of scale at NCW, may tend to confirm the disparity.

105. After August, 1990, when Deb Fitzgerald was hired, the NCW women were no longer substantially burdened by a lack of "straight" treatment—no equal protection violation has been established regarding this time frame.

106. With regard to the program described above which has been found to have substantially burdened the NCW inmates, (a) there is nothing about the need to segregate women from men that requires or justifies unequal mental health care for women; and (b) the program is not directly and substantially related to an important governmental objective—an equal protection violation has been established regarding this program.

### Inpatient Programs

107. During all relevant times, males at NSP could receive specialized and intensive inpatient treatment at a DCS facility, designed to address the special needs of prisoners, in four areas: substance abuse, sexual offenses, serious mental illness, and social or developmental impairment, but the females had no similar opportunities; accordingly, the NCW inmates were substantially burdened.

108. At best, NCW inmates can receive treatment at a state mental hospital which is not controlled by DCS, and this transfer opportunity does not provide comparable treatment because: (a) NCW women cannot be treated for substance abuse at the state hospital; and (b) the programs at the state hospitals, unlike the DCS programs for males, are not designed to deal with the unique personalities of criminals.

109. As the head of psychology for DCS observed: "At the NCW as women inmates seek parity and equality with the mental health services offered to male inmates, additional resources will need to be developed to address the growing needs of these women. There also is a need for increased ability to treat women with major mental and behavioral disturbances as evidenced by the necessity to transfer women to the Department of Public Institutions...."

110. The DCS program which serves NSP and other male inmates provides specialized and intense treatment, and there is no reason to believe that women inmates lack the need for similar treatment.

111. With regard to the program described above which has been found to have substantially burdened the NCW inmates, (a) there is nothing about the need to segregate women from men that requires or justifies unequal mental health care for women; (b) the suggestion, implicit in the unequal treatment, that women do not need the same intensity of treatment devalues women and is characteristic of gender bias; and (c) the program is not directly and substantially related to an important governmental objective—an equal protection violation has been established regarding this program.

## RECREATION

### Hours, Numbers, and Sophistication of Programs

112. At all relevant times, NCW women were substantially burdened compared with their fellow NSP inmates in both general recreational opportunities and art and hobbycraft opportunities in the following ways: (a) in the number of hours of recreational, art and hobbycraft opportunities available to the women, particularly when no activities coordinator was employed, and (b) in the number and sophistication of recreational, art and hobbycraft activities available to the women, particularly when no activities coordinator was employed.

113. The men have much greater access to their gym.

114. The men have much greater access to their "yard."

115. Defendants "readily admit that more recreational activities are scheduled at NSP than NCW"—in fact, the numbers and sophistication of such activities greatly favor NSP males.

116. The assertion that women at NCW are not burdened because they are much less "idle" than the NSP men is not persuasive for, among other reasons, even if one assumes the validity of the "idleness" data, many men at NSP are not "idle," and for these men NSP provides a much better recreational program than for similarly busy female inmates at NCW.

117. Even if one accepts the assertion that the females at NCW have not complained, it is fallacious to assume that the inmates at NCW do not want or need comparable recreation programs.

118. With regard to the program described above which has been found to have substantially burdened the NCW inmates, (a) there is nothing about the need to segregate women from men that requires or justifies unequal recreational opportunities for women; (b) the suggestion, implicitly made regarding the "idleness" data, that women do not want or need similar recreational opportunities devalues women and is characteristic of gender bias; and (c) the programs are not directly and substantially related to an important governmental objective—an equal protection violation has been established regarding these programs.

### Plant and Equipment

119. Although the plant and equipment at NCW and NSP are different, the NCW women are not substantially burdened by any differences as there is little reason to believe the differences cause any serious limitation in activities—no equal protection violation has been established in this regard.

### Orientation

120. Orientation inmates at NCW may use the law library during their one hour of recreation and for additional periods of time as needed.

121. The orientation inmates have access to indoor recreation but not outdoor recreation.

122. Since the orientation period is fairly short (normally not more than 30 days), and the NCW orientation inmates are offered some recreational opportunities, the NCW inmates are not substantially burdened when compared to their male counterparts, even if it is assumed that the male orientation inmates have somewhat more liberal recreation privileges—no equal protection violation has been established in this regard.

### Segregation

123. From my tour of the two facilities, it appears that the recreation facilities for inmates in segregation are similar, and thus

the inmates at NCW are not substantially burdened by any difference in facilities for segregation inmates—no equal protection violation has been established in this regard.

124. To the extent that during a short period of time (January through April, 1990) NCW segregation inmates were confined to exercise indoors (in a hallway), but the males were granted outdoor exercise privileges, such a burden was not substantial—no equal protection violation has been established in this regard.

## VISITATION

### General Population

125. At NCW, women can have visitors during four-hour blocks of time on Thursday, Friday, Saturday, and holidays; for a time, those visits could not exceed 20 hours per month.

126. At NCW, women who are mothers can also have MOLD visits where the inmate visits with her child on grounds overnight for a period of up to five 24–hour blocks of time each month; the NSP men have no similar visitation opportunities.

127. NSP inmates may have up to 8 hours of visitation on weekdays or 4 hours on weekends, but in order to reduce visiting on weekends, an NSP inmate may not have visitations on both weekdays and weekends.

128. There was no monthly visitation limit for NSP inmates.

129. The fact that males at NSP can have more hours of general visitation per week does burden the females, but the burden is not substantial and the differences involve operational detail in which the court ought not to involve itself, *Pitts*, 866 F.2d at 1464—no equal protection violation has been established.

### Orientation

130. Sometime after late spring or early summer of 1988, the orientation inmates at NCW had privileges similar to the general population at NCW—since the general population is not substantially burdened, the orientation inmates are likewise not substantially burdened by the same policy.

131. Until the policy changed in late spring or early summer of 1988, the NCW orientation inmates, unlike NSP inmates in orientation, were not allowed to have visitors or use the telephone; accordingly, the females at NCW were substantially burdened by the differences in visitation policies.

132. There was a legitimate penological purpose in prohibiting orientation inmates of either sex from having visitations or using the telephone; that is, the state had a legitimate interest in easing the transition from citizen to prisoner.

133. The means—a quarantine—is directly and substantially related to the objective—easing transition to prison life, and, since the NCW policy was changed soon after NCW learned of the differences in treatment between males at NSP and females at NCW, the original NCW nongender-based policy was not a pretext for discrimination and was evidently not used because of some archaic notion about women—no equal protection violation has been established in this regard.

## TITLE IX

134. Title IX, 20 U.S.C. §§ 1681–1688, prohibits sex discrimination in educational programs receiving federal assistance, and applies to prisons. *Canterino I,* 546 F.Supp. at 209–10; *Beehler v. Jeffes,* 664 F.Supp. at 940.

135. DCS received federal funds under the Perkins Act, 20 U.S.C. § 2301, *et seq.*

136. The Perkins Act funds were used in DCS adult prison prerelease programs from at least 1988 through at least July 1, 1991.

137. DCS and Gunter gave assurances of nondiscrimination in an application for Perkins Act monies.

138. Since plaintiffs have established a denial of equal protection of the laws from January 1, 1989, to the present by virtue of the failure of NCW to offer regularly scheduled prerelease programs to NCW inmates, the plaintiffs have also proven a violation of Title IX from at least January 1, 1989, to at least July 1, 1991, because DCS received Perkins Act funds for such prerelease programs.

139. Setting aside the question of damages, defendants have cited no convincing precedent for the proposition that intentional discrimination is an element of a cause of action under Title IX where the classification is explicitly based on gender; the precedent is to the contrary. *Canterino III*, 564 F.Supp. at 714–15.

140. It is likely, however, that intentional discrimination must be shown under Title IX in order to recover damages. *Franklin v. Gwinnett County Pub. Schs.*, —— U.S. at ——, 112 S.Ct. at 1037.

141. Intentional discrimination can be shown in a number of ways, and (a) disproportionate impact is not irrelevant, but it is not the sole touchstone of invidious discrimination; and (b) discriminatory purpose is central to the inquiry, but the challenged action need not be motivated solely or even primarily by a discriminatory purpose. *Village of Arlington Heights*, 429 U.S. at 265–68, 97 S.Ct. at 563–65.

142. Intentional discrimination has been shown in this case because: (a) there has clearly been proven a disproportionate impact (substantial burden) upon NCW females resulting from the gender classification regarding the prerelease program specifically and NCW programs generally; (b) applying *Hogan* and *Pitts*, it has been established that the means causing the substantial burdens are premised upon stereotypical or archaic notions of women and are not directly and substantially related to legitimate governmental objectives; and (c) defendants Gunter and Clarke, directors of DCS, displayed deliberate indifference to, or tacit authorization of, the practices which violated the Equal Protection Clause and Title IX.

143. The Eleventh Amendment immunity of the State of Nebraska was abrogated regarding the Title IX violation by the Civil Rights Remedies Equalization Amendment of 1986, 42 U.S.C. § 2000d–7. *Franklin v. Gwinnett County Pub. Schs.*, —— U.S. at ——, 112 S.Ct. at 1036.

## ACCESS TO THE COURTS

144. In 1977, the Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds*, 430 U.S. at 828, 97 S.Ct. at 1498 (footnote omitted).

145. In January and June, 1988, Magistrate Judge Piester and Judge Urbom found that "[t]he simple fact is that if the state denies a prisoner direct physical access to a law library, the state must provide that prisoner, no matter what his status, with assistance by trained, skilled, and independent legal personnel." *Reutcke*, 707 F.Supp. at 1132.

146. No showing of actual prejudice is required where the inmate establishes that the system of providing access to the courts is not in compliance with *Bounds*. *Reutcke*, 707 F.Supp. at 1129.

## Segregation and Orientation Inmates

147. It was not until sometime in January, 1989, that a trained inmate legal aide was appointed to assist NCW inmates.

148. The orientation and segregation inmates at NCW had no physical access to the law library until November, 1989.

149. A violation of *Bounds* has been established regarding the inmates who were in segregation or orientation at NCW until January, 1989, since these inmates had no physical access to the law library or the assistance of a trained legal aide—a violation of *Bounds* has been established for this period of time.

150. The system of asking Ms. Axdahl for assistance was not an adequate substitute for a trained inmate legal aide because she was not independent. *Reutcke*, 707 F.Supp. at 1132.

151. After January, 1989, since NCW provided the assistance of a trained inmate legal aide, NCW provided all that *Bounds* required as there is no requirement that the state provide both a law library and trained legal assistance, so long as either method alone is found adequate to satisfy the "meaningful assistance" requirement of *Bounds*. *Reutcke*, 707 F.Supp. at 1131 n. 21.

152. The availability of and training for the inmate legal aide was sufficient to provide "meaningful assistance" as required under *Bounds*, and, accordingly, after January, 1989, there was no violation of *Bounds* insofar as the segregation and orientation inmates are concerned.

### General Population

153. Prior to January, 1989, plaintiffs have proven a violation of *Bounds* because: (a) no trained and independent inmate legal aide had been appointed; and (b) the law library was not adequate in that one had to "stand in the aisle" because the only table was a small typewriter stand, and the legal materials were not organized but "just were kind of piled all over."

154. Although the *Bounds* Court considered the failure to include Shepard's Citations in the collection list of a prison law library as a "questionable omission," *Bounds*, 430 U.S. at 819–20 n. 4, 97 S.Ct. at 1493–94 n. 4, the Court did not conclude that such an omission established a violation of the right of access to the courts, and other courts have generally found such an omission does not establish a constitutional violation. *Lindquist*, 776 F.2d at 856.

155. After January 1, 1989, an inmate legal aide was appointed and she organized the law library.

156. The inmate legal aide testified that after her training she could "look up a case"; she developed a familiarity with a "few" forms for filing cases; and, although not satisfied with the results, she was able to file suit in a variety of situations.

157. The Court's main concern in *Bounds* was protecting the ability of an inmate to prepare a complaint. *Bounds*, 430 U.S. at 828 n. 17, 97 S.Ct. at 1498 n. 17.

158. After January 1, 1989, since a trained and independent legal aide was appointed, despite the problems with the law library, the minimum requirements of *Bounds* were satisfied—no violation of the right of access to the courts has been established for this time frame.

### Relationship Between Equal Protection Claim and Access Claim

159. The NCW inmates do not contend that the number of hours the library was open violated their right of access to the courts under *Bounds*, although they do claim that the fact that the library hours at NCW are less than 1/3 of the time available to the men at NSP violates the Equal Protection Clause.

160. The position of the plaintiffs described in the preceding paragraph is not inconsistent. *Canterino II*, 644 F.Supp. at 740–41.

161. Even though *Bounds* does not require NCW to provide both an adequate law library and trained inmate legal aides, the combination of an equal protection violation and the violation of *Bounds* may justify a remedy greatly exceeding the minimum requirements of *Bounds*. *Canterino II*, 644 F.Supp. at 740–41.

### MEDICAL

162. Plaintiffs claim that the defendants have been deliberately indifferent to the serious medical needs of the NCW inmates, and have thereby violated the Eighth Amendment. *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292.

163. In most respects, the facts of this case are similar to the facts in *Canterino I*, 546 F.Supp. at 199–201, and there, the court found no Eighth Amendment violation. *Id.* at 214–15.

164. However, unlike *Canterino I*, there was troubling evidence in this case of either lack of treatment or delay in treatment respecting serious medical needs, as evidenced by (a) the "bee-sting" incident involving inmate Younger who went into shock, (b) the postsurgery troubles of inmate Griffin who had significant bleeding, and (c) the incident involving inmate Williamson who waited a year to receive dental care which, according to the dentist, required treatment "ASAP." *Johnson*, 941 F.2d at 707.

165. Each of these incidents was serious enough so as to implicate the Eighth Amendment. *Hudson*, —— U.S. at ——, 112 S.Ct. at 1000.

166. To the extent that she was involved in the actual treatment, the actions of defendant Wehland (a nurse) were such that it cannot be concluded that she consciously refused to take steps to deal with the problem. Manual of Model Jury Instructions for the District Courts of the Eighth Circuit § 4.14, at 61.

167. While there is cause for concern about whether defendants were deliberately indifferent, the evidence does not persuade me that any of the defendants subjectively or objectively intended to punish the NCW inmates; accordingly, no Eighth Amendment violation has been established. *Wilson*, —— U.S. at ————, 111 S.Ct. at 2323–25.

## LIABILITY OF INDIVIDUAL DEFENDANTS

### Personal Involvement

168. The remaining individual defendants held supervisory positions with DCS or NCW.

169. Title 42 U.S.C. § 1983 imposes liability where there is an affirmative link between the occurrence of an incident of misconduct and the adoption of a plan or policy—express or otherwise—showing the supervisory officials' authorization or approval of the misconduct. *Rizzo*, 423 U.S. at 370–71, 96 S.Ct. at 603–04.

170. A prison official may be held liable if culpability is established in one of three ways: (a) personal administrative involvement, (b) personal knowledge, or (c) through breach of a legal duty that proximately causes the injury. *Johnson–El*, 878 F.2d at 1049–50.

### Equal Protection/Title IX Violations— Gunter and Clarke

171. A prison official is responsible for his or her own acts or failures to act where the official is on notice of a constitutional violation and despite having the authority to counteract the violation, fails to do so. Gunter and Clarke are liable. *Santiago*, 774 F.Supp. at 790.

172. Both Gunter and Clarke, as directors of DCS, had the right and affirmative duty under state law to make policy for all institutions housing prisoners in Nebraska, including the power to hire and fire superintendents at NCW and to delegate (or refrain from delegating) powers to such superintendents. Neb.Rev.Stat. § 83–173.

173. Pursuant to *Jane Doe A*, 901 F.2d at 645–47, the court should judge the actions of the defendants based upon a four-part test causing an inquiry as to: (a) whether the defendant received notice of a pattern of unconstitutional acts committed by others; (b) whether the defendant demonstrated deliberate indifference to or tacit authorization of the offensive acts; (c) whether the defendant failed to take sufficient remedial action; and (d) whether any failure to take sufficient remedial action proximately caused the injury or damage.

174. It is beyond question that Gunter and Clarke received notice of the unconstitutional violations because: (a) in a memo in February, 1988, Gunter was told of superintendent Lofgreen's warning of complaints by NCW inmates and the fact that NCW could not offer academic and vocational programs "anywhere near as comprehensive" as those at NSP and other male institutions; (b) both Gunter and Clarke were present at a meeting in March, 1988, when a very detailed grievance by more than half the inmates at NCW was submitted describing complaints about lack of parity in programs and services implicating virtually every facet of prison life; (c) Gunter had further notice when the federal lawsuit was filed in July, 1988; and (d) Gunter received additional notice from a report authored by a DCS consultant, Dr. Ryan, in May, 1989, which indicated that inequality existed in vocational and educational programs ·at NCW, and that such inequality had resulted in litigation.

175. Gunter, and later Clarke, displayed deliberate indifference to, or tacit authorization of, the offensive practices in that: (a) aside from an investigation by DCS legal counsel that evidently took not much more than seven days, Gunter caused little or no investigation to be made of the detailed inmate grievance; (b) although the inmates at NCW were notified of the formation of a "task force," Gunter's task force did nothing of substance even though "review of this

grievance [was] its first task"; (c) after creating the task force, Gunter did nothing to invigorate it; (d) Gunter promised the inmates certain reforms, but only one was implemented in a timely fashion and it took the filing of a lawsuit before the promised equal pay and training for inmate legal aides was accomplished; (e) the filing of the lawsuit did not prompt Gunter to investigate further; (f) although Gunter personally met with Dr. Ryan, Dr. Ryan's report did not prompt Gunter to act; and (g) when Clarke became director he had "definite intentions" to become familiar with "equity issues," but he did not pursue the matter to any significant degree. *Howard v. Adkison*, 887 F.2d at 138.

176. Gunter and Clarke failed to take sufficient remedial measures; indeed, more than four years after the NCW inmate grievance, some of the offensive practices still exist.

177. The failure to take adequate and timely remedial measures was certainly a proximate cause (if not the only cause) of the fact of damage and injury.

178. The fact, if it is a fact, that there were procedures at DCS intended to assure "consistency" does not disprove deliberate indifference because: (a) as Clarke admitted, there was no person responsible for parity at DCS; (b) the appointment of the "task force" is highly probative evidence that existing systems were not effective; (c) the fact that the "task force" did nothing is highly probative evidence that the directors were deliberately indifferent; (d) the Ryan report is highly probative evidence that the "consistency" procedures were not effective; (e) the fact that the Ryan report did not prompt action is highly probative evidence that the directors were deliberately indifferent; (f) the procedure for reviewing DCS regulations and institutional operational memoranda did not involve comparisons to determine whether women were receiving parity of treatment; (g) accreditation reviews did not involve comparisons of institutions to determine parity of treatment; and (h) the meetings of the institutional heads were not intended, as Clarke admitted, to discuss or compare programs.

## Equal Protection/Title IX Violations— Remaining Defendants

179. Although Wehland was the "head nurse" and in that capacity had certain program responsibilities, I do not understand the plaintiffs to claim that she was sufficiently personally involved in the decision process so as to have liability for equal protection or Title IX violations—Wehland is not liable.

180. In any event, the evidence is not sufficient to support a finding against Wehland; for example, it was a DCS staff person who ultimately decided that nursing coverage would not be provided 24 hours a day at NCW—Wehland is not liable.

181. As to the superintendents, before they can have liability for the violations they must have had the power and knowledge to deal with the violations—the superintendents are not liable for the equal protection and Title IX violations. *Slakan*, 737 F.2d at 373.

182. The power of the superintendents under Nebraska law is limited, Neb.Rev.Stat. § 83–177, the director of DCS, and the director alone, sets policy, Neb.Rev.Stat. § 83–173(3), and it is the director who delegates appropriate powers to the facility heads. Neb.Rev.Stat. § 83–173(4).

183. The evidence strongly indicates that the superintendents did not have the delegated authority to make decisions about what programs to offer, as Clarke, who had been a warden before becoming director, stated: "Basically the programs are set at the DCS level ... [W]e did not question ... why."

184. When Gunter appointed the "task force," he did not want one person to authorize an exception to policy, and once Gunter essentially denied the NCW inmate grievance and refused to change most of the existing programs at NCW, the superintendents had no authority to consider "parity" issues.

185. The superintendents were ill-suited to deal with far-reaching policy questions like "parity" because such questions required comparisons between institutions housing males and females, and as Clarke stated, a "particular superintendent is not positioned to know what's occurring in one facility vs. [another]."

186. These factors—lack of power and knowledge—distinguish this case from *Canterino III*, 564 F.Supp. at 714–15, insofar as the superintendents are concerned.

### Access-to-the-Courts Violations

187. Since the violations regarding access to the courts ended in January, 1989, Wayne has no liability because he did not become superintendent until January, 1989.

188. Since the violations regarding access to the courts ended in January, 1989, Clarke can have no liability because he did not become director until August, 1990, and there is no evidence that the directors of DCS were aware of or sanctioned the access-to-the-courts violations.

189. Gunter is not liable for the access-to-the-courts violations because he did not have sufficient personal involvement in the violations; in particular, the March, 1988, grievance from the NCW inmates was phrased in terms of parity and did not specifically complain about the inadequate law library or the restrictions on the use of the law library by inmates in segregation or orientation.

190. While the issues presented in *Reutcke v. Dahm*, or very similar issues, were detailed in a memorandum addressed to Gunter in February, 1988, the memorandum did not give Gunter notice that NCW was not in compliance with *Reutcke*.

191. This does not mean that Gunter escapes liability for an equal protection violation that also constituted an access-to-the-courts violation; that is, Gunter is liable for the equal protection violation regarding the law library because the library was poor compared to the NSP library; the issue of parity was Gunter's responsibility; he had specific notice of the claim of inequality; and he did nothing of substance to deal with it.

192. It is not inconsistent to also conclude that Gunter escapes liability because the law library did not comply with *Bounds*, inasmuch as compliance with *Bounds* was the responsibility of the individual superintendents and Gunter was not notified of the noncompliance with *Bounds*.

193. There can be more than one proximate cause of injury or damage and different liability theories for each proximate cause.

194. Since it was their policies which ran afoul of *Bounds*, Lofgreen and Tewes are liable for the access-to-the-courts violations. *Reutcke*, 707 F.Supp. at 1134.

195. There is little doubt that the physical condition of the law library was the "policy" of the superintendents, given the small size of NCW and the fact that Wayne recognized he was dealing with "policy" when he moved the library upon becoming superintendent so "it would be easier to find volumes and reference material they were seeking."

196. There is little doubt that the restrictions on segregation and orientation inmates' physical access to the law library was a "policy" of the superintendents; for example, inmate Younger testified that Lofgreen personally denied her access to the law library when she was in segregation and Tewes approved a policy of denying physical access to the law library when he authorized segregation inmates to have law books in segregation (a policy which also violated *Bounds*, according to *Reutcke*, 707 F.Supp. at 1130).

197. There is little doubt that Lofgreen and Tewes knew there were no trained inmate legal aides, and they knew the inmates claimed to need help, as evidenced by (a) the Lange grievance to Lofgreen in June, 1988, (b) the Lange communication form regarding writing to the NSP legal aide answered by Tewes in August, 1988, and (c) the Lange correspondence about assisting an inmate in segregation answered by Tewes in August, 1988.

198. Lofgreen and Tewes are liable for the access-to-the-courts violations.

### Qualified Immunity

199. Government officials who perform discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738; *Creighton*, 483 U.S. at 638–41, 107 S.Ct. at 3038–40.

200. A decision as to whether a right is clearly established requires an inquiry into the particular acts or omissions and the law which would have given a reasonable person notice that such acts or omissions would violate constitutional rights. *Myers,* 810 F.2d at 1459 n. 16.

201. As to the equal protection claims, similar suits have been successfully brought in different jurisdictions since 1974, and the law is settled enough to deny defendants qualified immunity as to the equal protection claims. *Canterino I,* 546 F.Supp. at 209–12; *Bukhari,* 487 F.Supp. at 1171–72 (quoting *Barefield v. Leach,* No. 10282 (D.N.M.1974); *Glover I,* 478 F.Supp. at 1079–83.

202. The contours of Title IX in the prison context are sufficiently well established so as to deny the defendants qualified immunity as to this claim. *Canterino I,* 546 F.Supp. at 209–10; *Canterino III,* 564 F.Supp. at 714–15; *Beehler,* 664 F.Supp. at 938–41.

203. The claims regarding access to the courts involve well-established areas of the law, and therefore qualified immunity is denied as to these claims. *Bounds,* 430 U.S. at 821, 97 S.Ct. at 1494; *Reutcke,* 707 F.Supp. at 1135.

Accordingly,

IT IS ORDERED that:

(1) As to the defendants for whom the court has found no liability (Wayne, Wehland, and Danielson), the Clerk of the United States District Court for the District of Nebraska shall withhold judgment pending conclusion of the remedial phase of trial regarding the remaining defendants for whom the court has found liability;

(2) Within ten (10) days of this date, plaintiffs' counsel shall confer with defendants' counsel and the chambers of Judge Kopf to schedule a telephone conference, and within ten (10) days of this date plaintiffs' counsel shall initiate a telephone conference with the court and counsel to discuss the remedial phase of trial;

(3) During the telephone conference, counsel shall be prepared to discuss whether the court should permit an interlocutory appeal by either plaintiffs or defendants pursuant to 28 U.S.C. § 1292(b).